IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SABEIN BURGESS,                                    )
                                                   )
                                                   )
                Plaintiff,                         )
                                                   )
        v.                                         )
                                                   )
BALTIMORE POLICE DEPARTMENT,                       )
DETECTIVE GERALD ALAN GOLDSTEIN,                   )
DETECTIVE WILLIAM RITZ,                            )
DANIEL VAN GELDER, OFFICER DALE WEESE,             )
OFFICER RICHARD PURTELL, DETECTIVE/SGT.            )
STEVEN LEHMAN, DETECTIVE ROBERT PATTON,            )
DETECTIVE NEVERDON, UNKNOWN EMPLOYEES              )
OF THE BALTIMORE POLICE DEPARTMENT, AND            )
MAYOR AND CITY COUNCIL OF BALTIMORE.               )        JURY DEMAND
                                                   )
                Defendants.                        )

## **COMPLAINT**

Plaintiff SABEIN BURGESS, by his undersigned attorneys,
complains of Defendants, BALTIMORE POLICE DEPARTMENT, DETECTIVE
GERALD ALAN GOLDSTEIN, DETECTIVE WILLIAM RITZ, DANIEL VAN
GELDER, OFFICER DALE WEESE, OFFICER RICHARD PURTELL,
DETECTIVE/SGT. STEVEN LEHMAN, DETECTIVE ROBERT PATTON, DETECTIVE
NEVERDON, UNKNOWN EMPLOYEES OF THE BALTIMORE POLICE DEPARTMENT,
and MAYOR AND CITY COUNCIL OF BALTIMORE as follows:

### **Introduction**

1.   Plaintiff Sabein Burgess spent 19 years in prison
for a murder that he did not commit.

2.     Mr. Burgess was convicted after the police withheld and fabricated evidence.  In particular, the Defendants concealed statements of the victim's son revealing that he had seen the offender and it was not Plaintiff.  Rather than search for the real killer, the Defendants instead fabricated gunshot residue ("GSR") evidence falsely inculpating Plaintiff in the crime.

3.     Years after his conviction, however, the real killer confessed to the crime and the fabricated GSR evidence was exposed as a sham.

4.     As a result, Mr. Burgess was finally able to prove his innocence and secure his release from prison.  This lawsuit seeks redress for his injuries and for the Defendants' misconduct.

## Jurisdiction and Venue

5.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

6.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.  Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to this complaint occurred in this judicial district.

## The Parties

7.   Plaintiff is a 44 year-old resident of Baltimore, Maryland.  Mr. Burgess was born and raised in Baltimore.  He has one daughter.

8.   At all times relevant hereto, Defendants Gerald Alan Goldstein, William Ritz, Dale Weese, Richard Purtell, Steven Lehman, Robert Patton and Detective Neverdon were police officers in the Baltimore Police Department (hereinafter "Officer Defendants").  All are sued in their individual capacities, and acted under color of law and within the scope of their employment during the investigation of the murder at issue.

9.   At all times relevant hereto, Defendant Daniel Van Gelder worked in the Baltimore Police Department Crime Laboratory and was employed by the Baltimore Police Department. Defendant Van Gelder is sued in his individual capacity, and acted under color of law and within the scope of his employment during the investigation of the murder at issue.

10.   Defendant Baltimore Police Department (hereinafter "Department" or "Police Department") is or was the employer of each of the Officer Defendants and Defendant Van Gelder.  The Police Department is a person within the meaning of 42 U.S.C. § 1983.

3

11.   Defendant Mayor Stephanie Rawlings-Blake and Defendant City Council of Baltimore ("City of Baltimore") was and is a municipal corporation, organized and existing under the laws of the State of Maryland.   In this respect, the City of Baltimore acted through its agents, employees and servants, who held responsibility for the conduct of the police officers employed by the Baltimore City Police Department.

## The Crime

12.   On October 5, 1994, Michelle Dyson was at home with her four children.   At the time, Ms. Dyson and Plaintiff were dating, a relationship that all persons, including Ms. Dyson's children, described as loving and caring.

