IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SABEIN BURGESS,

        Plaintiff,

        v.                                                   Civil Action No. RDB-15-0834

BALTIMORE POLICE DEPARTMENT,
*et al.*,

        Defendants.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

Plaintiff Sabein Burgess ("Burgess" or "Plaintiff") was released from a Maryland state prison two years ago after serving almost twenty years for the murder of his girlfriend, Michelle Dyson, as to which he has always claimed his innocence. After a hearing in the Circuit Court for Baltimore City on newly discovered evidence, the State prosecutors entered a *nolle prosecui*.[1] Burgess now brings this action against Defendants Baltimore Police Department ("BPD"), Detective Gerald Alan Goldstein, Detective William Ritz, Officer Dale Weese, Officer Richard Purtell, Detective/Sergeant Steven Lehman, Detective Robert Patton, Detective Neverdon (collectively, the "Officer Defendants"), Daniel Van Gelder ("Van Gelder"), a crime laboratory analyst at BPD, "Unknown Employees of the Baltimore Police Department," and the Mayor and City Council of Baltimore (the "City"), alleging

---

[1] Pursuant to Maryland Rule 4-247, an entry of *nolle prosecui* is a voluntary dismissal by the prosecutor of all charges against the defendant. Md. Code Ann., Md. Rule 4-247.

various violations of his constitutional rights and state law.[2] Burgess claims that Defendants'

illegal actions led to his wrongful imprisonment for the murder of Michelle Dyson.

Currently pending are Mayor and City Council of Baltimore's Motion to Dismiss

(ECF No. 33); Detective Goldstein, Detective Ritz, Officer Weese, Officer Purtell,

Detective/Sergeant Lehman, Detective Patton, Detective Neverdon, and Daniel Van

Gelder's Motion to Dismiss (ECF No. 35); and the Baltimore Police Department's Motion

to Dismiss (ECF No. 36). The parties' submissions have been reviewed and no hearing is

necessary. *See* Local Rule 105.6 (D. Md. 2014). For the reasons that follow, Mayor and City

Council of Baltimore's Motion to Dismiss (ECF No. 33) is GRANTED WITH

PREJUDICE; Detective Goldstein, Detective Ritz, Officer Weese, Officer Purtell,

Detective/Sergeant Lehman, Detective Patton, Detective Neverdon, and Daniel Van

Gelder's Motion to Dismiss (ECF No. 35) is GRANTED IN PART AND DENIED IN

PART; and the Baltimore Police Department's Motion to Dismiss (ECF No. 36) is

GRANTED IN PART AND DENIED IN PART. Specifically, Counts I, II, III, VI, VII,

VIII, and X will proceed against the Officer Defendants and Van Gelder, while Counts IV,

V, IX, and XI are dismissed; Count V will proceed against the Baltimore Police Department,

while Counts I-IV and VI-XI are dismissed; and all counts against the Mayor and City

Council of Baltimore are dismissed with prejudice.

## BACKGROUND

This Court accepts as true the facts alleged in the plaintiffs' complaint.  *See Aziz v.*

*Alcolac, Inc.*, 658 F.3d 388, 390 (4th Cir. 2011). This action arises from the investigation,

---

[2] Upon the retirement of the Honorable William D. Quarles, this case was reassigned to the undersigned on January 14, 2016.

conviction, and subsequent imprisonment of Plaintiff Sabein Burgess for the 1994 murder of his girlfriend, Michelle Dyson ("Ms. Dyson" or the "Victim"). After nearly twenty years in Maryland state prison, Burgess was released on February 21, 2014. Compl. ¶ 51, ECF No. 1.

Late in the evening of October 5, 1994, Ms. Dyson was shot and killed in the basement of her house. *Id.* ¶¶ 12, 14. Burgess alleges that he was not at the house during the murder, but returned soon thereafter and "cradled Ms. Dyson in his arms . . . try[ing] to remove the blood from her mouth." *Id.* ¶¶ 14, 16-17. When the Officer Defendants arrived at Ms. Dyson's house, they entered the basement and found the Plaintiff with the Victim. *Id.* ¶ 18. Plaintiff was then handcuffed and his hands were swabbed for gunshot residue. *Id.* ¶¶ 19-20. Burgess notes that the crime scene technician also swabbed "the inside of the palms of both of Plaintiff's hands." *Id.* ¶ 20. During Burgess's subsequent interrogation at the police station, the Officer Defendants allegedly told Burgess that "he was going away for murder." *Id.* ¶ 21. When he proclaimed his innocence, the Officer Defendants responded that "they would find people to say that Plaintiff fired the gun that killed his girlfriend." *Id.*

Plaintiff alleges that the Officer Defendants fulfilled their threat during their investigation of Ms. Dyson's murder. On the evening of the murder, the Officer Defendants interviewed Ms. Dyson's children. *Id.* ¶ 23. Although the Officer Defendants allegedly told Burgess that the children slept through the shooting, Ms. Dyson's son stated that he had come out of his bedroom when he heard "someone at the door." *Id.* He then allegedly recounted that he saw that individual (or individuals) "barge" into the house immediately before Ms. Dyson's murder. *Id.* When the Officer Defendants asked the son if the "someone" was Burgess, he replied in the negative. *Id.* The Officer Defendants allegedly

never disclosed this interview, instead creating police reports stating that the children "were asleep at the time of the shooting and therefore did not see anything." *Id.* ¶¶ 24, 26.

