IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

SABEIN BURGESS,                *

           Plaintiff,       *

v.                              Civil Action No. RDB-15-cv-00834

                    *

BALTIMORE POLICE DEPARTMENT,
*et al.*,                    *

          Defendants.    *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE* TO STRIKE PLAINTIFF'S EXPERT WITNESS WAYNE NIEMEYER'S REBUTTAL REPORT AND RELATED TESTIMONY

Defendants Gerald Goldstein, William Ritz, Richard Purtell, Dale Weese, Steven Lehmann, Robert Patton, David Neverdon, John Skinner, John Boyd, Dean Palmere, Kelly Miles, and Daniel Van Gelder (the "Defendants") by their undersigned attorneys, hereby move *in limine* for this Court to strike the Rebuttal Report of the Plaintiff's retained expert, Wayne Niemeyer. As set forth herein, the Rebuttal Report should be stricken, and all testimony relating to the content of the Rebuttal Report precluded, as the Rebuttal Report recites expert opinion testimony that is unreliable, and that was not properly disclosed.

## INTRODUCTION

Plaintiff Sabein Burgess has brought claims against former and current employees of the Baltimore Police Department (BPD) ("Defendants") arising from his 19-year incarceration for the murder of Michelle Dyson on October 5, 1994, alleging Defendants withheld exculpatory evidence and Defendant Van Gelder (a criminologist in the Trace Analysis Unit of the BPD)

improperly presented gunshot residue ("GSR") evidence in a GSR Report he drafted in 1994 and/or during his testimony[1] at Mr. Burgess's trial in 1995.

On June 30, 2017, Mr. Burgess served his Rule 26(a)(2) disclosures in which he identified Mr. Niemeyer as a retained expert witness and provided a copy of Mr. Niemeyer's report (the "Original Report"). Mr. Niemeyer's report was dated June 30, 2017, and contained opinions on the subject of GSR. On July 28, 2017, Defendants served their Rule 26(a)(2) disclosures and identified several experts, including Michael Knox, who would serve as Defendants' GSR expert.

On August 17, 2017—just one day before Defendants were scheduled to depose Mr. Niemeyer—Mr. Burgess produced a so-called "rebuttal" report (the "Rebuttal Report") from

---

[1] This Court has already concluded, and Mr. Burgess has conceded, that there is no claim against Mr. Van Gelder for the content of his trial testimony. In his Memorandum in Support of Motion to Dismiss, Mr. Van Gelder cited *Briscoe v. LaHue*, 460 U.S. 325 (1983) for the proposition that he was immune from a civil suit for his testimony in a criminal trial. (Doc. No. 35-1 at 16 n.7). Mr. Burgess conceded this point in his Opposition, noting that he "does not contend otherwise." (Doc. No. 42 at 2 n. 2). In its Memorandum Opinion dated March 1, 2016, granting in part the Motion to Dismiss, the Court observed that "a trial witness's immunity is clearly established," but that "Plaintiff does not seek to hold Van Gelder liable for any testimony as a witness." (Doc. No. 55 at 15 n. 10).

However, despite Mr. Burgess's concession that he cannot hold Mr. Van Gelder liable for his trial testimony, Mr. Burgess's experts, including Mr. Niemeyer, remain focused on Mr. Van Gelder's trial testimony. Indeed, Mr. Niemeyer testified in his deposition that his criticism of Mr. Van Gelder was limited to Mr. Van Gelder's trial testimony, and not to the content of Mr. Van Gelder's GSR Report:

> Q    Generally your opinions of Mr. Van Gelder, other than his
>      trial testimony which you've very clearly stated certain
>      disagreements about, is there any action that he took prior
>      to trial that you believe he did incorrectly?
>
> A    No.

(Ex. 1, Deposition of Wayne Niemeyer at pp. 229-230). Mr. Van Gelder has filed a motion for summary judgment regarding this issue and many others. (Doc. No. 183).

Mr. Niemeyer. Mr. Niemeyer's Rebuttal Report contained an opinion that there was an

extraordinarily high percentage of GSR particles detected on Mr. Burgess's hands that were

consistent with particles that are typically attributed to bullet fragments and for that reason the

GSR detected on Mr. Burgess's hands was most likely the result of GSR transfer and not Mr.

Burgess firing a gun or being in close proximity to a fired gun.

Because the Rebuttal Report is unreliable, and because it is not properly a "rebuttal" or

even a "supplemental" disclosure, it should be stricken.

## ARGUMENT

A.    **Mr. Niemeyer's Opinion (or New Basis for His Prior Opinion) Contained in His Rebuttal Report Is Not Reliable as Expert Opinion Testimony.**

The party offering expert testimony bears the burden of showing that the testimony

satisfies the requirements of Federal Rule of Evidence 702. *United States v. Davis*, 602 F. Supp.

2d 658, 681 (D. Md. 2009). Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The United States Supreme Court's landmark case of *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provides the analytical framework for determining

3

whether expert testimony is admissible under Rule 702. Under *Daubert*, Rule 702 charges the

trial court to act as a "gatekeepers," making a "preliminary assessment of whether the reasoning

or methodology underlying the testimony is scientifically valid and of whether that reasoning or

methodology properly can be applied to the facts in issue." *Mack v. AmerisourceBergen Drug

Corp.*, 671 F. Supp. 2d 706, 708 (D. Md. 2009) (quoting *Daubert*, 509 U.S. at 592-93). This

gatekeeping obligation applies to all types of expert testimony, not only scientific testimony.

