# Exhibit 1

```
 1            IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF MARYLAND, NORTHERN DIVISION
 2
      SABEIN BURGESS,                )
 3                                   )
              Plaintiff,             )
 4                                   )
         vs.                         ) Case No. 1:15-CV-00834-RDB
 5                                   )
      BALTIMORE POLICE DEPARTMENT,   )
 6    et al.,                        )
                                     )
 7            Defendant.             )

 8

 9

10

11

12

13

14           The deposition of WAYNE D. NIEMEYER, taken

15   before Christina M. Cummins, CSR and Notary Public,

16   pursuant to the Federal Rules of Civil Procedure for the

17   United States District Courts pertaining to the taking

18   of depositions, at 311 North Aberdeen, in the City of

19   Chicago, Cook County, Illinois at 10:58 a.m. on the 18th

20   day of August, A.D., 2017.

21

22   Job No. WDC-139640    Pages: 1 - 236
```

Page 34

1  case?
2  A  Yes.
3  Q  Okay. I was going to get to that, explain
4  later, I didn't understand the context of that chart as
5  I read this as to where it, you know, if it was from one
6  of these particles or something. I see, your own data
7  from firing projects. And do you know how long ago
8  those were, those firing projects?
9  A  There's a variety of them. I think the oldest
10 one might have been around 2010, 2009.
11 Q  So each line -- or I'm going to have to mark
12 it because I'm going to ask you about it now. You have
13 a copy over there?
14 A  Yes, I do.
15 Q  Okay. I'll just mark this copy. I'll give it
16 to you, but you can look at your copy. I'll mark it as
17 three.
18     MR. FIELDS: This is the rebuttal report?
19     MR. BARNARD: Yes, sir.
20     (Document marked as Niemeyer Deposition
21 Exhibit 3 for identification.)
22 Q  Is that a copy of your rebuttal report, sir?

Page 35

1  A  Yes, it is.
2  Q  Okay. Let's talk about the table on page
3  four. Do I understand that each row represents the
4  total particles from a different test firing project you
5  did?
6  A  Yes, each one is --
7     MS. KLEINHAUS: Just object to the form of the
8  question. Sorry. Go ahead.
9  A  Each row is a separate test.
10 BY MR. BARNARD:
11 Q  Okay. So these weren't all done the same day
12 or for the same gun or same project?
13 A  No.
14 Q  Okay. The year range in which these tests
15 were conducted, I think you said the last one was
16 probably around 2009, 2010? First one being, like
17 what's the year range these cover?
18 A  From 2009, 2010 to 2014.
19 Q  Okay. So nothing prior to '09 you're pretty
20 confident?
21 A  No, I don't think so. No, I'm pretty
22 confident that there's nothing prior to '09.

Page 36

1  Q  Have you ever personally fired a handgun?
2  A  Yes.
3  Q  And then had yourself tested for GSR?
4  A  I did that one time.
5  Q  Is that one of the tests that's on this chart?
6  A  No.
7  Q  Okay. Do you have that result, did you look
8  at those results?
9  A  Yes, I did. I have a cabin up in northern
10 Wisconsin that I can do target practice with. And I was
11 a hunter for awhile. My dad introduced me to all that.
12 But anyway, I have a .22 caliber revolver, and I was
13 curious to see how much gunshot residue would deposit on
14 my hand shooting two shots and also at a target 25 feet
15 away, and I wanted to see what would deposit around the
16 bullet holes.
17    So I shot the gun. I had the tape lift stub
18 with me. I didn't even move my hand. I was outside and
19 it was a calm day. I didn't move my hand at all. And I
20 tape lifted the back of my hand and around the thumb and
21 forefinger area, the web between my thumb and
22 forefinger, and then took the target and cut out the

Page 37

1  areas where the bullets were, the bullet holes were and
2  came back to the lab and analyzed it.
3     The stub that I had from my hand I found only
4  two GSR particles. And in the .22 caliber ammunition,
5  it was rim fire ammunition rather than a primer cap.
6  That type of ammunition and this particular ammunition
7  that I had did not have the antimony component in it.
8  It was only lead/barium. But I found two lead/barium
9  particles on my hand. And on the target I found
10 residues from probably the gun powder, organic type
11 stuff, and also bullet materials, lead from the bullet.
12 Q  .22's are interesting in that they're slightly
13 different, though, their ammunition, right, like you
14 said they don't have the antimony?
15 A  Not all of the manufacturers use the antimony
16 component, but some do have it. So you don't know for
17 sure unless you get the ammunition or the spent
18 cartridge case.
19 Q  So these tests, all of the tests on this
20 chart, are these all the tests or did you only pick a
21 few of them?
22 A  I just picked a few of them. There were some