13.   Earlier in the night, Plaintiff was with Ms. Dyson and her children.   Ms. Dyson put her children to bed.

14.   After Plaintiff stepped out, two men pushed their way into Ms. Dyson's home and ordered her to go down to the basement.   She was then shot at close range and killed.

15.   Plaintiff had absolutely nothing to do with this terrible crime.

16.   As soon as he returned to Ms. Dyson's home and learned of the shooting, Plaintiff ran to ask a neighbor to call 911 and returned to Ms. Dyson's home to be with her.

17.   Plaintiff then cradled Ms. Dyson in his arms and tilted her head to try to remove the blood from her mouth.

### The Police Investigation

18.   The Officer Defendants responded to Ms. Dyson's home that evening.   When they entered Ms. Dyson's house, they noticed that the basement door was ajar and called out to see if anyone was down there.   Plaintiff responded that he was, and complied with the Officer Defendants' orders to come upstairs.

19.   Plaintiff was then handcuffed.

20.   At the request of the Officer Defendants, a crime scene technician then swabbed both of Mr. Burgess' hands.   The technician swabbed the inside of the palms of both of Plaintiff's hands.

21.   Plaintiff was taken to the police station where he was interrogated by the Officer Defendants.   During that interrogation, the Officer Defendants told Plaintiff that he was going away for murder.   When Plaintiff denied any responsibility for the crime, the Officer Defendants told him that they would find people to say that Plaintiff fired the gun that killed his girlfriend.

### The Defendants' Misconduct

22.   Notwithstanding their threats to Plaintiff, as early as the night of the murder, the Officer Defendants knew that Plaintiff was innocent.

23.   That night, the Officer Defendants spoke to Ms. Dyson's children.   Ms. Dyson's son came out of his bedroom after

he heard someone at the door.  Ms. Dyson's son told the Officer Defendants that he then saw someone barge into their home right before his mother was killed.  The Officer Defendants asked Ms. Dyson's son if that person was Ms. Dyson's boyfriend.  Ms. Dyson's son told the Defendants that it was not Plaintiff.

24.   Despite the obvious exculpatory value of this statement, it was never disclosed to the prosecutor or to Plaintiff or his criminal defense lawyer.

25.   Because Ms. Dyson's children had just lost their mother, their grandmother did not let them see or speak to Plaintiff or his criminal defense attorney.

26.   Instead of disclosing the exculpatory information provided to them by Ms. Dyson's son, the Officer Defendants fabricated police reports stating that all of Ms. Dyson's children were asleep at the time of the shooting and therefore did not see anything.  Based on the Defendants' false statements, the prosecutor repeated that false narrative in her opening and closing statements at Plaintiff's criminal trial.

### The Fabricated Gun Shot Residue Results

27.   Mr. Burgess was released from police custody the morning after his girlfriend was killed.  There was no evidence implicating him in Ms. Dyson's murder.

28.   Rather than search for the real killer, the Officer Defendants instead turned to and conspired with

Defendant Van Gelder to fabricate GSR evidence that would falsely implicate Plaintiff in the crime.

29.   Approximately a month after the shooting, Defendant Van Gelder completed his gun shot residue ("GSR") analysis.  The results of that analysis were patently false.

30.   First, Defendant Van Gelder's falsely reported that GSR swabs were taken from the "webbing" of Plaintiff's hands – between the back of the thumbs and forefingers.  But the "webbing" of Plaintiff's hands were not swabbed; instead, the technician swabbed the inside of the palms of Plaintiff's hands.

31.   That lie was important because Defendant Van Gelder used it to falsely state that the GSR results showed that Defendant either fired a gun or was adjacent to a gun that was fired.  According to Defendant Van Gelder, there could be no other reason for GSR to show up on that part of Plaintiff's hands.

32.   Second, Defendant Van Gelder also falsely stated that any positive GSR finding from Plaintiff's hands could not have been the result of the transfer of GSR particles from Ms. Dyson to Plaintiff when Plaintiff was cradling her in his hands after she was shot.  That statement was not only patently false, but also had no legitimate basis in science.