Even further, the Officer Defendants allegedly conspired with Defendant Daniel Van Gelder, a crime laboratory analyst at BPD, to fabricate gunshot residue ("GSR") evidence to ensure the Plaintiff's conviction. For example, Van Gelder reported that the GSR swabs came from the "webbing" between Burgess's thumbs and forefinger. *Id.* ¶ 30. Yet, according to Burgess, the GSR swabs actually came from his palms. *Id.* Plaintiff states that this "lie" was critical to Van Gelder's conclusion that Burgess "either fired a gun or was adjacent to a gun that was fired." *Id.* ¶ 31. Van Gelder also allegedly eliminated any possibility that the GSR evidence recovered from Plaintiff's hands came from the transfer of GSR particles from the Victim to Plaintiff when he held her. *Id.* ¶ 32. Burgess states that this conclusion "had no legitimate basis in science" and was "patently false." *Id.* Burgess alleges that Van Gelder knew his statements to be false, but conveyed them to the Officer Defendants and the prosecutor regardless. *Id.* ¶ 33. The Officer Defendants also allegedly knew the falsity of the statements. *Id.*

This evidence was allegedly key to the 1995 conviction of Burgess for the murder of Ms. Dyson. *Id.* ¶¶ 37-38. Burgess received a sentence of lifetime imprisonment. *Id.* ¶ 39. At his sentencing, he maintained his innocence, stating "I would like to let you know that I'm innocent . . . I don't understand how I was tried and convicted for a crime that I didn't do." *Id.*

In October 1998, Charles Dorsey ("Dorsey") allegedly wrote a letter in which he confessed to the killing of Ms. Dyson. *Id.* ¶ 40. Dorsey purportedly admitted that he and

another individual, Howard Rice ("Rice"), forced their way into Ms. Dyson's home and shot her in the basement. *Id.* ¶ 43. Plaintiff claims that Dorsey repeated his confession to Plaintiff's criminal defense counsel, "acknowledge[ing] that by doing so, he could face charges for first-degree murder." *Id.* ¶ 40. Defendant Officer Ritz and another unnamed Baltimore Police detective allegedly interviewed Dorsey, but reported that the confession "lacked details that the real killer would know." *Id.* ¶ 41. Plaintiff claims that this statement was false, as Dorsey allegedly specified the caliber of handgun used, as well as the location and number of gunshot wounds. *Id.* ¶ 42. Burgess also alleges that Dorsey and Rice's culpability was not a surprise, as they had questioned an unnamed witness in 1996 about Rice's possible involvement. *Id.* ¶ 44-45. The Officer Defendants thus allegedly knew of an alternative perpetrator, but did not disclose this information to Burgess. *Id.* ¶ 46.

Plaintiff continued to maintain his innocence while imprisoned. *Id.* ¶ 47. Through the Mid-Atlantic Innocence Project (the "Innocence Project"), he filed a Petition for Writ of Actual Innocence in the Circuit Court for Baltimore City, Maryland. *Id.* ¶¶ 48, 50. Specifically, Burgess relied on the "newly-discovered evidence" provision of Maryland law, where the "newly-discovered evidence" must "(1) create[] a substantial or significant possibility that the result may have been different . . .; and (2) could not have been discovered in time to move for a new trial . . ." Md. Code Ann., Crim. Proc. § 8-301; *see also* Officer Defs. and Van Gelder's Mot. to Dismiss Ex. A, ECF No. 35-3 (Copy of Petition).[3]

---

[3] In reviewing a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, this Court "may properly take judicial notice of matters of public record . . . [and] consider documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Philips v. Pitt County Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Hall v. Virginia*, 385 F.3d 421, 424 (4th Cir. 2004) ("[W]hen a defendant attaches a document to its motion to dismiss, 'a court may consider it in detrmining whether to dismiss the complaint [if] it was integral to and explicitly relied on in

He offered several pieces of newly-discovered evidence, including an affidavit from Ms. Dyson's son confirming Burgess's innocence, police notes discussing the son's testimony on the night of the murder, and new technology related to the probative value of GSR evidence. *Id.* ¶¶ 48-50. At a hearing on February 21, 2014, the State agreed to enter a *nolle prosequi* rather than conduct a second trial. *See* Officer Defs. and Van Gelder's Mot. to Dismiss Ex. B. As such, the Circuit Court for Baltimore City granted Burgess's Petition, a *nolle prosequi* was entered, and Burgess was released. *Id.*; *see also* Officer Defs. and Van Gelder's Mot. to Dismiss Ex. D.

Plaintiff subsequently filed the present action against Defendants Mayor and City Council of Baltimore, the Baltimore Police Department, the Officer Defendants, and Van Gelder, alleging various violations of his federal and state civil rights. Under the auspices of 42 U.S.C. § 1983, he asserts claims of violation of due process (Count I), malicious prosecution (Count II), failure to intervene (Count III), conspiracy to deprive constitutional rights (Count IV), and unconstitutional practice or policy, as prohibited by *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978) (Count V). Plaintiff's state law claims include malicious prosecution (Count VI), abuse of process (Count VII), intentional infliction of emotional distress (Count VIII), civil conspiracy (Count IX),[4] violation of

---

the complaint and [if] the plaintiffs do not challenge its authenticity.'") (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999))). As such, this Court takes judicial notice of "Exhibit A" (a copy Plaintiff's Petition for Writ of Actual Innocence), ECF No. 35-3, "Exhibit B" (Petition Hearing Transcript, Feb. 21, 2014), ECF No. 35-4, and "Exhibit D" (Consent Order), ECF No. 35-6. Burgess explicitly refers to his Petition and its disposition throughout the Complaint. He does not dispute the authenticity of the exhibits, although he does object to any use of the documents "for the truth of the matter asserted therein." Pl.'s Resp. in Opp'n, 14. ECF No. 42. The documents, however, will serve only to show how Plaintiff's actual innocence proceeding unfolded. Plaintiff's objection is thus moot.