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

    Once the court determines that the proffered expert is qualified to offer opinions

concerning the actual subject at issue, it must next determine whether the expert opinion is based

on scientific knowledge (i.e. that it is reliable) and whether the expert opinion will assist the trier

of fact to understand or determine a fact in issue (i.e. that it is relevant).  See *Daubert*, 509 U.S.

at 592-93.

    Testimony is reliable if (1) it is "based on sufficient facts or data"; (2) it is "the product of

reliable principles and methods"; and (3) the expert "reliably applied the principles and methods

to the facts of the case." Fed. R. Evid. 702. A court must exclude the opinion testimony of an

expert if it is not reliable. *Montgomery v. CSX Transp., Inc.,* 230 F. Supp. 3d 447, 451 (D. Md.

2017).

    In assessing whether a proffered expert's methodology is scientifically valid or reliable,

the Supreme Court set forth the following non-exclusive list of factors to guide courts:

>    (1)  whether the expert's theory can be or has been tested;
>    (2)  whether the theory has been subject to peer review and
>    publication;
>
>    (3)  the known or potential rate of error of a technique or theory
>    when applied;
>
>    (4)  the existence and maintenance of standards and controls; and

4

> (5) the degree to which the technique or theory has been generally
> accepted in the scientific community.

*Daubert*, 509 U.S. at 593-95. Given the virtually limitless contexts in which expert testimony can

arise, not every *Daubert* factor will be applicable in every case; and a court has discretion to

consider other factors it deems relevant. *Kumho Tire Co.*, 526 U.S. at 151.

In both pre- and post-*Daubert* cases, courts also have consistently considered the following

additional factors:

> (1)  Whether experts are proposing to testify about matters growing
> naturally and directly out of research they have conducted
> independent of the litigation, or whether they have developed their
> opinions expressly for purposes of testifying;
>
> (2)  Whether the expert has unjustifiably extrapolated from an
> accepted premise to an unfounded conclusion;
>
> (3) Whether the expert has adequately accounted for obvious
> alternative explanations;
>
> (4) Whether the expert is being as careful as he would be in his
> regular professional work outside his paid litigation consulting;
> and
>
> (5) Whether the field of expertise claimed by the expert is known
> to reach reliable results for the type of opinion the expert would
> give.

Fed. R. Evid. 702 advisory committee's notes (2000 Am.) (citations omitted). A court is free to

consider other factors as well. *Id.* (citing *Kumho Tire Co.*, 526 U.S. at 152 ("[W]e conclude that

the trial judge must have considerable leeway in deciding in a particular case how to go about

determining whether particular expert testimony is reliable.")).

The proffered testimony also must be deemed relevant by the court before it may be

admissible at trial. To be relevant, it must be clear that the proffered testimony "will help the

trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

Indeed, "[t]he Court must exclude expert testimony if it is so fundamentally unreliable that it can offer no assistance to the jury." *Montgomery*, 230 F. Supp. 3d at 451.

Even if the trial court finds the expert qualified and the proffered testimony reliable and relevant, it must examine whether the testimony should nonetheless be excluded under Rule 403 because its probative value is substantially outweighed by the danger of "confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Huskey v. Ethicon, Inc.*, 848 F.3d 151, 159 (4th Cir. 2017) (quoting Fed. R. Evid. 403); see also *Daubert*, 509 U.S. at 595.

The Court should preclude Mr. Niemeyer from providing testimony on this matter because Mr. Niemeyer's opinion in his Rebuttal Report and related testimony does not meet the requirements of Federal Rule 702.

Mr. Niemeyer intends to testify, pursuant to his Rebuttal Report, that that there was an extraordinarily high percentage of certain GSR particles detected on Mr. Burgess's hands that were consistent with particles that are typically attributed to bullet fragments, and for that reason, the GSR detected on Mr. Burgess's hands was most likely the result of GSR transfer. Mr. Niemeyer intends also to opine and testify that GSR analysts such as Mr. Van Gelder would or should have recognized this extraordinarily high percentage of GSR particles that were detected on Mr. Burgess's hands that were consistent with particles attributed to bullet fragments and concluded that the GSR detected on Mr. Burgess's hands was most likely the result of GSR transfer and not Mr. Burgess firing a fun or being in close proximity to a fired gun. This opinion (or basis for Mr. Niemeyer's prior opinion) is not scientifically valid or reliable.

To support his opinion, Mr. Niemeyer relies on three tables[2] from an article written by Wolten, *et al.* published in 1979[3] that provide data on the fraction of particles that are typically attributed to bullet fragments compared to the total number of spheroidal particles which were presumed to be primer formed GSR from the test firings wherein samples were obtained from the shooters hands. Mr. Niemeyer then compares the numbers in the three charts from the Wolten article to the data contained in Mr. Van Gelder's GSR analysis of Mr. Burgess's hands and states that the number of particles found on Mr. Burgess's hands that are consistent with bullet fragments "are considerably higher than the data in the Wolten article and therefore not consistent with Mr. Burgess having fired a gun or having his hands in close proximity to a gun when fired." (Ex. 5, August 17, 2017 Rebuttal Report at 4). Mr. Niemeyer also "looked at" some of his own data "from a few test firing projects" and calculated the percentage of particles that are typically associated with bullet fragments and contends that this data shows that bullet fragments are not found in great abundance on a shooters hands. (*Id.*) Finally, Mr. Niemeyer cites articles that show that the majority of GSR particles deposited on a target in the line of the path of the bullet would be mostly bullet fragments. (*Id.* at 4-5).