Page 38

1  more that were further back. There was one in
2  particular that I wanted to find because I had -- there
3  was thousands of particles on the hand from the shooters
4  on those things. But I couldn't find that data. It was
5  back, it was way back, early on. And the project file
6  is still available, which I didn't ask the secretary to
7  go into the archives in the basement and try to pull out
8  that project file, but I wanted that one, too, but I
9  just couldn't get to the data or get it in time. I
10 couldn't find the data. That was too old for our
11 network storage systems, you know, computer system.
12     Q   So all of these -- these tests were all
13 controlled tests, like were they indoor, outdoor?
14     A   They were indoor from the information I was
15 given, yeah. Yeah, they were controlled tests with --
16 in a firing range without any ventilation turned on or
17 anything like that.
18     Q   Do you know if they were all handguns?
19     A   They were handguns, yes.
20     Q   And obviously there's a range of particle
21 counts going from 87 to 603 and a range of fractions
22 from 5 percent to 53 percent. What is the scientific

Page 39

1  reason why even though these are all controlled tests,
2  known firers, that there's such a tremendous range?
3        MS. KLEINHAUS: Just object to the form of the
4     question. You can answer. Go ahead.
5     A   Oh. Probably different types of guns,
6  different types of ammunition. Probably mainly the
7  different type of gun revolver versus semiautomatic
8  pistols.
9  BY MR. BARNARD:
10    Q   So these varied? You don't know the mix of
11 revolvers, calibers, automatic?
12    A   I don't know the mix of the specific guns, no.
13    Q   Is it your contention that if a shooter on two
14 different days in the exact same environment used the
15 same gun with the exact same kind of ammunition that
16 these numbers, the total number of particles and the
17 fraction, should pretty much be the same?
18    A   I would certainly expect that, but you won't
19 know until you actually do the analysis.
20    Q   Have you ever seen any scientific studies or
21 literature saying that the scenario that I just said,
22 that they should be within, you know, some standard

Page 40

1  deviation but approximately the same?
2        MS. KLEINHAUS: Just object to the incomplete
3     hypothetical, but go ahead, you can answer.
4     A   I don't recall anything like that, no.
5  BY MR. BARNARD:
6     Q   In your expertise if, let's say, myself and
7  the court reporter, sorry to drag you into this, each
8  shot a gun, like I shot one, then she came up and shot
9  the same gun and we each had the same type of
10 ammunition, the same gun, that the two of us, if we did
11 everything else the same, should have the same,
12 generally the same amount of particles and the same
13 fraction as each other?
14    A   Again, I have no scientific basis to make that
15 conclusion about that. We'd have to do the analysis and
16 the experiment to find out.
17    Q   Okay. And none of the tests you did included
18 that kind of analysis, did it, to see if it would be
19 identical sequentially if it's the same gun and same
20 ammunition? Have you ever done a test like that?
21    A   No, I have not.
22    Q   Okay. Do you have any kind of certifications

Page 41

1  or anything in the field of forensics or studies,
2  anything like that?
3     A   No, I have no certifications. The laboratory
4  has accreditation from A2LA or 17025 accreditation.
5     Q   I suspect that you wouldn't get -- your office
6  wouldn't get work from law enforcement agencies if it
7  wasn't accredited.
8     A   That would be the assumption, yeah. The
9  accreditation is mainly for the pharmaceutical
10 companies.
11    Q   I see.
12    A   They absolutely insist on it, and the Food and
13 Drug Administration, but the accreditation applies to
14 all other things, too.
15    Q   Speaking of that, do you get into some of
16 your -- using some of these machines, the scan electron
17 microscope or microprobe, when you're analyzing things
18 in like, you know, trade disputes, patent disputes
19 between drug manufacturers, is that the kind of work
20 that you would get engaged in?
21    A   Most of the work is involved with just
22 identifying and characterizing contamination-type

Page 130

1   Let's move on.
2   BY MR. BARNARD:
3   Q   Is it possible to determine -- well, scratch
4   that.
5       I want to talk briefly about your discussion
6   of the -- when you give the opinion that the GSR test
7   results for Mr. Burgess's hands were most likely the
8   result of transfer, tell me kind of in your own words
9   what are the main things you're relying on to come up
10  with that conclusion.
11  A   Well, the specific environment of the case,
12  small area in the basement, two shots fired, a plume of
13  smoke was still seen in the basement by one of the
14  police officers. They could smell the smoke. There's a
15  lot of gunshot residue in that room, in that whole area.
16  There's a lot of gunshot residue in there, around there.
17      Mr. Burgess knelt down to cradle her, and you
18  would expect that with a close range shot that there's
19  going to be quite a bit of gunshot residue deposited not
20  only on her but also on the floor nearby her where she
21  fell. And Mr. Burgess was in that environment and was
22  able to come into contact with all of that material,