33.   Defendant Van Gelder shared his fabricated findings with the Officer Defendants.  For their part, the

Officer Defendants knew that Defendant those findings were
false; they had conspired to manufacture them.

34.   Defendant Van Gelder also told the prosecutor
about his fabricated findings despite knowing that these
statements were untrue.

35.   Defendant Van Gelder never disclosed to the
prosecutor or Plaintiff the falsity of his statements or the
manner in which he fabricated them.  Nor did he and the Officer
Defendants disclose to the prosecutor the fact that they
conspired to fabricate the GSR results.

36.   Based on Van Gelder's fabricated findings, Mr.
Burgess was charged with murder.

### Plaintiff's Wrongful Conviction

37.   Plaintiff's trial lasted two days, after which he
was found guilty of the murder of Michelle Dyson.  The primary –
and virtually only – evidence used against him was Defendant Van
Gelder's fabricated GSR findings.

38.   Defendant Van Gelder's false evidence was
presented at trial.  It categorically rejected all scenarios in
which GSR particles could have transferred from Ms. Dyson to
Plaintiff and instead, offered that the GSR results were
consistent with only one of two theories, each of which
implicated Plaintiff in the murder:  either Mr. Burgess fired a

firearm killing Ms. Dyson or his hand was near the firearm that killed her when it was fired.  That testimony was a lie.

39.   Following his conviction, Plaintiff was sentenced to life in prison. During his sentencing, rather than seek a lower sentence by accepting responsibility, Plaintiff continued to maintain his innocence explaining:

> I would like to let you know that I'm innocent . . . I don't understand how I was tried and convicted for a crime that I didn't do.

**The Real Killer Confesses**

40.   In October 1998, one of the real perpetrators of Ms. Dyson's murder, Charles Dorsey, wrote a letter confessing to the crime.  Dorsey stated that Plaintiff was doing time for a murder that he had committed.  Dorsey repeated that admission several times in letters to Plaintiff's criminal defense attorney and acknowledged that by doing so, he could face charges for first-degree murder.

41.   Nearly one year later, Defendant Ritz and another Baltimore police detective interviewed Dorsey but did no additional follow-up because, according to their report, Dorsey's confession lacked details that the real killer would know.

42.   That claim, however, was patently false.  For example, Dorsey not only told the Detectives about the caliber of weapon used, but also the correct number and location of the

gunshot wounds sustained.  Dorsey also correctly told Defendant Ritz that he removed a safe with money and personal papers from a second-story bedroom.

43.   According to Dorsey, he and another person, Howard Rice, were the sole perpetrators of the Dyson homicide; Rice forced his way into Ms. Dyson's home with Dorsey following later behind, and they both shot and killed her in her basement.

### Defendants Hide Evidence of the Real Killer

44.   Even before Dorsey confessed to the crime, the Defendants were well aware of Howard Rice's involvement in the Dyson murder.  In fact, the Officer Defendants knew of Rice's culpability well before Plaintiff's conviction.

45.   For example, in 1996, the Officer Defendants questioned an unrelated witness about whether Rice was responsible for the Dyson shooting.

46.   That the Officer Defendants knew of an alternate – and correct – perpetrator was never disclosed to the prosecutor or to Plaintiff or his criminal defense attorney.

### Plaintiff's Exoneration

47.   Never giving up hope that he would be able to prove his innocence, Mr. Burgess continued to fight for his release while incarcerated.

48.   The Mid-Atlantic Innocence Project ("MAIP") eventually began representing Mr. Burgess.  In April 2010, in

response to a request from the MAIP, the police turned over handwritten police notes that had never been disclosed to anyone before; included in those notes was information that Ms. Dyson's son provided to the Defendants about his mother's killing.

49. Later, Ms. Dyson's son confirmed via letter and affidavit that he knew that Plaintiff was innocent because he saw the offender and it was not Plaintiff.