[4] In his Response in Opposition, Plaintiff withdrew his claim for civil conspiracy under Maryland law. Pl.'s Resp. in Opp'n at 59. Count IX is thus dismissed.

Article 24 of the Maryland Constitution, Md. Const. Declaration of Rights, Art. 24 (Count X), and indemnification (Count XI). Defendants have moved for dismissal of all counts.

## STANDARD OF REVIEW

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P 8(a)(2). Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The Supreme Court's recent opinions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "require that complaints in civil actions be alleged with greater specificity than previously was required." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). In *Twombly*, the Supreme Court articulated "[t]wo working principles" that courts must employ when ruling on Rule 12(b)(6) motions to dismiss. *Iqbal*, 556 U.S. at 678. First, while a court must accept as true all the factual allegations contained in the complaint, legal conclusions drawn from those facts are not afforded such deference. *Id.* (stating that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim); *see also Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) ("Although we are constrained to take the facts in the light most favorable to the plaintiff, we need not accept

legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." (internal quotation marks omitted)).

Second, a complaint must be dismissed if it does not allege "a plausible claim for relief." *Iqbal*, 556 U.S. at 679.  Although a "plaintiff need not plead the evidentiary standard for proving" her claim, she may no longer rely on the mere possibility that she could later establish her claim. *McCleary-Evans v. Maryland Department of Transportation, State Highway Administration*, 780 F.3d 582, 584 (4th Cir. 2015) (emphasis omitted) (discussing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) in light of *Twombly* and *Iqbal*). Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.  While the plausibility requirement does not impose a "probability requirement," *id.* at 556, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 291 (4th Cir. 2012) ("A complaint need not make a case against a defendant or *forecast evidence* sufficient to *prove* an element of the claim.  It need only *allege facts* sufficient to *state* elements of the claim." (emphasis in original) (internal quotation marks and citation omitted)).  In making this assessment, a court must "draw on its judicial experience and common sense" to determine whether the pleader has stated a plausible claim for relief. *Iqbal*, 556 U.S. at 679.  "At bottom, a plaintiff must nudge [its] claims across the line from conceivable to plausible to resist dismissal." *Wag More Dogs, LLC*, 680 F.3d at 365 (internal quotation marks omitted).

<u>ANALYSIS</u>

I.      **Mayor and City Council of Baltimore**

In moving to dismiss the subject Complaint with prejudice, the City argues that it lacks sufficient control over the Baltimore Police Department ("BPD") to be liable under state or federal law for the actions of BPD employees. First, to the extent that Plaintiff asserts any state law claims against the City, Maryland law clearly provides that the BPD is a *state* entity. *See Mayor & City Council of Baltimore v. Clarke*, 541 A.2d 1122, 1128-31 (Md. 2008) (exhaustively describing the BPD's history as a state agency). BPD officers, technicians, or employees of any kind are not employees of the City. *See, e.g.*, *id.*; *Clea v. Mayor & City Council of Baltimore*, 541 A.2d 1303, 1306 (Md. 1988). The City cannot be held liable under state law for the conduct of BPD employees, thereby necessitating the dismissal with prejudice of any state law claims against the City for that conduct. *See Clea*, 541 A.2d at 1306.

With respect to Burgess's federal claim,[5] Section 1983 creates a private right of action for any United States citizen seeking to remedy alleged constitutional violations. 42 U.S.C. § 1983. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

---

[5] Burgess asserts only one federal claim against the City—a claim pursuant to *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978). As this distinction is not clear from the face of the Complaint, Counts I-IV are nevertheless dismissed as to the City.

42 U.S.C. § 1983. Section 1983 does not create "substantive rights;" rather, it provides "a method for vindicating federal rights elsewhere conferred." *Thompson v. Dorsey*, Civ. A. No. ELH-10-1364, 2011 WL 2610704, at *3 (D. Md. June 30, 2011) (quoting *Albright v. Oliver*, 510 U.S. 266, 271 (1994)).

Under *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978), a Section 1983 cause of action may lie against a local government or municipality when execution of the government's unconstitutional policy or custom causes a plaintiff injury. *See Walker v. Prince George's Cnty., Md.*, 575 F.3d 426, 431 (4th Cir. 2009) (stating that the liability of the municipality arises only where the employees' unconstitutional actions are taken in furtherance of a municipal policy or custom). In order to support a claim, "(1) the municipality must have actual or constructive knowledge of the custom and usage by its responsible policymakers, and (2) there must be a failure by those policymakers, as a matter of specific intent or deliberate indifference, to correct or terminate the improper custom and usage." *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 210 (4th Cir. 2002) (internal quotation marks omitted).