Mr. Niemeyer's opinion or basis for his prior opinion is flawed in several respects. First, the Wolten article has nothing to with GSR transfer or how to analyze or determine whether GSR detected on a shooter's hand came from shooting a gun or being in close proximity to fired gun or from GSR that was transferred from another source. Indeed, the conclusion of the Wolten article makes this point abundantly clear and establishes the findings of the research conducted:

---

[2] The tables demonstrate results from three different gun calibers.

[3] Wolten, G.M. et al. Particle Analysis for the Detection of Gunshot Residue. I:Scanning Electron Microscopy/Energy Dispersive X-Ray Characterization of Hand Deposits from Firing, J Forensic Sci., Apr. 1979, Vol. 24, No. 2, pp. 409-422 (Ex. 6, Wolten Article).

**Conclusion**

> The characterizations of gunshot residue from a broad range of
> hand gun cartridges have been found adequate for successful
> analyses of actual cases and in favorable circumstances have
> permitted placing some limitations on the type of ammunition that
> may have been used.

(Ex. 6, Wolten Article at 411). More importantly, in the Wolten article, that authors state that

"[t]he simple division into bullet and primer particles is highly **useful for descriptive purposes,**

**but it is arbitrary.**" (Ex. 6, Wolten Article at p. 412 (emphasis added)). Nevertheless, Mr.

Niemeyer relies on the "arbitrary" division of GSR particles and primer particles and their

percentages or ratios contained in three tables from the Wolten article to conclude that the GSR

found on Mr. Burgess's hands was most likely the result of GSR transfer and not Mr. Burgess

firing a gun or being in close proximity to a fired gun.

When Mr. Niemeyer was asked during his deposition about the authors' statement that

the simple division into bullet and primer particles was "arbitrary," Mr. Niemeyer surprisingly

responded that he did not know why the authors said it was arbitrary, but that he did not think it

was *that* arbitrary.

> Q    He then says the simple division into bulletin primer
>       particles is highly useful for descriptive purposes, but it is
>       arbitrary.  Why do you think he said it was arbitrary?
>
> A    I don't know.
>
> Q    Do you believe it's arbitrary?
>
> Q    I don't think it's **that** arbitrary, no.

(Ex. 1, Deposition of Wayne Niemeyer at 156-157 (emphasis added)).

Essentially, what we have here is an expert who, relying on data from three tables

contained in one article, has crafted an opinion or developed a theory based on the percentage of

GSR particles that are presumed be from bullet fragments versus particles that are presumed to be primer formed GSR—a division that the authors of the relied-upon study calls "arbitrary"— and used those percentages to conclude that the GSR on Mr. Burgess's hands was most likely the result of GSR transfer. This alone establishes that Mr. Niemeyer's opinion is not "based on sufficient facts or data" or "the product of reliable principles and methods" as required by the Rules of Evidence.

Not surprisingly, Mr. Niemeyer's opinion (or theory) contained in his Rebuttal Report has not been the subject of peer review or publication, nor is it a generally accepted methodology. Mr. Niemeyer admitted this during his deposition:

> Q   I understand that response. My question's slightly different. Is the comparison of percentages and identification of a certain threshold perhaps established by Wolten an accepted practice for determining which end of the gun GSR particles come from?
>
> A   You're asking if there's published studies about that?
>
> Q   We'll start with is there published studies about that?
>
> A   Not that I'm aware of, no.
>
> Q   Is it a generally accepted methodology that analysts use to your knowledge to compare the percentages of lead particles to determine which end of the gun the three-component particles came from?
>
> MS. KLEINHAUS:  Just object to the form.  You can answer.
>
> A   No.

(Ex. 1, Deposition of Wayne Niemeyer at 164-165).

Mr. Niemeyer's opinion presents further reliability issues, including that Mr. Niemeyer, did not know whether if a bullet was coated or not coated would affect the type of particles that

would be found on the target. (Ex. 1, Deposition of Wayne Niemeyer at 152-153). Mr. Niemeyer also relied on data from his own test firings and testified that the tests he chose were from various years and used different types of guns and different types of ammunition, which makes any kind of comparison between them and any other firings at hand next to impossible. (Ex. 1, Deposition of Wayne Niemeyer at 35-39).

In sum, Mr. Niemeyer's opinion or basis for his prior opinion contained in his Rebuttal Report is not reliable as required by Fed. R. Evid. 702 and should be stricken.

**B.    Mr. Niemeyer's Rebuttal Report Should Be Stricken and Mr. Niemeyer Should be Precluded from Offering Any Testimony at Trial Pertaining to the Opinions or Statements Contained in his Rebuttal Report.**

In addition, Mr. Niemeyer's Rebuttal Report is not properly "rebuttal," or even "supplemental," and it should therefore be stricken.

### 1.    Applicable Law

A party must disclose the identity of each expert witness "accompanied by a written report—prepared and signed by the witness." Fed. R. Civ. P. 26(a)(2)(B). The report *must* include:

> (i) *a complete statement of all opinions the witness will express and the basis and reasons for them;*
> (iii) the facts or data considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B) (emphasis added).