Page 131

1   even material that's still settling from the smoke
2   plume.
3       But the main thing that I came up with looking
4   at the -- at Mr. Van Gelder's data was the presence of
5   an extraordinarily high quantity of lead and
6   lead/barium -- lead/antimony particles, I'm sorry, lead
7   and lead/antimony particles. That was very unusual from
8   at least my experience in casework to see that high of a
9   quantity of those types of particles.
10      And lead and lead/antimony particles are
11  typically associated with bullet fragments. Bullet
12  fragments are produced in the gun as the bullet goes
13  down the barrel, scraping against the barrel, just
14  friction wear particles coming out of the gun traveling
15  with the bullet down the line of sight of the bullet.
16  The bullet strikes an object. Particles are shed from
17  it. If the object that's struck is fairly hard, there
18  could be even more particles produced as the bullet
19  starts to let's say crack or disintegrate, deform, so
20  forth.
21      And when I saw the high quantity of the lead
22  and lead/antimony particles, to me that was a big clue

Page 132

1   that indicated that this might not have come from firing
2   a gun. You don't see that kind of particle distribution
3   on the hands of someone that has fired a gun. The main
4   bullet fragments are from down range of the gun. And I
5   feel that Mr. Burgess picked those particles up when he
6   knelt down to cradle the victim.
7   Q   So I understand your conclusion then, are you
8   saying you can completely eliminate the possibility that
9   he was -- shot a gun or near a gun at the time it was
10  shot?
11  A   I would not completely eliminate the
12  possibility, no.
13  Q   How does your analysis of the hair particle
14  inform that opinion?
15  A   That's the issue of how easily GSR particles
16  can be transferred. And, again, there's very little
17  studies about that. And this was a particular case that
18  I was able to work on that did involve hair being
19  contaminated with gunshot residue from a gun that was
20  fired within inches of this woman's head leaving a dark
21  smudge in her hair.
22      And that lock of hair was sent in to us for

Page 133

1   analysis to see if it was just plain dirt or if it was
2   gunshot residue. And we took out -- I should say I took
3   out a strand of hair, a couple strands of hair, just
4   looked at it under a microscope and saw that the hair
5   was almost completely covered with dark material. And
6   in a polarized lab microscope you can see the internal
7   structure of hair with transmitted light. In this case
8   I couldn't even see anything through the hair. All I
9   could see was just black. But on reflected light I
10  could see that it was covered with dark particulate.
11      So what we did was took a strand of hair and
12  just draped it lightly over one of those GSR collection
13  stubs and picked it up, put it down a couple more times
14  along the length of the strand of hair. And then we
15  were going to analyze it in the scan electron
16  microscope. Just a quick just manual survey I could see
17  that just about everything there was gunshot residue,
18  lead/barium/antimony particles.
19      So instead of doing a full automated analysis,
20  because that would have been probably thousands of
21  particles, I focused in on one small area of a cluster
22  of them to get what we call an elemental map of the

Page 138

1 requiring more dabs for effective collection versus less
2 is indicative of whether it's easier or harder to
3 transfer off of a substance?
4    A  I'm sorry, what was that again?
5    Q  Do you have an opinion as to whether or not
6 the fact it requires more dabs for effective collection
7 from an object than another is an indicator as to
8 whether or not transference is more difficult from one
9 object to another?
10   A  I wouldn't make that conclusion, no.
11   Q  You don't have an opinion one way or the
12 other?
13   A  No, I don't have an opinion for that, because
14 that would have to be studied again.
15   Q  So you agree that the impact or relevance of
16 the potential for transfer from the hair is a topic that
17 would require further study to adequately predict how
18 products or items would transfer off it?
19   A  Certainly.
20   Q  Is it appropriate -- well, let me rephrase
21 that.
22       Much of the testimony you've given here today

Page 139

1 is explaining your interpretation of events or of facts
2 in light of your own experience of reading prior tests,
3 is that correct?
4        MS. KLEINHAUS: I'm sorry, did you say prior
5    tests?
6        MR. BARNARD: Yes.
7    A  Yes.
8    Q  Is that a proper method for a GSR analyst to
9 use when interpreting GSR results?
10       MS. KLEINHAUS: Just object to the form of the
11   question. That's an incomplete hypothetical, but
12   you can answer.
13   A  Repeat the question again.
14 BY MR. BARNARD:
15   Q  Is comparing the results of the SEM, the
16 findings of the SEM to an individual analyst's own
17 empirical experience and review of past known tests and
18 results a proper and legitimate methodology for
19 interpreting new test results?
20   A  I would say yes.
21   Q  I'm going to go to Exhibit 3. Do you have a
22 copy of your supplemental?