50. Armed with that new evidence and other evidence refuting the fabricated GSR findings, in December 2013, Plaintiff filed a Petition for Writ of Actual Innocence.

51. On February 21, 2014, the State agreed to vacate Plaintiff's conviction and all charges against him were dismissed.

52. On August 7, 2014, Plaintiff filed a notice of claim with the City Council, Mayor, Baltimore Police Department and State of Maryland.

### Baltimore's Policy and Practice of Conducting Flawed Investigations

53. The constitutional violations that caused Plaintiff's wrongful conviction were not isolated events. To the contrary, they were the result of the Baltimore Police Department's policies and practices of pursuing wrongful convictions through reliance on profoundly flawed investigations.

54.   In a race to clear murder cases, the Department cut corners and rushed to judgment.  Sometimes those constitutional errors were exposed prior to prosecution: In 1988, nearly 10 percent of Baltimore's 234 homicides were cleared by the Department through arrest, but later dropped by the State's Attorney's Office prior to indictment.

55.   Other times, however, the Department's unconstitutional conduct was not exposed until long after a prosecution and conviction had been completed.

**Policy and Practice of Fabricating and Withholding Evidence**

56.   In Plaintiff's case, the unconstitutional fabrication of false inculpatory evidence and withholding of exculpatory information from Plaintiff's defense was undertaken pursuant to, and caused by, a policy and practice on the part of the Department.

57.   Specifically, at all times relevant hereto, members of the Baltimore Police Department, including the Defendants in this action, systematically suppressed *Brady* material.  The unlawful withholding described in this Complaint occurred in other cases as well.

58.   For example, Wendell Griffin was convicted of the 1981 murder of James Wise.  In 2011, Griffin discovered numerous documents in the Baltimore police file that were never turned over to him, including exculpatory reports that showed that the

two key witnesses in the case had failed early in the investigation to identify Griffin as the perpetrator.

59.  Similarly, James Owens's 1988 conviction was overturned after Owens discovered that the police withheld evidence of highly inconsistent statements by the prosecution's star witness.

60.  In addition, in 1995 Antoine Pettiford was convicted of the murder of Oscar Lewis.  After his conviction, Pettiford discovered witness statements and other highly exculpatory material that the Baltimore Police Department never disclosed.  Following that discovery, Pettiford's plea was vacated and all charges against him were dismissed.

61.  Consistent with the municipal policies and practices described in the cases referenced in the preceding paragraphs as well as others, Defendants in this case fabricated police reports that they knew to be false and concealed exculpatory evidence, including information provided to them by Ms. Dyson's son, the identity of the real perpetrator, and the fact that the GSR findings were fabricated.  None of this evidence was ever disclosed to the prosecution or to Plaintiff's criminal defense team.

62.  The practice described in the preceding paragraphs was consciously approved by policymakers who were deliberately indifferent to the violations of constitutional

rights described herein, and the practice was a cause of the injuries suffered here by Plaintiff.

63.   The Department failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct.  It thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

### Policy and Practice of Relying on Fabricated GSR Results

64.   In addition, the fabricated false GSR findings, used against Plaintiff at trial in violation of his constitutional rights, were caused by the Department's policies and practices.

65.   In particular, at all times relevant hereto, members of the Baltimore Police Department, including Defendant Van Gelder, created and relied on fabricated GSR findings to secure wrongful convictions.

66.   For example, in Plaintiff's case, as described more fully above, Defendant Van Gelder falsely identified the area from which GSR had been collected from Plaintiff's hands and disclaimed the possibility that GSR particles could have transferred to Plaintiff's hands despite the falsity of such a statement.

67.   Indeed, as late as 2004, the Baltimore Crime
Laboratory continued to falsely deny that transfer was possible.
Its laboratory director Edward Koch, Sr. stated that only people
who have fired guns will have unique gunshot particles in the
web of their hands, an organizational belief that finds no
support in legitimate science.

68.   Similarly, in the case of Tyrone Jones, the
Laboratory misrepresented the findings of GSR testing.
Defendant Van Gelder stated that he found 17 unique particles
when in fact only one particle was found.