A prerequisite for any *Monell* claim, however, is that the targeted entity control the offending actors. In *Estate of Anderson, et al. v. Strohman, et al.*, 6. F. Supp. 3d 639, 644-45 (D. Md. 2014), this Court concluded that BPD officers are not employees of the City, nor did the City possess sufficient control of the officers. As the BPD is a state agency, the City simply does not exert legal control over the BPD within the ambit of Section 1983. *Id.* Earlier opinions of this Court had reached the opposite conclusion. *See, e.g., Brown v. Tshamba*, Civ. A. No. RDB-11-0609, 2011 WL 2935037 (D. Md. July 18, 2011); *Humbert v.*

*O'Malley*, Civ. A. No. WDQ-11-0440, 2011 WL 6019689 (D. Md. Nov. 29, 2011); *Mason v. Mayor & City Council of Baltimore*, Civ. A. No. HAR-95-0041, 1995 WL 168037 (D. Md. Mar. 24, 1995); *Wilcher v. Curley*, 519 F. Supp. 1 (D. Md. 1980). Nevertheless, recent opinions of this Court since *Anderson* have held that the City does not sufficiently control the BPD for purposes of Section 1983. *See, e.g.*, *Holloman v. Rawlings-Blake, et al.*, Civ. A. No. CCB-14-1516, 2014 WL 7146974, at *4 (D. Md. Dec. 12, 2014); *Dale v. Mayor and City Council of Baltimore City, et al.*, Civ. A. No. WDQ-14-2152, 2015 WL 5521815, at *3-4 (D. Md. Sept. 15, 2015). The United States Court of Appeals for the Fourth Circuit has still yet to address this precise question.[6] *See Wiley v. Mayor and City Council of Baltimore*, 48 F.3d 773, 776 (4th Cir. 1995) (assuming, without deciding, that the City could be liable for acts of the BPD under § 1983).

Accordingly, this Court recognizes the weight of precedent concluding that the City of Baltimore does not exert sufficient control for purposes of *Monell* liability under Section 1983. Baltimore police officers are state employees free from the City's control. The City sets no policy nor practices for the BPD. While Plaintiff's proffered links between the City and the BPD—for example, the reports made by the Police Commissioner to the City, and the Mayor's recent firing of former Commissioner Anthony Batts—may demonstrate some *relationship* between the two entities, he has failed to demonstrate any connection between these examples and § 1983 liability. Plaintiff's assertions simply fail to overcome clear Maryland law separating the two entities.  Accordingly, the City may not be held liable for

---

[6] The question of whether the City sufficiently controls BPD for purposes of *Monell* liability is pending on appeal before the Fourth Circuit in *Holloman v. Markowski, et al.*, Case No. 15-1878 (4th Cir. Aug. 6, 2015). Preliminary briefing has concluded, but the Fourth Circuit has yet to schedule oral argument or issue any ruling on the merits or otherwise.

the actions of the BPD, the Officer Defendants, or Van Gelder. Plaintiff's claims are thus dismissed with prejudice as to the City.

## II.      Officer Defendants and Van Gelder

The Officer Defendants and Van Gelder move to dismiss the subject Complaint on several grounds. First, they argue that Burgess is judicially estopped from asserting his claims [7] due to the arguments and representations made during the actual innocence proceedings in state court. Second, the Officer Defendants and Van Gelder contend that any claim pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), concerning post-conviction evidence must be dismissed, as law enforcement is under no *Brady* obligation to produce such evidence. Third, they assert an affirmative defense of reasonable diligence against Burgess's claims regarding the interview of Ms. Dyson's son and the 1998 confession of Charles Dorsey. Fourth, the Defendants seek dismissal of all counts due to Plaintiff's impermissible use of "group pleading." Finally, they invoke the intracorporate conspiracy doctrine to rebut the conspiracy claims of Counts IV and IX.[8] Each argument will be addressed in turn.

### A. Judicial Estoppel

First, the Officer Defendants and Van Gelder contend that certain representations made during the course of Plaintiff's actual innocence petition and related hearing preclude him from asserting the present claims. Defendants focus on two specific claims. The first is Burgess's allegation that Van Gelder knowingly fabricated false reports regarding the

---

[7] Plaintiff acknowledges that only Counts I-IV and VI-X are asserted against the Officer Defendants and Van Gelder. The remaining counts—Count V (the *Monell* claim) and Count XI (indemnification)—are appropriately asserted against the BPD and the City only. Thus, to the extent Plaintiff levies either Count V or Count XI against the Officer Defendants and Van Gelder, these claims are dismissed.

[8] As noted *supra*, Burgess withdrew his claim for civil conspiracy under Maryland law.

gunshot residue ("GSR") evidence. The Officer Defendants allegedly conspired with Van Gelder to create and perpetuate this false evidence. The second claim concerns the Officer Defendants' alleged concealment of material and potentially exculpatory evidence from Burgess—namely, the interview with the Victim's son on the night of the murder. Defendants argue that Plaintiff is judicially estopped from asserting any arguments that contradict the positions adopted during the actual innocence proceedings.

Judicial estoppel is "an equitable doctrine that exists to prevent litigants from playing 'fast and loose' with the courts—to deter improper manipulation of the judiciary."[9] *Folio v. City of Clarksburg, W. Va.*, 134 F.3d 1211, 1217 (4th Cir. 1998) (quoting *John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26, 28-29 (4th Cir. 1995)). The United States Court of Appeals for the Fourth Circuit has advised, however, that due to "the harsh results attendant with precluding a party from asserting a position that would normally be available to the party, judicial estoppel must be applied with caution." *Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996). As such, the following elements must be satisfied: (1) "the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation[;] . . . (2) the prior inconsistent position must have been accepted by the court[;] . . . [and] (3) the party sought to be estopped must have intentionally misled the court to gain unfair advantage." *Id.* (internal quotation marks and citations omitted). These elements

---

[9] Likewise, under Maryland law, judicial estoppel "looks to the connection between the litigant and the judicial system while equitable estoppel focuses on the relationship between the parties to the prior litigation." *WinMark, L.P. v. Miles & Stockbridge*, 345 Md. 614, 623, 693 A.2d 824 (1997) (quoting *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.3d 414, 419 (3d Cir. 1988) (holding that debtor's "failure to list its claim against the bank worked in opposition to preservation of the integrity of the system which the doctrine of judicial estoppel seeks to protect.")).