The parties are required to submit their expert disclosures "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). "[T]he test of a report is whether it

was sufficiently complete, detailed and in compliance with the Rules so that surprise is eliminated, unnecessary depositions are avoided and costs are reduced." *Sullivan v. Glock, Inc.*, 175 F.R.D. 497, 503 (D. Md. 1997) (quoting *Reed v. Binder,* 165 F.R.D. 424, 429 (D.N.J. 1996)). The rule requires that expert reports be "detailed and complete." *See Salgado v. General Motors Corp.,* 150 F.3d 735, 742 n.6 (7th Cir. 1998) (quoting Fed. R. Civ. P. 26 Advisory Committee's Note); *see also Sierra Club v. Cedar Point Oil Co.,* 73 F.3d 546, 571 (5th Cir. 1996), *cert. denied* 519 U.S. 811 (1996). This Court has held that "the report must contain 'a complete statement of *all* opinions the witness will express,'" as well as the basis and reasons for those opinions and the facts or data by the witness in forming those opinions. *Osunde v. Lewis,* 281 F.R.D. 250, 257 (D. Md. 2012) (emphasis in original) (excluding from trial opinion on causation that was not disclosed in expert's report). The report must also give the opposing party an opportunity to arrange for expert testimony by its own witness to respond to opinions stated in the report. *Id.*

Expert reports "must not be *sketchy, vague or preliminary in nature.*" *Salgado,* 150 F.3d at 742 n.6 (citing Fed. R. Civ. P. 26 Advisory Committee's Note; *Sierra Club,* 73 F.3d at 571) (emphasis added); *see also Sharpe v. United States,* 230 F.R.D. 452, 458 (E.D. Va. 2005) (citing *Sierra Club,* 73 F.3d at 571) ("An expert's report must be 'detailed and complete' in order to 'avoid the disclosure of "sketchy and vague" expert information.'"). Rather, they must include the "how" and "why" the expert reached a particular result, and not merely the expert's conclusory opinions. *Id.* (citing *Reed,* 165 F.R.D. at 429); *see also Smith v. Ford Motor Co.,* 626 F.2d 784, 794 (10th Cir. 1980) (requiring an expert report to explain the factual basis for his opinion so that the opposing attorney has some idea of the basis of that opinion and the data relied upon).

Moreover, this Court has confirmed that Rule 26(e), which requires that an expert report be supplemented when a "party learns that in some material respect the disclosure or response is incomplete or incorrect," "does not create a 'right to produce information in a belated fashion.'" *EEOC v. Freeman*, 961 F. Supp. 2d 783, 797 (D. Md. 2013). "'Supplementation under the Rules means correcting inaccuracies, or filling the interstices of an incomplete report *based on information that was not available at the time of the initial disclosure.*'" *Id.* (emphasis added). The Fourth Circuit has held: "'To construe [Rule 26(e)] supplementation to apply whenever a party wants to bolster or submit additional expert opinions would [wreak] havoc in docket control and amount to unlimited expert opinion preparation.'" *Campbell v. United States,* 470 Fed. Appx. 153, 157 (4th Cir. 2012).

Rule 37(c)(1) forbids a party from using at trial any information that party failed to disclose as required by Rule 26(a). Specifically, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence," unless the failure was justified or harmless. *See Hoffman v. Construction Protective Services, Inc.,* 541 F.3d 1175, 1179 (9th Cir. 2008). This sanction is "self-executing" and "automatic." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,* 259 F.3d 1101, 1106 (9th Cir. 2001) (quoting Fed. R. Civ. P. 37 advisory committee's note (1993)); *see also Rambus, Inc. v. Infineon Techs. AG*, 145 F. Supp. 2d 721, 724 (E.D. Va. 2001) ("Notwithstanding the second sentence, Rule 37(c)(1) has been described as a self-executing sanction for failure to make a disclosure required by Rule 26(a), designed to provide a strong inducement for disclosure.") (quoting authority omitted)). The rule allows for an exception where the failure to disclose was substantially justified or harmless. *Yeti by Molly, Ltd.,* 259 F.3d at 1106. In *Southern States Rack And Fixture, Inc. v. Sherwin-Williams Co.,* the

Fourth Circuit articulated a five-factor test to determine whether the failure to disclose was substantially justified or harmless:

> (1) the surprise to the party against whom the evidence would be offered;
> (2) the ability of that party to cure the surprise;
> (3) the extent to which allowing the evidence would disrupt the trial;
> (4) the importance of the evidence; and
> (5) the nondisclosing party's explanation for its failure to disclose the evidence.

318 F.3d 592, 596-97 (4th Cir. 2003); *accord Wilkins v. Montgomery,* 751 F.3d 214, 222 (4th Cir. 2014); *Osunde,* 281 F.R.D. at 258-59.

The nondisclosing party bears the burden of establishing, using the *Southern States* factors, that the failure to disclose was justified or harmless. *Wilkins,* 751 F.3d at 222 (affirming exclusion of expert witness); *see also Sullivan,* 175 F.R.D. at 507 ("'Substantial justification requires justification to the degree that could satisfy a reasonable person that parties could differ as to whether a party was required to comply with the disclosure request.'" (quoting *Nguyen v. IBP, Inc.,* 162 F.R.D. 675, 678 (D. Kan. 1995))). If the nondisclosing party fails to carry that burden, Rule 37(c) imposes "the 'automatic sanction' of exclusion" of the undisclosed evidence. *Southern States,* 318 F.3d at 592 n.2 (quoting 1993 advisory committee note to Fed. R. Civ. P. 37); *accord Campbell,* 470 Fed. Appx. at 156.