Page 140

1    A  I have a copy of the --
2    Q  Or rebuttal?
3    A  -- the text of it.
4    Q  Yeah.
5    A  That's all it was. Yeah, I have it.
6    Q  Okay. Good. Now, you started to talk about
7 this earlier in terms of you immediately -- the
8 percentage of lead and lead/barium particles stood out
9 to you as significant when you read the results.
10   A  Yes.
11   Q  When's the first time -- I'm sorry, had they
12 stood out to you as significant when you read the
13 results before you made your first report?
14   A  Yes.
15   Q  Did you learn of the Wolten articles after you
16 wrote your first report?
17   A  No.
18   Q  Did you learn more information about the
19 particle counts after your first report?
20   A  The particle counts?
21   Q  Yes.
22   A  No.

Page 141

1    Q  Did you know Mr. Van Gelder's position on --
2 his opinions on transference at the time of your first
3 report?
4    A  Yes, I knew that.
5    Q  So what new information did you get that you
6 were responding to from the time of your first report to
7 the time of your rebuttal report?
8    A  In the first report I concluded that the
9 likelihood of GSR particles found on Mr. Burgess's hands
10 were from transfer. And when I saw the report from
11 Mr. Michael Knox, he had pretty much the same opinion as
12 Mr. Van Gelder. And I thought, wait a minute, neither
13 one of them took into account the frequency of the types
14 of particles that were present in that data. I just
15 presumed that they would have seen that or taken that
16 into account. Any analyst would look for some sort of
17 anomaly in their data.
18       And to me, the lead and lead/antimony
19 particles, the high quantity of them in Van Gelder's
20 data was an anomaly. And I suddenly realized after I
21 read Knox's report that he didn't recognize that either
22 or didn't address it if he did recognize it.

Page 142

1    So I thought, well, in my rebuttal I'm going
2 to have to explain this in much more detail about the
3 issue of bullet fragments being down line, down range
4 from the gun. And most of the particles that were found
5 on Mr. Burgess's hands appeared to be bullet fragments.
6    Q   So you'd agree that you hadn't included it in
7 your first report but you knew that at the time of your
8 first report?
9    A   I knew it certainly, yeah.
10   Q   And you agree that Mr. Knox did not give any
11 discussion of particle percentages in his report?
12       MS. KLEINHAUS: Just object to the form of the
13   question. You can answer.
14   A   In his report he repeated the number of
15 particles that were found during that analysis by
16 Mr. Van Gelder. He summarized them again. So he had
17 the numbers there.
18 BY MR. BARNARD:
19   Q   He did not make a conclusion about ratios or
20 particle percentages in his report?
21   A   No, he did not.
22       MR. BARNARD: Tess, do you have a copy of

Page 143

1 Mr. Knox's report with you by any chance?
2        MS. KLEINHAUS: I might. It might be part
3    of --
4        MR. BARNARD: For your own use.
5        MS. KLEINHAUS: Oh, for my own use. Yes, I
6    do.
7        (Document marked as Niemeyer Deposition
8    Exhibit 8 for identification.)
9 BY MR. BARNARD:
10   Q   I will hand you Exhibit 8, Mr. Niemeyer. It's
11 unfortunately a thick document. I'm handing Exhibit 8,
12 James. It's Mr. Knox's report.
13       MR. FIELDS: Okay.
14 BY MR. BARNARD:
15   Q   Is this the report you previously had a chance
16 to review a copy of, appears to be anyway?
17   A   Yes.
18   Q   Okay. Other than the rebuttal information you
19 include in your rebuttal report, was there anything else
20 in Mr. Knox's report that you hadn't addressed in your
21 first report that you need to address or that you want
22 to address?

Page 144

1    A   No, I don't think so.
2    Q   Okay. Can I take that back from you? Because
3 that's the only copy I got. We'll just do this little
4 game here back and forth. He includes -- this is from
5 page 53, paragraph 1155. I'd like you to take a look at
6 that particular paragraph and read it to yourself.
7    A   Okay.
8    Q   Let me take that back and see what that
9 paragraph says. Do you disagree with that paragraph?
10   A   I don't disagree with that paragraph as it's
11 stated there, but I would disagree that there should be
12 something added to it.
13   Q   What would you add to it?
14   A   I would add to it that there's also no
15 empirical literature showing that the transfer
16 possibility is very small.
17   Q   Okay. I'm not going to try and oversimplify
18 this, but I'm going to anyway. Am I right that between
19 you and Knox, there's just no evidence to show one way
20 or the other as to which possibility is more likely?
21   A   Oh, I disagree with that.
22   Q   Is there scientific evidence to support a