69.   The Laboratory also had a policy and practice of
relying on GSR testing despite knowing that contamination was a
significant problem that undermined the validity of any results.

70.   For example, up until 2001, police officers were
conducting GSR testing in the district police stations, at least
two of which had live firing ranges on site thereby increasing
the potential for contamination.

71.   Even after GSR testing was moved to headquarters,
an internal audit showed that the cleaning bucket, floor in the
testing room and a police officer's handcuffs all had GSR
particles on them.

72.   The practice described in the preceding
paragraphs was consciously approved at the highest policy-making
level by policymakers who were deliberately indifferent to the

violations of constitutional rights described herein, and was a proximate cause of the injuries suffered here by Plaintiff.

73.   The Department failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct.  It thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

### Failure to Train, Supervise and Discipline

74.   Finally, the policies and practices described above were also caused by the Department's failure to train, supervise and discipline its police officers.

75.   The Department's failure to train, supervise, and discipline its employees effectively condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case.  Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the Department's practices and *de facto* policies, as alleged above.

76.   For example, there is no training on GSR testing. New police officers simply learn on-the-job, replicating the same errors and flawed scientific procedures as their predecessors.  The failure to provide any such training creates

an obvious risk that the testing will be done improperly and the results will be invalid.

77.   There is a similar failure during the relevant time period to train police officers on disclosing evidence and complying with their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) notwithstanding the obvious necessity of such training.

78.   In addition, the Department failed to properly supervise and discipline its police officers.  As a result, officers continue to violate suspects' rights in the manner described more fully above, with impunity.

79.   The failure to train, supervise and discipline Department employees was consciously approved at the highest policy-making level by policymakers who were deliberately indifferent to the violations of constitutional rights described herein, and was a cause of the injuries suffered here by Plaintiff.

80.   The Department failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct.  They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

### The City's Wrongful Conduct

81.   With the consent of the City Council, the Mayor appoints the Police Commissioner and has the power to remove the Commissioner for cause.   The City Council also controls the revenue allocated to the Department, and sets the salary and pays Department employees.

82.   For his part, the Commissioner regularly reports to both the Mayor and City Council and keeps both apprised of the activities of the Department.

83.   In addition, a City agency reviews civilian complaints about police misconduct.   At the time of Plaintiff's arrest and trial, that agency was called the Complaint Evaluation Board; it is now the Civilian Review Board.   The Board not only reviews complaints, but also Department policies.

84.   The Board makes recommendations to the Police Commissioner.

85.   As such, the City Council and Mayor were well aware of the above-described constitutionally infirm policies and practices.   Nonetheless, neither the City nor the Mayor took any corrective action.   To the contrary, both the City and Mayor condoned, ratified and/or turned a blind eye to the problems described above, and therefore were deliberately indifferent to the violation of constitutional rights described herein.

86.   The City Council and Mayor's failure to act in the face of repeated constitutional violations, and unconstitutional policies and practices was the proximate cause of Plaintiff's injuries.

## Plaintiff's Damages

87.   Plaintiff spent nearly 20 years in prison for a murder that he did not commit.  Worse yet, he was convicted of killing a woman he loved.

88.   Plaintiff must now attempt to make a life for himself outside of prison without the benefit of two decades of life experiences, which normally equip adults for that task.

89.   Additionally, the emotional pain and suffering caused by losing nearly 20 years in the prime of his life has been substantial.  During his wrongful incarceration, Plaintiff was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right.  He missed out on the ability to share holidays, births, funerals and other life events with loved ones, the opportunity to fall in love and marry and to pursue a career, and the fundamental freedom to live one's life as an autonomous human being.

90.   Plaintiff's two decades of wrongful incarceration forced him into a world of isolation in which he lost contact with his friends and family in the outside world.

91.  As a result of the foregoing, Plaintiff has suffered tremendous damage, including physical sickness and injury and emotional damages, all proximately caused by Defendants' misconduct.