"ensure[] that judicial estoppel is applied in the narrowest of circumstances." *Id.*; *see also*
*Dorsey v. Ruth*, 222 F. Supp. 2d 753, 755-56 (D. Md. 2002).

Although all three elements must be satisfied for judicial estoppel, Defendants'
argument cannot surmount even the first hurdle. Turning first to the allegations against Van
Gelder, Plaintiff's statements during his actual innocence proceedings are not inconsistent
with his present claims of fabrication. Burgess sought release on the theory that "newly-
discovered evidence" raised a significant possibility of a different trial result. *See also* Md.
Code Ann., Crim. Proc. § 3-801. One piece of "newly-discovered evidence" was the theory
that certain advancements in forensic science revealed that GSR evidence is of substantially
less probative value than previously believed. *See* Officer Defs. and Van Gelder's Mot. to
Dismiss Ex. A. at 14 (noting that, among other issues, "the reliability of GSR evidence [has
been] generally called into question due to contamination . . ."). Specifically, the "[e]vidence
about the easy transference of GSR particles, and the limited conclusions that GSR reports
now provide, represent advances in forensic science that have come about since May 1997."
*Id.* at 22. Van Gelder contends that, given these representations, Plaintiff cannot now claim
that Van Gelder fabricated GSR evidence and issued false reports with respect to the GSR
evidence retrieved from the crime scene.

These statements, however, are not inconsistent. When Burgess argued that scientific
advancements significantly reduced the probative value of GSR evidence, he made no
statement on the quality or integrity of Van Gelder's analysis. Rather, Burgess's argument
would apply in equal force if he believed that Van Gelder had conducted a satisfactory GSR
analysis. Under this theory, Van Gelder could have fabricated the GSR evidence and known

that his analysis was not rooted in the science of the time—the improvements in forensic science revealed only the limited value of that evidence, fabricated or otherwise. Burgess has not asserted factually inconsistent positions, thus judicial estoppel is inappropriate. [10] Moreover, since the GSR-related claim against the Officer Defendants rest on the same theory of inconsistency, this claim is similarly not subject to judicial estoppel.

The Officer Defendants also seek to use judicial estoppel to bar Plaintiff's claim that they withheld material and potentially exculpatory evidence. The Officer Defendants argue that Plaintiff necessarily adopted the Assistant State's Attorney's statement that "the Baltimore Police Department conducted a very thorough, professional job in this case." Officer Defs. and Van Gelder's Mot. to Dismiss Ex. B at 4:22-25. Further, regarding the "newly-discovered evidence," there "was no evidence, nor was there any claim that evidence was withheld." *Id.* Even assuming that Burgess did adopt these statements, whether expressly or impliedly, they are not inconsistent with the present allegations of misconduct. The representations by the Assistant State's Attorney simply stated that Plaintiff made no argument in his Petition with respect to whether the Officer Defendants (or the BPD) withheld the "newly-discovered evidence." Indeed, such an argument would be irrelevant to the actual innocence proceedings because the "newly-discovered evidence" need only be newly discovered. Maryland law does not require that the evidence be withheld. Plaintiff's adoption of the statements at issue is not a representation that no misconduct occurred. Judicial estoppel thus does not bar the claims against the Officer Defendants.

---

[10] In a footnote, Van Gelder asserts an alternative theory for dismissal—that he is entitled to qualified immunity as a witness in a criminal trial. Although a trial witness's immunity is clearly established, *Briscoe v. LaHue*, 460 U.S. 325 (1983), Plaintiff does not seek to hold Van Gelder liable for any testimony as a witness. Rather, Burgess's claims rest on Van Gelder's alleged knowing fabrication of GSR analysis. The qualified immunity of a witness is thus inapplicable.

### B. *Brady v. Maryland* and Post-Conviction Evidence

The Officer Defendants next seek to dismiss any claims arising under *Brady v. Maryland*, 373 U.S. 83 (1963), related to evidence post-dating Plaintiff's conviction. They point to two pieces of evidence in particular: (1) in 1996, the Officer Defendants allegedly interviewed an unrelated witness regarding the possible involvement of Howard Rice in the murder of Ms. Dyson, Compl. ¶ 45; and (2) in 1998, Charles Dorsey wrote a letter in which he confessed to the murder, but the Officer Defendants allegedly never conducted any follow-up or further investigation of the confession, *id.* ¶¶ 40-41. As Plaintiff was convicted in 1995, the Officer Defendants had no *Brady* obligation to produce this potentially exculpatory evidence.

In *Brady v. Maryland*, the United States Supreme Court held that the prosecution's failure to produce "evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. *Brady* effectively placed an obligation on the prosecution and law enforcement to provide material exculpatory evidence to a defendant. *See also District Attorney's Officer for the Third Judicial District v. Osborne*, 557 U.S. 52, 68 (2009). This obligation, however, applies only to evidence obtained before trial—any *Brady* obligation disappears after a conviction is obtained.[11] *Id.* As the Supreme Court explained in *Osborne*, a "criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man." *Id.*

---

[11] Alternatively, the Officer Defendants contend that they are entitled to qualified immunity for any *Brady* violation stemming from the post-conviction evidence. As the Officer Defendants were under no *Brady* obligation to disclose post-conviction material evidence, and Plaintiff does not even bring such a claim, their argument for qualified immunity is moot.