As outlined below, application of the foregoing law to the facts and circumstances of this case leads to but one result: Mr. Niemeyer should be precluded from offering any testimony at trial pertaining to the opinions or statements contained in his "Rebuttal Report."

### 2.    Mr. Niemeyer's Improper "Rebuttal" Disclosure.

#### a.    Mr. Burgess's Initial Disclosure of Mr. Niemeyer

On June 30, 2017, Mr. Burgess served his Rule 26(a)(2) disclosures. (Ex.2, Plaintiff's

Rule 26(a)(2) Disclosures (without attachments)). Mr. Burgess identified Mr. Niemeyer as a

retained expert who may be called "to present evidence at trial under the Federal Rules of

Evidence, 702, 703, or 705, consistent with the signed report attached to this disclosure." (*Id.*).

As an attachment to his disclosure, Mr. Burgess served Mr. Niemeyer's 11-page Original Report

(24 pages with attachments) dated June 30, 2017. (Ex. 3, June 30, 2017 Original Report)

The Original Report focused on GSR and GSR transfer and contained three primary

opinions:

(1)    "Analyst, including Van Gelder, would have known about the possibility of transfer in 1994";

(2)    "The GSR test results from Mr. Burgess' hands were most likely the result of transfer"; and

(3)    "Van Gelder's opinions had no scientific basis."

(Ex. 3, June 30, 2017 Original Report at 4, 6, and 8).

To support his opinion that the GSR test results from Mr. Burgess hands were most likely

the result of transfer, Mr. Niemeyer relied on the following facts:

(1)    The victim was allegedly shot at close range in the head and chest in a small area of a basement;

(2)    when the first responding police officer arrived at the scene, he described smelling gun smoke and seeing a lingering cloud of smoke; and

(3)    Mr. Burgess cradled the victim's head with his hands and arms while she laid on the basement floor.

Nowhere in the Original Report is there a mention or discussion of bullet fragments, what

type of GSR particles are typically attributed to bullet fragments, or the purportedly high

percentage of particles which are typically attributed to bullet fragments that were allegedly

detected on Burgess's hands.

### b.    Mr. Burgess's Improper Supplemental Disclosure of Mr. Niemeyer, and Mr. Niemeyer's Rebuttal Report

On August, 17, 2017—just one day before Defendants were scheduled to depose

Mr. Niemeyer—Mr. Burgess served Plaintiff's Second Supplemental Rule 26(a)(2) Disclosure.

(Ex.4, Plaintiff's Second Supplemental Rule 26(a)(2) Disclosure). In this disclosure, Mr. Burgess

identified Mr. Niemeyer as an "Additional Witness Designated Under Rule 26(a)(2)(B)" who

may be called "to present evidence at trial under the Federal Rules of Evidence, 702, 703, or 705,

consistent with the signed report attached to this disclosure." (*Id.*). As an attachment to this

disclosure, Mr. Burgess served Mr. Niemeyer's seven-page Rebuttal Report dated August 17,

2017. (Ex. 5, August 17, 2017 Rebuttal Report at 2).

In the Rebuttal Report, Mr. Niemeyer for the first time opines that Mr. Van Gelder

"overlooked a major finding in the GSR analysis results [from Mr. Burgess's hands], *i.e.* the

extraordinarily high quantity of lead (Pb), and lead antimony (Pb/Sb) particles which are

typically attributed to bullet fragments." (Ex. 5, August 17, 2017 Rebuttal Report at 2). To

support this opinion, Mr. Niemeyer relies on three tables contained in an article published in

1979 which show the fraction of bullet fragments compared to the total number of spheroidal

particles which were presumed to be primer formed GSR from the test firings wherein samples

were obtained from the shooters hands and a table containing some of Mr. Niemeyer's own data

from a few test firing projects.[4] (Ex.5, August 17, 2017 Rebuttal Report at 2-4). Toward the end

---

[4] Mr. Niemeyer also cites to three articles to show that the predominant material found on targets at various distances from a fired gun is bullet fragments. (Ex. 5, August 17, 2017 Rebuttal Report at 4,5).   One of these articles is addressed in separate motion in limine.

of his Rebuttal Report, Mr. Niemeyer asserts that "Mr. Van Gelder's GSR analysis revealed the extraordinarily high quantity of bullet fragments, which became **the major clue** to form my opinion that the GSR particles on Mr. Burgess's hands resulted from transfer during cradling the victim." (Ex. 5, August 17, 2017 Rebuttal Report at 6 (emphasis added)).

This "new" opinion and the basis for that opinion contained in Niemeyer's Rebuttal Report was not disclosed to Defendants in Mr. Niemeyer's Original Report. More importantly, Mr. Niemeyer does not cite or rely on any information in his Rebuttal Report that was not available to him at the time Mr. Burgess made his initial Rule 26(a)(2) disclosures or at the time Mr. Niemeyer prepared his first report.