Page 145

1 conclusion one way more likely?
2    A   I believe so, yes.
3    Q   And what is that scientific evidence?
4    A   The preponderance of the lead and
5 lead/antimony particles on Mr. Burgess's hands.
6    Q   Is there anything other than that?
7    A   No, that's the main thing that I found to
8 support my conclusion and the scientific data showing
9 that away from the gun most of the residues that are
10 deposited are bullet fragments, lead/antimony fragments.
11   Q   Well, it's your main scientific point. The
12 first time you brought that up was in your rebuttal
13 report, is that correct?
14   A   Yes.
15   Q   We'll talk, I guess it's the Wolten articles,
16 other than the Wolten articles is there any literature
17 or scientific text or anything supporting your opinion
18 that the percentage of lead and lead/barium particles is
19 indicative of essentially what end of the gun the
20 particles came from?
21   A   I think I put those into my rebuttal report.
22 There's a couple of other article references relating to

Page 150

1  Q  You done with that? I'll take that back from
2  you. So I guess my question for you is also have you
3  ever reviewed any of the statements or testimony by
4  Charles Dorsey?
5  A  No, I don't recall that either.
6  Q  I can't represent this as true as to what
7  happened, but at least his testimony is that he shot at
8  least one of the shots from the staircase when
9  Miss Dyson was still standing down in the basement.
10  A  Okay. I'm not --
11  Q  Suggesting some -- it's not like a
12  pointblank -- the way he described it didn't sound like
13  it was a pointblank type situation.
14  A  Okay.
15  Q  Does that distance, now, we know that
16  Mr. Van Gelder found at least 13, 15 particles of
17  three-component particles, is that distance, how far
18  that would be for at least one of the shots, relevant to
19  you? Because it was the head shot here that's allegedly
20  not the close range shot. Is that relevant to your
21  opinion?
22  A  No.

Page 151

1  Q  Okay. So the distance from shooting is not a
2  critical factor in reaching the conclusion you've
3  reached?
4  A  That's correct.
5  Q  Okay. Now, of the two articles other than
6  Wolten, what were the other articles that you were
7  indicating might have been relevant to this particular
8  issue that you were talking about, distance down-range
9  shots, bullets, whether that was the Ravreby and the Nag
10  article? Is that what you're referring to?
11  A  Oh, let's see. No, it was the Ueyama article
12  and the Nag article.
13  Q  The Nag article, okay. Let's talk briefly
14  about the -- and neither of those discuss the concept of
15  transference, correct?
16  A  That's correct.
17  Q  These dealt with on down range shots over a
18  certain distance you're more likely to find primarily
19  bullet fragments?
20  A  Correct.
21  Q  In the Wolten article, one of the points --
22  you're relying on the Wolten article for his -- well,

Page 152

1  what are you relying on the Wolten article for, let's
2  start with that? That might be easier.
3  A  I'm relying on the Wolten article for the
4  tables one, two and four that appear on page three of my
5  rebuttal report.
6  Q  And the surrounding text to those tables or
7  just the tables themselves?
8  A  Just the tables themselves.
9  Q  Okay. Are you familiar with the conditions of
10  the tests that produced those tables?
11  A  They were test firings from the various
12  calibers of weapons. And as I recall the sampling was
13  taken immediately after the firing. There's more
14  details in the article about that I'm sure, but it
15  seemed like a pretty controlled test.
16      MR. BARNARD: I'm marking that article as
17  Exhibit 10.
18      (Document marked as Niemeyer Deposition
19  Exhibit 10 for identification.)
20  Q  Are you aware whether or not the test used
21  lead bullets or coated bullets?
22  A  I don't recall at this point. I'd have to

Page 153

1  look at the article again.
2      (Document marked as Niemeyer Deposition
3  Exhibit 11 for identification.)
4  Q  I'm going to show you what's been marked as
5  Exhibit 11. Do you have a copy of this, Tess?
6      MS. KLEINHAUS: I don't have a copy of this,
7  but I'll just take a look.
8  BY MR. BARNARD:
9  Q  Mr. Niemeyer, I'm showing you what's been
10  marked as Exhibit 11. Are you familiar with this
11  document? Have you seen it before?
12  A  I do not believe I've seen this, no.
13  Q  Do you recognize that type of document, have
14  you seen anything like that before, what it means, what
15  it's about?
16  A  It's describing a bullet.
17  Q  I'll take it back. So let's assume that this
18  document represents a finding by the forensic analyst,
19  in this case Mr. Wagster, that the jacket type of the
20  round used that was recovered from Miss Dyson had a
21  jacket of copper alloy.
22  A  Uh-huh.