## Count I – 42 U.S.C. § 1983
## Violation of Due Process

92.  Each paragraph of this Complaint is incorporated as if restated fully herein.

93.  As described more fully above, the Defendants, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

94.  In the manner described more fully above, the Defendants, individually, jointly, and/or in concert and in conspiracy, fabricated false reports and false GSR findings and conclusions.

95.  In the manner described more fully above, the Defendants also deliberately withheld exculpatory evidence.  In doing so, the Defendants violated their clearly established duty to report all material exculpatory and impeachment information to prosecutors.

96.   Absent Defendants' misconduct, the prosecution of Plaintiff could not and would not have been pursued, and Plaintiff would not have been convicted.

97.   The Defendants' misconduct directly and proximately resulted in the unjust and wrongful criminal conviction of Plaintiff and his continuing wrongful imprisonment, thereby denying him his constitutional right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

98.   As a direct and proximate result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to loss of liberty, physical sickness and injury, and emotional distress.

99.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

## Count II – 42 U.S.C. § 1983
## Malicious Prosecution

100. Each paragraph of this Complaint is incorporated as if restated fully herein.

101. In the manner described above, the Defendants caused and continued a seizure of the Plaintiff pursuant to legal process that was unsupported by probable cause.

102. The criminal proceedings terminated in Plaintiff's favor.

103. In the alternative, Plaintiff was denied the right to effectively defend himself at trial and the State does not provide an adequate remedy.

104. Also in the alternative, the Defendants' conduct shocked the conscience.

105. As a direct and proximate result of the Defendants' malicious prosecution, Plaintiff suffered injuries, including but not limited to loss of liberty, physical injury and sickness, and emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

106. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

### Count III – 42 U.S.C. § 1983
### Failure to Intervene

107. Each paragraph of this Complaint is incorporated as if restated fully herein.

108. In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Defendants stood by without

intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

109. As a direct and proximate result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty, physical injury and sickness, and emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

110. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

## Count IV – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

111. Each paragraph of this Complaint is incorporated as if restated fully herein.

112. After the murder of Michelle Dyson, the Defendants, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights to due process

and to a fair trial, all as described in the various paragraphs
of this Complaint.

113. Additionally, before and after Plaintiff's
conviction, the Defendants further conspired to deprive
Plaintiff of exculpatory information to which he was lawfully
entitled and which would have led either to his not being
charged, his acquittal, or his more timely exoneration.

114. In this manner, the Defendants, acting in concert
with other unknown co-conspirators, conspired by concerted
action to accomplish an unlawful purpose by unlawful means.

115. In furtherance of the conspiracy, each of the co-
conspirators engaged in and facilitated numerous overt acts,
including but not limited to those set forth above – such as
fabricating evidence, withholding exculpatory evidence, and
committing perjury during hearings and trials – and was an
otherwise willful participant in joint activity.

116. As a direct and proximate result of the illicit
prior agreement and actions in furtherance of the conspiracy
referenced above, Plaintiff's rights were violated, and he
suffered injuries, including but not limited to loss of liberty,
physical sickness and injury, and emotional distress.

117. The misconduct described in this Count was
objectively unreasonable and was undertaken intentionally, with

malice, willfulness, and deliberate indifference to Plaintiff's rights.

### Count V – 42 U.S.C. § 1983
### *Monell* Policy Claims

118. Each paragraph of this Complaint is incorporated as if restated fully herein.

119. The actions of all the Defendants were undertaken pursuant to policies and practices of the Department and/or the City Council and/or Mayor, described above, which were ratified by policymakers with final policymaking authority.  These policies and practices included the failure to adequately train, supervise, and discipline officers who engaged in the alleged constitutional violations, as set forth in greater detail above. The policies and practices also included the failure to turn over exculpatory evidence and to rely on fabricated evidence, including fabricated police reports and GSR findings.

120. The policies and practices described in this Count were maintained and implemented by the Department, City Council and/or Mayor with deliberate indifference to Plaintiff's constitutional rights.