The Officer Defendants are thus correct that any suppression of post-conviction evidence did not violation due process under *Brady*. Yet, Plaintiff is not seeking relief under *Brady*. Rather, he argues that the Officer Defendants' actions regarding the 1996 interview and 1998 confession violated his post-conviction right to due process. As master of his Complaint, Burgess is free to decide the theory under which his claim will proceed. *See, e.g.,* *United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 405-406 (4th Cir. 2013) ("The primacy of the complaining party is reflected in the legal vernacular."). He acknowledges that certain pre-conviction rights, including *Brady* disclosures, are unavailable, but the defendant's right to due process remains. *Osborne*, 557 U.S. at 69. The post-conviction due process inquiry asks whether the claim "'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranged as fundamental,' or transgresses any recognized principle of fundamental fairness in operation." *Id.* (quoting *Medina v. California*, 505 U.S. 437, 446, 448 (1992) (internal quotation marks omitted)).

Although the Officer Defendants contend that the 1996 interview reveals no knowledge or concealment of an alternative perpetrator, their argument effectively places a higher burden on the Plaintiff than that imposed by *Iqbal* and *Twombly*. *Iqbal* and *Twombly* do not require that a "plaintiff . . . plead the evidentiary standard for proving" a claim. *McCleary-Evans*, 780 F.3d at 584. Burgess need only plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Plaintiff argues that the interview is circumstantial evidence that the Officer Defendants knew of Howard Rice's involvement in the murder prior to Plaintiff's conviction. Moreover, he alleges that the Officer Defendants knew of an alternate

perpetrator, but concealed this knowledge even after Burgess was convicted. *See* Compl. ¶¶ 44, 46. Burgess contends that the Officer Defendants' actions with respect to the 1998 confession are further evidence of their continuing efforts to conceal any possibility of an alternative perpetrator. This alleged cover up violated Burgess's post-conviction due process rights, as articulated by the *Osborne* Court. At the motion to dismiss stage, these allegations are sufficient to plead a plausible due process violation.

### C. Reasonable Diligence

The Officer Defendants argue that any *Brady* allegations regarding the interview of the Victim's son on the night of the murder and the 1998 confession of Dorsey must be dismissed, as Plaintiff's counsel could have obtained this evidence by exercising reasonable diligence. While *Brady* places an obligation on the government to disclose material and exculpatory evidence, that obligation is not limitless. *United States v. Wilson*, 901 F.2d 378 (4th Cir. 1990). When the exculpatory evidence at issue is "not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine." *Id.* at 381. A plaintiff's failure to exercise reasonable diligence in securing the exculpatory information is an affirmative defense to a *Brady* claim. Generally, motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure address the legal sufficiency of a complaint rather than the existence of meritorious affirmative defenses. To succeed, the existence of the affirmative defense must be apparent on the face of the complaint. *Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013).

As a preliminary matter, the Officer Defendants' reasonable diligence argument with respect to the 1998 confession of Dorsey is moot because Burgess does not allege a *Brady* violation occurred. *See supra* Analysis II.B. On the other hand, Burgess does allege that the Officer Defendants' failure to disclose their interview of the Victim's son on the night of the murder violated *Brady*. During that interview, the son allegedly said that he saw "someone" "barge" into the house immediately before Ms. Dyson's murder. Compl. ¶ 23. When the Officer Defendants asked the son if the "someone" was Burgess, he answered that it was not. *Id.* The Officer Defendants allegedly never disclosed this interview, instead telling Burgess that the children were asleep at the time of the shooting. *Id.* ¶¶ 24, 26.

The Officer Defendants do not dispute the exculpatory value of this alleged interview. Instead, they argue that a reasonable defendant would have interviewed the children, given that they were at home on the night of the murder. Plaintiff contends that his failure to interview the children was reasonable in light of the circumstances of this case. After the horror of their mother's murder, the children's grandmother allegedly "did not let them see or speak to Plaintiff or his criminal defense attorney." *Id.* ¶ 25. While the Officer Defendants correctly point out that the children remained within the subpoena power of the state court, Burgess responds that a court was unlikely to authorize a subpoena for young, recently orphaned children. More importantly, Burgess argues that he had no knowledge of the value of the son's testimony. The Officer Defendants had allegedly told him that the children were asleep throughout the murder, and thus did not hear or see anything. Burgess (and his attorney), relying on the Officer Defendants' statements, saw no point in pursuing the children, especially in light of their grandmother's preventative measures.

The reasonableness of a failure to subpoena a witness is dependent on the known value of the unavailable witness. In *Wilson*, 901 F.2d at 380-81, the defendant was "aware[] of [the witness's] closeness to [an alternative perpetrator] and given Wilson's belief that he was framed, it would have been natural for Wilson to have interviewed [the witness] in preparation for trial[.]" When, as in this case, the defendant alleges that he did not know the importance of the unavailable witness due to the alleged misconduct of another party, he cannot reasonably be expected to pursue the witness. Whether Burgess failed to exercise reasonable diligence in obtaining the son's testimony is thus not clear from the allegations of the Complaint. Discovery is necessary to determine if there is evidence to prove or disprove this affirmative defense.

### D. Group Pleading

The Officer Defendants contend that Plaintiff's use of "Officer Defendants" amounts to group pleading, thereby rendering the Complaint legally insufficient. This collective noun prevents the individual officers from determining the precise scope of the charges against them. The plausibility requirement of *Iqbal* and *Twombly* does not permit a plaintiff's "listing everyone that could have been involved for every specific act that allegedly occurred[.]" *Proctor v. Metro. Money Store Corp.*, 579 F. Supp. 2d 724, 744 (D. Md. 2008). Yet, nor do *Iqbal* and *Twombly* demand that a plaintiff possess full and complete knowledge of the defendant's alleged actions. Rather, a plaintiff need only submit facts sufficient to plead a plausible claim for relief. Indeed, it is the purpose of discovery to establish the presence or absence of facts with which the plaintiff intends to *prove* his claim.