    **c.**    **Mr. Niemeyer's Deposition**

Mr. Niemeyer was deposed on August 18, 2017. (Ex. 1, Deposition of Wayne Niemeyer at 1). During his deposition, Mr. Niemeyer was questioned about his Rebuttal Report and whether it contained any information that was not available to him at the time he wrote his first report:

> Q    So what new information did you that you were responding to from the time of your first report to the time of your rebuttal report?
>
> A    In the first report I concluded that the likelihood of GSR particles foundon Mr. Burgess's hands were from transfer. And when I saw the report from Mr. Michael Knox, he had pretty much the same opinion as Mr. Van Gelder. And I thought, wait a minute, neither one of them took into account the frequency of the types of particles that were present in that data. I just presumed that they would have seen that or taken that into account. Any analyst would look for some sort of anomaly in their data. And to me, the lead and lead/antimony particles, the high quantity of them in Van Gelder's data was an anomaly. And I suddenly realized after I read Knox's report that he didn't recognize that either or didn't address it if he did recognize it.

16

So I thought, well, in my rebuttal I'm going to have to explain this in much more detail about the issue of bullet fragments being down line, down range from the gun. And most of the particles that were found on Mr. Burgess's hands appeared to be bullet fragments.

Q     So you'd agree that you hadn't included it in your first report but you knew that at the time of your first report?

A     I knew it certainly, yeah.

Q     And you agree that Mr. Knox did not give any discussion of particle percentages in his report?

MS. KLEINHAUS:   Just object to the form of the question. You can answer.

A     In his report he repeated the number of particles that were found during   that analysis by Mr. Van Gelder. He summarized them again. So he had the numbers there.

Q     He did not make a conclusion about ratios or particle percentages in his report?

A     No, he did not.

(Ex. 1, Deposition of Wayne Niemeyer at 141-142). Later in the deposition, Mr.

Niemeyer repeated the point:

Q     I'll take that back. The Knox report, the two sections you were asked about that you indicated would be your rebuttal, your rebuttal report was in response to paragraphs 10.2.1.2 and 10.2.1.3 was what I understood from the testimony you just gave. Am I summarizing that correctly?

A     Yes.

Q     While they were in response to those paragraphs, was there anything in your supplemental report that you did not know at the time you made your original report?

MS. KLEINHAUS: Object to the form in terms of -

-

A     No.

Q     Okay. And while in 10.2.1.3 Mr. Knox discusses
        the numbers of total particles, can we agree that
        nowhere in his report does he make any assertions
        or opinions in his report about the significance of
        the ratios between the various particles?

A     That's correct, he makes no reference to that.

(Ex. 1, Deposition of Wayne Niemeyer at 230-231).

During his deposition, Mr. Niemeyer was also asked what he relied on to form his

opinion that the GSR test results for Mr. Burgess's hands were most likely the result of transfer.

Mr. Niemeyer testified:

> But the **main thing** that I came up with looking at the --Mr.
> Van Gelder's data was the presence of the extraordinarily
> high quantity of lead and lead/barium---lead/antimony
> particles, I'm sorry, lead and lead/antimony particles. That
> was very unusual from at least my experience in casework
> to see that high of a quantity of those type of particles.

(Ex. 1, Deposition of Wayne Niemeyer at p. 130-131 (emphasis added)).

### 3.     Mr. Niemeyer's Report Is Not Properly "Rebuttal," and It Therefore Should Be Stricken.

Mr. Niemeyer produced an expert report that failed to set forth a complete statement of

all of the opinions Mr. Niemeyer intended to express and the basis and reasons for them in

violation of Rule 26(a)(2)(B) and then Mr. Burgess and Mr. Niemeyer surprised Defendants with

a so-called "rebuttal" report that did not rebut anything in Defendants' expert's report and

contained a new opinion (or, at a minimum, the primary basis for a prior opinion) that had not

been previously disclosed.

Mr. Niemeyer's Rebuttal Report and Mr. Niemeyer's testimony establish that his Original Report did not comply with the requirements of Rule 26(a)(2)(b). In his Rebuttal Report, Mr. Niemeyer asserts that the alleged high quantity of bullet fragments found in Mr. Van Gelder's handwritten GSR analysis (which Mr. Niemeyer had when he drafted his Original Report[5]) was *the major clue*" to form his opinion that the GSR particles on Mr. Burgess's hands resulted from transfer during cradling the victim. (Ex. 5, August 17, 2017 Rebuttal Report at 6 (emphasis added)). Likewise, Mr. Niemeyer testified that the "*main thing*" he came up with after reviewing Mr. Van Gelder's GSR data and analysis was the extraordinarily high quantity of lead and lead/antimony particles which Mr. Niemeyer contends are typically associated with bullet fragments. (Ex. 5, Deposition of Wayne Niemeyer at 130-132). However, Mr. Niemeyer did not include this "**major clue**" or "**main thing**," or even the term "bullet fragment," in his Original Report, nor did he indicate that he relied on the percentage, ratio, or type of GSR particles detected on Mr. Burgess's hands to form his opinion that the GSR particles on Mr. Burgess's hands were most likely the result GSR transfer. This is not a case in which an expert neglected to include one of a long list of facts relied upon as a basis for an opinion, Mr. Niemeyer admitted that he failed to include in Original Report what he himself identified as the "main" or 'major" opinion or factor he relied upon to form an opinion. Mr. Niemeyer's Rebuttal Report and deposition testimony confirm that Mr. Niemeyer's Original Report failed to provide

---

[5] Mr. Niemeyer states in his Rebuttal Report that he reviewed Mr. Van Gelder's data contained in Mr. Van Gelder's handwritten notes (Ex. 7 at Burgess 003304-003338) to determine the percentage of particles that Mr. Niemeyer contends are typically attributed to bullet fragments and to perform his bullet fraction calculations. (Ex. 5, August 17, 2017 Rebuttal Report at 3).