Page 154

1  Q   Okay. How does whether or not a round is
2  coated or not coated affect the types of particles you
3  tend to find at the target?
4  A   That I don't know.
5  Q   One of the things Mr. Wolten states is that --
6  well, he makes this distinction between categories of
7  bullet versus primer particles. Do you understand what
8  that distinction means, what he's talking about there?
9  A   What I believe he's talking about there is the
10 lead and lead/antimony type particles as bullet
11 material, the other particles are primer particles.
12 That's the lead/barium/antimony type particles and the
13 two-component particles that would go along with it, the
14 population of particles from the primer itself, not from
15 the bullet.
16 Q   So you understand the distinction he was
17 drawing was a chemical-based or an elemental-based
18 distinction?
19 A   Yes.
20 Q   If it were that he's saying the bullet and
21 things that accompany the bullet out the muzzle he's
22 calling bullet particles and those things that otherwise

Page 155

1  exit the firearm, you know, out the back are primer
2  particles, let's assume it's one of those two scenarios,
3  do you understand that distinction?
4  A   Yes.
5  Q   Okay. He uses the phrase the distinction of
6  bullet versus primer particles is descriptive but it's
7  arbitrary. Why is the description of -- why would
8  trying to distinguish bullet particles versus primer
9  particles be arbitrary?
10    MS. KLEINHAUS: I'm sorry, can you give him
11    the passage that you're looking at?
12    MR. BARNARD: Sure, I'll point him right to
13    it.
14 Q   Actually there's a paragraph right above it, a
15 one-sentence paragraph -- you know, from the top of this
16 Post-it note to the bottom, if you could read that, that
17 would be great.
18    MR. BARNARD: And beyond that if the
19    context --
20 BY MR. BARNARD:
21 Q   I'm just asking you to read that. If you need
22 to read other things, go ahead.

Page 156

1  A   Okay. You're asking me to look at page 411 of
2  Wolten's article --
3  Q   Yes.
4  A   -- from 1979, and beginning with the sentence
5  that says particles that contain more than traces of
6  barium and ending with the sentence before the heading
7  of morphology and size. And I can go beyond or --
8  Q   Whatever you need.
9  A   Whatever I want, okay. Okay.
10 Q   Did you get to review everything you wanted to
11 review?
12 A   Yes.
13 Q   First question, the sentence the particles
14 that contain more traces -- more than traces of barium,
15 antimony or silicon are classified as primer particles,
16 do you agree with that?
17 A   Yes.
18 Q   He then says the simple division into bulletin
19 primer particles is highly useful for descriptive
20 purposes, but it is arbitrary. Why do you think he said
21 it was arbitrary?
22 A   I don't know.

Page 157

1  Q   Do you believe it's arbitrary?
2  A   I don't think it's that arbitrary, no.
3  Q   Okay. One of the points I believe you're
4  relying on is a statement where he says most of the lead
5  particles are derived from bullet and in this report are
6  classified as bullet particles, provided that in
7  addition to lead they contain only elements that can
8  come from a coating or jacket and provide that they
9  contain no more than a trace of antimony. Do you
10 understand what he means by that?
11 A   Uh-huh.
12 Q   So in his mind what he's talking about, what
13 is a bullet particle, a particle that contains more than
14 a trace of antimony could not be a bullet particle,
15 correct?
16 A   That's what that statement's implying there,
17 yes. He hasn't defined trace, by the way.
18 Q   Well, I think that's -- trace evidence is a
19 well accepted -- would you agree the phrase trace
20 evidence is a generally accepted term in the use of
21 criminologists and criminalists and laboratory
22 technicians?

Page 162

1  BY MR. BARNARD:
2      Q   But do you have any reason to doubt that
3  Mr. Wolten when he published the same year as he
4  published the article you referenced to talked about the
5  interpretations of the test and didn't even mention the
6  possibility of GSR from a victim to a subject's hands?
7          MS. KLEINHAUS: Object, calls for speculation.
8      If you read it and you know you can answer.
9      A   Yeah, I don't know for sure. I haven't read
10 that article. I have the article, but I didn't read it.
11 BY MR. BARNARD:
12     Q   Is it your opinion in your rebuttal report
13 that the higher percentage of lead particles above those
14 percentages identified in the Wolten article make it
15 more likely than not that the GSR particles found on
16 Mr. Burgess was from the muzzle end of a weapon?
17     A   Yes, down range of the weapon.
18     Q   And that would include even the three
19 component particles that Mr. Van Gelder identified?
20     A   Yes.
21     Q   Other than this 1979 article and the other two
22 articles that you have mentioned dealing with bullet