121. As a direct and proximate result of the Department's, City's and/or Mayor's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

122. The Department, City Council and/or Mayor are therefore liable for the misconduct committed by the Defendants.

## Count VI – State Law Claim
## Malicious Prosecution

123. Each paragraph of this Complaint is incorporated as if restated fully herein.

124. The Defendants accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

125. The Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause, resulting in injury.

126. Statements of the Defendants regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured.  The Defendants also fabricated evidence by falsifying GSR findings and withheld exculpatory evidence that would have demonstrated Plaintiff's absolute innocence.  The Defendants were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in the murder of Michelle Dyson.

127. The Defendants intentionally withheld from and misrepresented to prosecutors facts that further vitiated

probable cause against Plaintiff, as set forth above, and failed to investigate evidence which would have led to the actual perpetrator.

128. The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

129. On February 21, 2014, the prosecution terminated in Plaintiff's favor when his conviction was vacated.

130. As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including physical sickness and injury, and emotional distress.

### Count VII – State Law Claim
### Abuse of Process

131. Each paragraph of this Complaint is incorporated as if restated fully herein.

132. As explained more fully above, each of the Defendants willfully misused the criminal process against Plaintiff for a purpose different than the proceeding's intended purpose.

133. Indeed, rather than investigate and prosecute the real killer, the Defendants fabricated evidence and withheld exculpatory evidence to frame Plaintiff for a crime that he did not commit.

134. The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

135. As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including physical sickness and injury, and emotional distress.

### Count VIII – State Law Claim
### Intentional Infliction of Emotional Distress

136. The acts and conduct of the Defendants as set forth above were extreme and outrageous. The Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

137. As a direct and proximate result of the Defendants' actions, Plaintiff suffered and continues to suffer physical sickness and severe emotional distress.

### Count IX – State Law Claim
### Civil Conspiracy

138. Each paragraph of this Complaint is incorporated as if restated fully herein.

139. As described more fully in the preceding paragraphs, the Defendants, acting in concert with other known

and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

140. In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

141. The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

142. As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered damages, including physical sickness and injury, and severe emotional distress, as is more fully alleged above.

### Count X – State Law Claim
### Article 24 of the Maryland Constitution – Declaration of Rights

143. Each paragraph of this Complaint is incorporated as if restated fully herein.

144. As described more fully in the preceding paragraphs, the Defendants violated Plaintiff's due process rights.

145. As a direct and proximate result of the Defendants' actions, Plaintiff was wrongfully imprisoned for nearly two decades for a crime that he did not commit.

146. As a direct and proximate result of the Defendants' actions, Plaintiff suffered damages, including physical sickness and injury, and severe emotional distress, as is more fully alleged above.

### Count XI – State Law Claim
### Indemnification

147. Each paragraph of this Complaint is incorporated as if restated fully herein.

148. Maryland law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

149. The Defendants are or were employees of the Baltimore Police Department, who acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff, SABEIN BURGESS, respectfully requests that this Court enter judgment in his favor and against Defendants, Defendants, BALTIMORE POLICE DEPARTMENT, DETECTIVE GERALD ALAN GOLDSTEIN, DETECTIVE WILLIAM RITZ, DANIEL VAN GELDER, OFFICER DALE WEESE, OFFICER RICHARD PURTELL, DETECTIVE/SGT. STEVEN LEHMAN, DETECTIVE ROBERT PATTON, DETECTIVE NEVERDON, UNKNOWN EMPLOYEES OF THE BALTIMORE POLICE DEPARTMENT, and MAYOR AND CITY COUNCIL OF BALTIMORE, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and

punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

### JURY DEMAND

Plaintiff, SABEIN BURGESS, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**SABEIN BURGESS**

By:      /s/Gayle Horn
        One of his attorneys
        Arthur Loevy
        Jon Loevy
        Gayle Horn
        LOEVY & LOEVY
        312 North May Street
        Suite 100
        Chicago, Illinois 60607
        (312) 243-5900