At this early stage in the litigation, Burgess's allegations regarding the Officer Defendants are sufficient. Where Burgess alleges direct knowledge of the specific officers involved, he uses only those names. When he does not have this knowledge, he alleges that a definite subgroup of Defendants—the Officer Defendants—committed the alleged acts. Plaintiff contends that his use of the collective noun is not an effort to name "everyone that *could* have been involved," *Proctor*, 579 F. Supp. 2d at 744 (emphasis added), but rather a calculated decision to accuse all named parties. The use of "Officer Defendants" is hardly an attempt to shift the burden from Plaintiff to the Officer Defendants regarding what they did or did not do, as they assert. Instead, the burden remains firmly on the shoulders of Burgess to plead a plausible claim for relief, and then prove that claim through information obtained during discovery. The use of "Officer Defendants" thus does not amount to insufficient group pleading under *Iqbal* and *Twombly*.

### E.  Intracorporate Conspiracy Doctrine

Finally, the Officer Defendants and Van Gelder argue that the intracorporate conspiracy doctrine necessitates the dismissal of Plaintiff's claim for conspiracy under 42 U.S.C. § 1983 (Count IV).[12] The intracorporate conspiracy doctrine is rooted in the basic tenet that "you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation." *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir. 1952), *cert. denied*, 345 U.S. 925 (1952). Although

---

[12] Defendants also assert this argument against Count IX (civil conspiracy). Given Plaintiff's withdrawal of his civil conspiracy claim, this argument is moot as to Count IX. *See supra* n.2.

originating in antitrust, the doctrine applies with equal force to civil rights cases. *Buschi v. Kirven*, 775 F.2d 1240, 1251 (4th Cir. 1985).

A claim for conspiracy between a corporation and its employees, agents, or officers, however, may proceed under either of two circumstances. First, the doctrine does not grant immunity "where the plaintiff has alleged that the corporate employees where dominated by personal motives[.]" *Id.* at 1252 (quoting *Cole v. University of Hartford*, 391 F. Supp. 888, 893 (D. Conn. 1975)); *see also Greenville Publ'g Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974). Second, the doctrine is inapplicable where the employees' actions in furtherance of the conspiracy were unauthorized. *Buschi*, 775 F.2d at 1252-53 (citing *Hodgin v. Jefferson*, 447 F. Supp. 804, 807 (D. Md. 1978)). In sum, "while authorized acts of the officials would constitute corporate action, (and hence would avoid a conspiracy charge), unauthorized acts would not." *Buschi*, 775 F.2d at 1253 (quoting *Hodgin*, 447 F. Supp. at 807).

In this case, Burgess's claim for conspiracy under Section 1983 rests on the allegations that the Officer Defendants and Van Gelder conspired with one another and with the BPD to fabricate evidence, withhold material and potentially exculpatory evidence, and otherwise deprive Burgess of his constitutional rights. The Officer Defendants and Van Gelder are employees of BPD who specifically acted within the scope of their employment. Their actions in furtherance of the alleged conspiracy were thus authorized by the BPD— indeed, Burgess's *Monell* claim hinges on his assertion that the BPD perpetuated certain unconstitutional policies and practices. Even further, Plaintiff has pleaded no facts indicating any personal stake of the individual Defendants in the alleged conspiracy.

The Officer Defendants and Van Gelder, as employees of BPD, may not be held liable for the alleged conspiracy under the intracorporate conspiracy doctrine. Count IV is accordingly dismissed with respect to the Officer Defendants and Van Gelder. Moreover, BPD, as the corporation employing the alleged co-conspirators, is also immune under this doctrine. Count IV is thus dismissed as to the BPD.

## III.   Baltimore Police Department

Only one claim remains against BPD: a federal claim under *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978) (Count V).[13] BPD contends that Burgess's claims of unconstitutional policies or practices do not satisfy the plausibility standard set forth by *Twombly* and *Iqbal*.[14] Plaintiff contends that the violations of his constitutional rights arose due to BPD's policy and practice of conducting constitutionally flawed investigations.[15]

---

[13] In his Response in Opposition, Plaintiff acknowledges that Counts VI, VII, VIII, and X, all state law claims, are asserted only against the individual Defendants. BPD's arguments with respect to those claims are therefore moot. As the Complaint does not state that Counts VI, VII, VIII, and X are directed solely against the individual Defendants, these counts are dismissed as to BPD. Further, Burgess's claim for indemnification under state law (Count XI) is not ripe, as no judgment against the Officer Defendants and Van Gelder has yet to be entered. A local government agency is obliged to indemnify its employees "for any judgment . . . for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government." Md. Code Ann., Cts. & Jud. Proc. § 5-303(b)(1). If a judgment is ultimately entered against the Officer Defendants and Van Gelder for acts within the scope of their employment, then BPD will pay the judgment unless an exception applies. Count XI is thus also dismissed as to BPD.

[14] Where relevant, BPD joins in the Officer Defendants and Van Gelder's arguments for dismissal. This Court's disposition of the joined arguments will thus apply equally to the individual Defendants and BPD. BPD also asserts several arguments identical to those of the Officer Defendants and Van Gelder—in particular, judicial estoppel and the intracorporate conspiracy doctrine. As this Court concludes that Burgess is not judicially estopped from asserting his claims, BPD's identical argument for estoppel is unpersuasive. The intracorporate conspiracy doctrine, however, does apply to dismiss Plaintiff's federal claim of conspiracy against BPD.