Mr. Niemeyer was provided Mr. Van Gelder's handwritten notes (Ex. 7 at Burgess 003304-003338) that he relied on prior to drafting his Original Report because he lists those documents on Appendix A (Documents Received from Loevy & Loevy) in his Original Report. (Ex. 3, June 30, 2017 Original Report, Appendix A).

the "how" and the "why" Mr. Niemeyer reached his opinion that the GSR on Mr. Burgess's

hands was most likely the result of transfer.

Also, during his deposition, Mr. Niemeyer testified that his Rebuttal Report was in

response to two sections contained in Defendants' expert Michael Knox's report, specifically

sections 10.2.1.2 and 10.2.1.3. (Ex. 1, Deposition of Wayne Niemeyer at 230). However, a

review of these sections from Mr. Knox's report demonstrates that Mr. Niemeyer's claim is not

supported:

<div style="margin-left: 2em;">

10.2.1.2.    Niemeyer wrote: "Due to many uncontrolled variables regarding
GSR particle deposition and particle loss over time, one cannot
scientifically (i.e. statistically) determine the relative likelihood of
a person firing a gun, being in close proximity to a gun when fired
or coming into contact with a surface that has GSR on it"
(Niemeyer Report, p. 3).

• This statement, particularly as it applies to Van Gelder's
analysis in this case, is contradicted by the empirical,
textbook, and training literature. The empirical literature
quite clearly establishes that, although the probabilities
of these three possibilities cannot easily be quantified,
transfer depositions occur less frequently, and in
smaller particle numbers, than do depositions due to
firing or being in close proximity to a firearm when it is
discharged. Hence, the relative probabilities are at least
implicit in the research, even if the absolute probabilities
are far from known.

• Furthermore, this statement contradicts Niemeyer's
conclusion that transfer was "most likely" the reason
for GSR being detected on Burgess's hands. If, as
Niemeyer wrote, one "cannot scientifically . . . determine
the relative likelihood" of the three possible explanations,
how can Niemeyer determine that transfer
was "most likely"?

10.2.1.3.    Niemeyer stated his objection to Van Gelder's reported
conclusion and trial testimony, opining that "Van Gelder's
opinions had no scientific basis" (Niemeyer Report, p. 8).
However, in supporting his conclusion, Niemeyer
mischaracterized the basis for Van Gelder's conclusion by

</div>

> only stating that Van Gelder found 18 GSR particles. In
> fact, Van Gelder found 18 particles characteristic of GSR,
> but he also found 223 particles consistent with GSR for a
> total of 241 particles associated with GSR (Scientific
> Working Group for Gunshot Residue, 2011, pp. 20-22).

(Ex. 8, July 28, 2017 Expert Report of Michael Knox at pp. 36-38).

Nothing in these paragraphs or in Michael Knox's report mentions or provides an opinion

on the ratios or significance of ratios between the various GSR particles nor is there any mention

or discussion of the presence (or lack thereof) of particles that are typically attributed to bullet

fragments versus particles that are typically attributed to primer formed GSR. Mr. Niemeyer

conceded this in his deposition, not once, but twice:

> Q   And you agree that Mr. Knox did not give any
>     discussion of particle percentages in his report?
>
> MS. KLEINHAUS:  Just object to the form of the
> question.  You can answer.
>
> A   In his report he repeated the number of particles that
>     were found during that analysis by Mr. Van Gelder.
>     He summarized them again. So he had the numbers
>     there.
>
> Q   He did not make a conclusion about ratios or
>     particle percentages in his report?
>
> A   No, he did not.

(Ex. 1, Deposition of Wayne Niemeyer at 142).

> Q   Okay. And while in 10.2.1.3 Mr. Knox discusses
>     the numbers of total particles, can we agree that
>     nowhere in his report does he make any assertions
>     or opinions in his report about the significance of
>     the ratios between the various particles?
>
> A   That's correct, he makes no reference to that.

(Ex. 1, Deposition of Wayne Niemeyer at 230-231). Mr. Burgess and Mr. Niemeyer should not

be allowed to escape the requirements of Rule 26(a)(2)(b) by naming an out-of-time expert

report a "rebuttal" report when it does not rebut anything in Defendants' expert's report and instead provides additional opinions or reasoning or basis for prior opinions.

Mr. Niemeyer also testified that he knew everything that he included in his Rebuttal Report when he drafted his Original Report, stating "I knew it certainly, yeah" but nevertheless choosing not include it in his Original Report. (Ex. 1, Deposition of Wayne Niemeyer at 142). Therefore, Mr. Niemeyer's Rebuttal Report is not the type of supplementation that is allowed under the Rules because it is not based on information that was not available at the time of his Original Report and the initial disclosure. *See EEOC v. Freeman,* 961 F. Supp. 2d 783, 797 (D. Md. 2013). ("Supplementation under the Rules means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure.")