Page 163

1  fragments down range, is there any study supporting the
2  idea that percentage of lead particles is predictive or
3  indicative of what end of the gun the GSR came from?
4      A   Well, I think the -- those articles already
5  tell that, that the bullet fragments are coming from the
6  barrel of the gun, down the barrel of the gun when the
7  gun is fired, down range.
8      Q   I understand that that's -- they describe what
9  the lead particles. My question for you is is there any
10 study that says when you find three-component particles,
11 that those -- you can use that analysis to determine
12 that those three-component particles are not from primer
13 but they are from the down-range portion of the weapon?
14     A   Well, you said not from primer.
15     Q   That they're not primer particles but that
16 they're related to the bullet.
17     A   Oh, no, no, there's no studies like that.
18     Q   Is the use of a percentage of lead particles
19 test a widely accepted methodology for interpreting GSR
20 SEM results?
21         MS. KLEINHAUS: I'll just object to the extent
22     it calls for a legal conclusion or what is widely

Page 164

1      accepted. You can answer.
2      A   I think for any analyst looking at data with
3  multiple materials that have been identified, I don't
4  care if it's GSR or anything else, you have to look at
5  the population of each individual type of article to see
6  if there's any things that are anomalous.
7  BY MR. BARNARD:
8      Q   I understand that response. My question's
9  slightly different. Is the comparison of percentages
10 and identification of a certain threshold perhaps
11 established by Wolten an accepted practice for
12 determining which end of the gun GSR particles come
13 from?
14     A   You're asking if there's published studies
15 about that?
16     Q   We'll start with is there published studies
17 about that?
18     A   Not that I'm aware of, no.
19     Q   Is it a generally accepted methodology that
20 analysts use to your knowledge to compare the
21 percentages of lead particles to determine which end of
22 the gun the three-component particles came from?

Page 165

1          MS. KLEINHAUS: Just object to the form. You
2      can answer.
3      A   No.
4  BY MR. BARNARD:
5      Q   Can you think of any expert that you know of,
6  either a criminal case, civil case or otherwise, who's
7  used the same or similar methodology to give an opinion
8  about how three-component GSR particles were put on a
9  particular surface?
10     A   There have been studies showing distance of
11 travel for primer particles. I don't believe they were
12 done before 1994. There's more recent studies that have
13 been done. The biggest one that I know of is from
14 Michael McVicker & Company up in Canada. They did some
15 studies on their shooting range setting up targets at
16 various distances down range, and they were able to find
17 that primer particles do travel that far. It's up to,
18 you know, 50 feet away that it could travel that far.
19         That was something that was not generally
20 known or realized until some of those studies came out.
21 There's a couple others I think that showed similar
22 results. The speculation is that the primer material is

Page 226

1 discussed, even the principles of those things in that
2 article?
3      MS. KLEINHAUS: Just object to form as vague
4   as to what things in principles, but you can
5   answer.
6 BY MR. BARNARD:
7   Q   Whatever principles you're describing --
8   A   I'm talking about any results for any analysis
9 work, whether it's GSR or anything else, the analyst
10 needs to have a good solid critical look at the data
11 that's been obtained to look for something that might be
12 an anomaly.
13   Q   And in this instance the anomaly you're
14 referring to is the elevated percentages of lead and
15 lead and barium particles in the collection or the
16 identification?
17   A   Lead and antimony particles, not lead and
18 barium. You said lead and barium.
19   Q   Is it antimony?
20   A   It's lead and lead/antimony particles that are
21 highly elevated.
22   Q   Okay. So it's not elevated barium particles?

Page 227

1   A   Correct.
2   Q   Is it there's elevated antimony particles or
3 elevated combined and lead and antimony particles?
4   A   There's two types of particles that he listed
5 in his data, lead, which would be just lead only as the
6 element that he put in there, and then lead plus
7 antimony.
8   Q   Okay. Can I see that exhibit for a second,
9 sir? Are you aware of anywhere in this document or
10 other guidance put out by the FBI prior to 1995 that
11 suggested an analysis of the ratio between lead, lead
12 and antimony particles and other particles?
13   A   No. Wait a minute. I have to take that back.
14 I refer back to the Wolten article that showed the
15 tables showing the bullet fragment fractions versus the
16 total particles.
17   Q   Other than the Wolten article, and would you
18 agree with me that the Wolten article does not suggest
19 as an analytical tool that the analyst should do a
20 comparison of the percentages of the particles to
21 identify the source of the particles?
22   A   Okay. I'll agree with that.