[15] BPD first attacks this policy—conducting flawed investigations—as a policy and practice apart from the specific components described *supra*. Plaintiff's Complaint, however, appears to describe the policy and practice of conducting flawed investigations as an umbrella policy under which specific unconstitutional policies and practices occurred. As master of his Complaint, Burgess is free to construct his allegations as he desires. This Court will heed his organization of the claims and thus consider the more general policy and practice of conducting flawed investigations in light of the specific components identified by the Plaintiff.

He offers three specific components of this unconstitutional policy. First, BPD conducted a policy and practice of fabricating and withholding material, potentially exculpatory evidence. Second, BPD created and relied upon fabricated GSR results. Third, BPD failed to adequately train, supervise, and discipline its employees regarding constitutional violations.[16]

As discussed *supra*, *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978), permits a Section 1983 cause of action against a local government or municipality when execution of the government's unconstitutional policy or custom causes a plaintiff injury. *See Walker*, 575 F.3d at 431. In order to support a claim, "(1) the municipality must have actual or constructive knowledge of the custom and usage by its responsible policymakers, and (2) there must be a failure by those policymakers, as a matter of specific intent or deliberate indifference, to correct or terminate the improper custom and usage." *Randall*, 302 F.3d at 210 (internal quotation marks omitted). BPD argues that Plaintiff's alleged unconstitutional policies and practices do not demonstrate plausible claims for relief, in contravention of *Iqbal* and *Twombly*.

With respect to the allegation of fabricating and withholding evidence, BPD argues that Burgess relies on conclusory allegations of misconduct instead of the requisite facts. Plaintiff, however, does describe three specific examples of alleged *Brady* violations by BPD in 1981, 1988, and 1995. Labeling these examples mere "mistakes," BPD contends that they are insufficient to establish an unconstitutional policy, that such "mistakes" are inevitable, and that they do not amount to evidence of an unconstitutional policy to fabricate and/or withhold *Brady* evidence. At this early stage in the proceedings, BPD's argument places too

---

[16] This Court notes that BPD offers no argument for dismissal of the third alleged policy or practice. As such, only the arguments against the first and second alleged policies will be considered.

high a burden on the Plaintiff to plead a claim. In *Owens v. Baltimore City State's Attorney's Office, et al.*, 767 F.3d 379, 403 (4th Cir. 2014), the Fourth Circuit acknowledged that "[p]revailing under [a *Monell*] theory is no easy task." Yet, "simply alleging such a claim is, by definition, easier." *Id.* Under *Iqbal* and *Twombly*, "[t]he recitation of facts need not be particularly detailed, and the chance of success need not be particularly high." *Id.* (citing *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570). Based on this reasoning, the Fourth Circuit found that the plaintiff's assertion of "reported and unreported cases" showing misconduct was sufficient to plead a *Monell* claim. *Id.*

In this case, Burgess's allegations sufficiently plead a policy or practice of withholding and/or fabricating evidence. He alleges that employees of BPD "systematically suppressed *Brady* material," as illustrated by the examples of Wendell Griffin, James Owens, and Antoine Pettiford. Compl. ¶¶ 57-60. This Court does not dispute that "the Law of Large Numbers" may guarantee that *Brady* mistakes occur. *Connick v. Thompson*, 563 U.S. 51, 73 (2011) (Scalia, J., concurring). Determining whether the cited examples were truly mistakes, or evidence of an unconstitutional policy or practice to fabricate and withhold evidence, however, is not the proper inquiry at the motion to dismiss stage. Plaintiff may face a difficult path to *prove* his claim, but he has sufficiently *alleged* such a policy or practice.

BPD next argues that the second alleged policy, relying on fabricated GSR results, fails to state a plausible claim for relief because this allegation contradicts Plaintiff's representations during the actual innocence proceedings.  This argument, however, is merely a reiteration of BPD, the Officer Defendants, and Van Gelder's contention that Burgess is judicially estopped from asserting any claims related to the GSR evidence. As this Court

explained *supra*, Burgess's representations in the actual innocence proceedings and in the present action are not mutually exclusive. When Burgess argued that scientific advancements significantly reduced the probative value of GSR evidence, he made no statement on the quality or integrity of Van Gelder's analysis. Van Gelder *could* have fabricated the GSR evidence, and this Court must accept that allegation as true for purposes of a motion to dismiss. Since BPD allegedly relied on this evidence in its investigation of Burgess, it is plausible that this incident is one example of BPD's unconstitutional policy or practice.

In sum, Plaintiff has sufficiently alleged that he suffered violations of his constitutional rights due to a BPD policy or practice to conduct flawed investigations. Accordingly, Count V will proceed against BPD.

CONCLUSION

For the reasons stated above, Mayor and City Council of Baltimore's Motion to Dismiss (ECF No. 33) is GRANTED WITH PREJUDICE; Detective Goldstein, Detective Ritz, Officer Weese, Officer Purtell, Detective/Sergeant Lehman, Detective Patton, Detective Neverdon, and Daniel Van Gelder's Motion to Dismiss (ECF No. 35) is GRANTED IN PART AND DENIED IN PART; and the Baltimore Police Department's Motion to Dismiss (ECF No. 36) is GRANTED IN PART AND DENIED IN PART. Specifically, Counts I, II, III, VI, VII, VIII, and X will proceed against the Officer Defendants and Van Gelder, while Counts IV, V, IX, and XI are dismissed; Count V will proceed against the Baltimore Police Department, while Counts I-IV and VI-XI are dismissed; and all counts against the Mayor and City Council of Baltimore are dismissed with prejudice.

A separate Order follows.

Dated: March 1, 2016                    _____/s/_____
                                        Richard D. Bennett
                                        United States District Judge