The failure of Mr. Burgess to provide Defendants with a report from Mr. Niemeyer that satisfied Rule 26(a)(2) within the time period the Court established has unfairly prejudiced Defendants. The failure was neither substantially justified, nor harmless. The Defendants were deprived of the right to have their own expert review and understand all of Mr. Niemeyer's opinions and to review and understand all of the bases and reasons for Mr. Niemeyer's opinions. The Defendants were also deprived of the right to effectively and completely question Mr. Niemeyer during his deposition regarding his undisclosed opinion and the undisclosed basis and reason for the opinion that was disclosed the day before Mr. Niemeyer's deposition. *See Smith v. Tenet Healthsystem SL, Inc.,* 436 F.3d 879, 889 (8th Cir. 2006) ("Rule 26(a)(2) imposes an additional duty to disclose information regarding expert testimony sufficiently in advance of trial that opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses.").

Because Mr. Burgess violated Rule 26(a)(2) with respect to his disclosure of Mr. Niemeyer, and because Mr. Burgess cannot meet his burden of establishing that the violation was either substantially justified or harmless, the Defendants ask that this Court strike Mr. Niemeyer's Rebuttal Report and preclude Mr. Niemeyer from offering any testimony at trial pertaining to the opinions or statements contained in his Rebuttal Report. *See* Fed. R. Civ. P. 37(c)(1); *see also Southern States,* 318 F.3d at 592 n.2 (holding that, if the nondisclosing party fails to carry the burden of establishing substantially justification or harmlessness, Rule 37(c) imposes "the 'automatic sanction' of exclusion" of the undisclosed evidence); *Ciomber,* 527 F.3d at 641 (noting that the sanction under Rule 37(c)(1) is "'automatic and mandatory' unless the offending party can establish 'that its violation of Rule 26(a)(2) was either justified or harmless'" quoting authority omitted)).

Because Mr. Burgess failed to provide all information required under Rule 26(a)(2)(B) with respect to Mr. Niemeyer—*i.e.,* "a complete statement of all opinions the witness will express and the basis and reasons for them," Mr. Niemeyer should be precluded from offering any testimony at trial concerning the opinions or statements contained in his Rebuttal Report. If, however, the Court is inclined to conclude that Mr. Burgess did not violate Rule 26(a)(2) (he did) or that exclusion of Mr. Niemeyer's testimony pertaining to opinions or statements contained in his Rebuttal Report is not an appropriate sanction under Rule 37(c), the Court, for the reasons set forth below, should nevertheless preclude Mr. Niemeyer from offering any opinions or statements contained in his Rebuttal Report at trial because his opinion (or the basis for his prior opinion) is not reliable as required under the Federal Rules of Evidence. *See* Fed. R. Evid. 702.

## CONCLUSION

For the reasons stated above, the Defendants ask that this Court grant this motion, strike

the Rebuttal Report of Mr. Niemeyer, and preclude any testimony of Mr. Niemeyer pertaining to

the opinions or statements contained in his Rebuttal Report.


Respectfully submitted,


/s/ _____

James H. Fields, Esquire

jfields@fieldspeterson.com

Fields Peterson, LLC

Harborplace Tower

111 South Calvert Street, Suite 1400

Baltimore, Maryland  21202

*Counsel for Defendants, Kelly Miles, John Boyd, John Skinner and Dean Palmere*

/s/ _____

Neil E. Duke, Bar No. 14073

nduke@bakerdonelson.com

Kelly M. Preteroti, Bar No. 28231

kpreteroti@bakerdonelson.com

Christopher C. Dahl, Bar No. 29649

cdahl@bakerdonelson.com

Thomas H. Barnard, Bar No. 27488

tbarnard@bakerdonelson.com

Elizabeth J. Cappiello, Bar No. 29185

ecappiello@bakerdonelson.com

BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC

100 Light Street

19th Floor

Baltimore, Maryland 21202

Phone: 410-862-1108

Fax:  443-263-7508

*Counsel for Defendants, Gerald Alan Goldstein, William Ritz, Dale Weese, Richard Purtell, Steven Lehmann, Robert Patton, David Neverdon, and Daniel Van Gelder*

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of October, 2017, a copy of the foregoing Memorandum In Support of Motion *in Limine* to Strike Plaintiff's Expert Witness Wayne Niemeyer's Rebuttal Report and Related Testimony was sent, via the court's CM/ECF System, to:

Arthur Loevy, Esquire
arthur@loevy.com
Jon Loevy, Esquire
jon@loevy.com
Gayle Horn, Esquire
gayle@loevy.com
Steven Art, Esquire
steve@loevy.com
Theresa Kleinhaus, Esquire
tess@loevy.com
Anthony Balkissoon
tony@loevy.com
LOEVY & LOEVY
311 N. Aberdeen Street
Third Floor
Chicago, Illinois 60607

***Counsel for Plaintiff Sabein Burgess***

Colin P. Glynn, Esquire
Colin.Glynn@baltimorepolice.org
Daniel W. Goldberg, Esquire
daniel.goldberg@baltimorecity.gov
Michael G. Comeau, Esquire
michael.comeau@baltimorepolice.org
Baltimore City Law Department
Office of Legal Affairs
100 N. Holliday St.
Baltimore, Maryland 21202
Telephone: (443) 934-1620

***Counsel for Defendant the Baltimore Police Department***

/s/ _____
Neil E. Duke, Bar No. 14073