Page 228

1   Q   So excluding what the findings of the test are
2 in the Wolten article, are you aware of any guidance put
3 out by testing agencies or advisory councils or things
4 like the McCrone Institute that would suggest an analyst
5 in 1995 or prior that they should after performing an
6 SEM do an analysis of the ratios of the different types
7 of particles and draw a conclusion from those ratios?
8   A   I don't know of any published information like
9 that.
10   Q   Okay. Turning to Exhibit 7, this is the
11 report. If -- I think, you know, originally I asked you
12 about this and you indicated that you thought
13 Mr. Van Gelder had checked the correct box on this
14 report.
15   A   Yes.
16   Q   And then you were asked some questions about
17 there's a sentence in there, which specific phrase do
18 you disagree with in that conclusion you checked?
19   A   I think it was the last sentence. It says
20 most probably, however, the subject's hands were
21 immediately adjacent to the discharging firearm or were
22 themselves used to fire the firearm within a few hours

Page 229

1 of time.
2   Q   So given your understanding, that view or
3 disagreement with that sentence, which block should
4 Mr. Van Gelder have checked?
5      MS. KLEINHAUS: I'll just object to the form
6   that it mischaracterizes his prior testimony which
7   wasn't about which box he should or should not have
8   checked, it was about whether anything was
9   misleading in the last sentence.
10      MR. BARNARD: Okay. I'll just object for the
11   record that my prior question to him was about
12   which box should be checked.
13   Q   And I'm just saying, do you believe now, do
14 you change your answer based on that other question
15 about which block Mr. Van Gelder should have checked?
16   A   No, I do not change my opinion of that.
17   Q   That's all I wanted to know. I just wanted to
18 make sure you weren't changing your answer.
19   A   No.
20   Q   Generally your opinions of Mr. Van Gelder,
21 other than his trial testimony which you've very clearly
22 stated certain disagreements about, is there any action

Page 230

1  he took prior to trial that you believe he did
2  incorrectly?
3     A   No.
4     Q   I'll take that back. The Knox report, the two
5  sections you were asked about that you indicated would
6  be your rebuttal, your rebuttal report was in response
7  to paragraphs 10.2.1.2 and 10.2.1.3 was what I
8  understood from the testimony you just gave. Am I
9  summarizing that correctly?
10    A   Yes.
11    Q   While they were in response to those
12 paragraphs, was there anything in your supplemental
13 report that you did not know at the time you made your
14 original report?
15        MS. KLEINHAUS: Object to the form in terms
16 of --
17    A   No.
18 BY MR. BARNARD:
19    Q   Okay. And while in 10.2.1.3 Mr. Knox
20 discusses the numbers of total particles, can we agree
21 that nowhere in his report does he make any assertions
22 or opinions in his report about the significance of the

Page 231

1  ratios between the various particles?
2     A   That's correct, he makes no reference to that.
3     Q   Just to clarify what I understand your
4  testimony was about studies related to the transfer of
5  particles, and I think my question was were you aware of
6  a study or any finding of transference where there was
7  over three three-component particles, I believe even
8  though you have some clarifying answers, is your answer
9  to that question still yes?
10    A   Are there any studies that show transfer of
11 more than three GSR particles?
12    Q   Yes.
13    A   I think I said no, I don't know of any of
14 those.
15    Q   I'm trying to figure out if the questions that
16 you were asked by counsel has changed that answer in any
17 way.
18    A   No.
19    Q   Okay. And when you found in the case where
20 you found just a single particle on the sock, I think
21 it's in the Kamm, is it the Kamm case?
22    A   It's the Kamm case, yes.

Page 232

1     Q   What was the basis for you finding that that
2  was the result of a transfer?
3     A   I just said it was a possibility that it was a
4  transfer. That's as far as I needed to go with it.
5     Q   Okay. Is there any widely accepted standard
6  in the field, either test, evaluation, criteria or
7  otherwise, to deciding whether or not particles were
8  placed directly from the weapon or transferred?
9     A   No, not that I'm aware of.
10        MR. BARNARD: I have nothing else.
11        MS. KLEINHAUS: I have nothing based on that.
12 I think you are a free man.
13        MR. BARNARD: Read and sign?
14        MS. KLEINHAUS: Oh, yes. You can --
15        THE WITNESS: Yes, please.
16        MS. KLEINHAUS: Great.
17
18            (WITNESS EXCUSED.)
19
20
21
22

Page 233

1  STATE OF ILLINOIS)
                   ) SS.
2  COUNTY OF C O O K)
3         The within and foregoing deposition of the
4  aforementioned witness was taken before Christina M.
5  Cummins, C.S.R., and Notary Public, at the place, date
6  and time aforementioned.
7         There were present during the taking of the
8  deposition the previously named counsel.
9         The said witness was first duly sworn and was
10 then examined upon oral interrogatories; the questions
11 and answers were taken down in shorthand by the
12 undersigned, acting as stenographer and Notary Public;
13 and the within and foregoing is a true, accurate and
14 complete record of all of the questions asked of and
15 answers made by the aforementioned witness, at the time
16 and place herinabove referred to.
17        The signature of the witness was not waived,
18 and the deposition was submitted, pursuant to Rules
19 30(e) and 32(d)4 of the Rules of Civil Procedure for the
20 United States District Court, to the deponent per copy
21 of the attached letter.
22