**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| SABEIN BURGESS, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No.: RDB-15-0834 |
| BALTIMORE | * | |
| POLICE DEPARTMENT *et al.*, | | |
| | * | |
| Defendants. | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**PLAINTIFF'S MOTION *IN LIMINE* NO. 3 TO BAR ARGUMENTS
<u>UNSUPPORTED BY FACTUAL FOUNDATION</u>**

Now comes Plaintiff, Sabein Burgess, by his counsel, Loevy & Loevy, and

respectfully moves this Court for an order barring arguments unsupported by factual

foundation. In support thereof, Plaintiff states as follows:

During the litigation of this case, the Defendants have tried to suggest that

Plaintiff is a puppeteer pulling the strings on any evidence that exculpates Plaintiff and

inculpates Howard Rice or Charles Dorsey. Despite exhaustive discovery, the Defendants

have yet to be able to connect the dots in their theory, and they have failed to produce a

shred of evidence suggesting that Plaintiff orchestrated his own exoneration. Apart from

lacking any evidentiary foundation, Defendants' theory is facially implausible—in their

view, Plaintiff, while incarcerated, convinced Charles Dorsey to confess to murder that

could put him in prison for life, without any motivation for doing so; convinced Brian

Rainey to falsely exculpate him of the murder of Brian's own mother; and convinced

Denise Wilson, an FBI informant and ex-girlfriend of Howard Rice, to falsely tell the FBI

that Rice had killed Dyson. These cynical and unsupported assertions are nothing more than self-serving speculation.

It is hornbook law that a party at trial cannot ask questions of witnesses or present arguments to the jury that do not have a basis in the record. Because Defendants have produced no evidence support these theories, they should be forbidden from arguing at the upcoming trial that Plaintiff was behind any of the following evidence: the confession of Charles Dorsey; the exculpatory statements of Brian Rainey; and the information that Denise Wilson provided the FBI regarding Howard Rice.

### Argument

The Federal Rules of Evidence require a witness to have personal knowledge in order to testify. Fed. R. Evid. 602. Likewise, case law requires that any argument made by counsel must be based on evidence in the record. It is a foundational rule that at trial counsel are not free to speculate and fill in the evidentiary holes in their case without a good faith basis in the record for doing so. *See Summerville v. Loc. 77*, 369 F. Supp. 2d 648, 657 (M.D.N.C. 2005), *aff'd* 142 Fed. Appx. 762 (4th Cir. 2005) ("Mere speculation and suspicion will not suffice. Plaintiff has shown no personal knowledge of conspiratorial agreements. He has presented no witnesses whose testimony, and on documents whose contents, raise a reasonable inference of conspiracy."); *Takeall v. Pepsico, Inc.*, 809 F. Supp. 19, 22–23 (D. Md. 1992), *aff'd*, 14 F.3d 596 (4th Cir. 1993) (explaining that where there is no evidence, plaintiff cannot make argument that the creator of the Pepsi jingle had access to plaintiff's phrase). Those very basic principles require barring the Defendants' from arguing that Plaintiff masterminded his own exoneration by nefarious means.

**A.      There is No Evidence Suggesting Plaintiff Was the Reason Charles Dorsey Confessed**

During his deposition, Defendant Ritz suggested, without any foundation, that Plaintiff was behind Charles Dorsey's confession to the Dyson homicide. Ex. 1, Ritz Dep. 11/7/16 at 376 ("I guess I had someone that was trying to confess to a crime where the information he was providing didn't match up. It would be very easy with the length of sentence that Mr. Dorsey was providing and the relationship that he had with Sabein and his mother stayed there."). But apart from his say-so, Defendant Ritz was never able to point to any evidence supporting his view—other than the fact that Plaintiff had been convicted of the crime. And Plaintiff's counsel pushed him hard to identify the factual support for his view. Defendant Ritz testified that he searched through Dorsey's phone records at the prison but did not identify any communications between Dorsey and Plaintiff or any member of Plaintiff's family. Ex. 1 at 347-49. Nor could Ritz identify any other type of communication between Plaintiff and Dorsey that occurred during the operative time period. Instead, Ritz simply speculated that Plaintiff told Dorsey about the crime, but admitted that this belief was not based on any actual evidence in the record. *Id.* at 379, 382.[1] Defendant Ritz speculated during his deposition that it was odd that Dorsey was confessing to the crime to make amends with Plaintiff's mother, but at the same time Dorsey did not care a bit about either Plaintiff or the victim's children. But ultimately

---

[1] For example, Defendant Ritz testified that because Plaintiff made an MPIA request for the homicide file prior to Dorsey's confession, Plaintiff must have somehow communicated all of the evidence in that file to Dorsey. Ex. 1 at 385-86. But Defendant Ritz admitted that he has absolutely no evidence that whatever documents Plaintiff received in response to that request were ever sent to Dorsey and that he has no evidence to support a belief that such an exchanged occurred. *Id.* at 386 (Id. at 386 ("Q. Do you have any evidence that copies of documents that Sabein received through the Maryland Public Information Act were sent to Charles Dorsey? A. No. I have -- Q. You are surmising that that might have been done, correct? A. Yes. Q. Based on no evidence, right? A. Yes.").

Defendant Ritz concluded that his speculation was just that—speculation. *Id*. at 408-14.[2] Apart from Defendant Ritz's testimony, there is not a single piece of evidence supporting a connection between Plaintiff and Dorsey's confession.

Given this backdrop, Defendant Ritz should be barred from testifying that Plaintiff and Dorsey colluded to produce Dorsey's confession to murder. It is pure self-serving speculation that is not based on a single evidentiary fact—a concession that Defendant Ritz was forced to make repeatedly at his deposition. Likewise, the Defendants should not otherwise be permitted to argue that Dorsey only confessed because he and Plaintiff colluded, or Plaintiff somehow convinced him to do so. Nor should Defendants be permitted to cross-examine Plaintiff on this point without first identifying a good-faith basis for asking such a question. At the end of the day, the Defendants conducted extensive discovery in this case, and they have not developed any fact to support their theory. Dorsey denies it; Plaintiff denies it; the records refute it; no other witness has supported it in any way; Defendants cannot point to any other written discovery or testimony to support this false accusation; and Defendants cannot rely on their own speculation as evidence.

**B.      There is No Evidence Suggesting that Plaintiff Was the Reason that Rainey Disclosed His Exculpatory Statements**

There is similarly no evidence to support the Defendants' galling theory that Plaintiff conned Brian Rainey into providing entirely false testimony exculpating him of his mother's murder. Such a categorically impossible theory—that a child of a murder victim joined forces with his mother's murderer to set him free from prison without any

---

[2] Defendant Ritz has not been identified as an expert witness on police practices, or false confessions and as a result, cannot opine on the same. Nor would he be qualified to give such testimony.

perceivable reason for doing so—would have to be supported by compelling evidence in order to justify inviting the jury to consider such a theory. Defendants have no supporting evidence at all, let alone compelling evidence.

After telling Defendants on the night of his mother's murder, unbeknownst to Plaintiff, that Plaintiff was not the perpetrator, Rainey next came forward in 2012, when he wrote a letter to Plaintiff while incarcerated. Ex. 2, Rainey Letter dated 2/14/12. According to Rainey, in addition to the Defendants, he told his grandmother on the night of the murder what he saw—and that neither offender was Plaintiff—but his grandmother did not want him getting involved in the criminal justice system. Ex. 3, Rainey Dep. at 26-29, 138. In 2007, Rainey broached the issue with his grandmother again, and spoke to her about correcting the injustice that had occurred. It then took him until 2012 to take action to do the same. Ex. 3 at 82-83, 130.[3] After the night of the crime, the only people he spoke to before coming forward were his grandmother and his siblings. Ex. 3, Rainey Dep. at 100.

Neither Plaintiff nor Rainey have testified or will testify that they were in communication at this time, or any time prior. Ex. 3 at 177-178; Ex. 4, Plaintiff Dep. 12/1/16 at 375-377. Nor is there any evidence that Rainey was in contact with any other member of Plaintiff's family. Instead, as Rainey testified he wrote the letter to Plaintiff

---

[3] Rainey explained that the reason it took him until 2012 to come forward was because:

> [A]t first, I didn't think I could really do nothing.· I didn't.· So I'm like, no, he's still locked up.· Like even though everybody knows like he didn't do it, like I never knew like how to --the system worked as far as start asking questions. You know, I start asking questions. And I said, well, you know what, first I'm doing the writing. First this letter, letting him know that I know he didn't do it, and I was going to come home and I wanted to come home and talk to some lawyers about it.· But, obviously, by me writing a letter and I didn't know that he was already in the process of trying to get some of his time back, so that's when the Innocence Project came and spoke to me, but that's something I wanted to do, though, you know.

Ex. 3 at 130-31.

by himself and of his own volition. Ex. 3 at 82 ("Q. And you can confirm that you wrote this letter? A. Correct, I can confirm. Q. Did anyone else help you write this letter? A. No. Q. And was this letter written at anyone's direction? A. No."). Try as they have, the Defendants have not been able to demonstrate any communication or contact, directly or indirectly, between Rainey and Plaintiff prior to, let alone leading up to, Rainey's letter to Plaintiff saying that Rainey knew Plaintiff was innocent.

### C.   There is No Evidence Suggesting that Rainey's Testimony that He Told Police About What He Saw on the Night of His Mother's Murder was Because of Plaintiff or Witness Johnson

Additionally, and relatedly, there is no evidence in the record suggesting that Rainey's testimony—that he told the Defendants about what he saw on the night of his mother's murder—was provided at Plaintiff's behest or because of Rainey's relationship with witness Amanda Johnson.[4] The Defendants have tried to make hay of the fact that Rainey's 2012 affidavit, while discussing what he witnesses on the night of his mother's murder, does not include a statement that he told police these facts when asked at the scene. But there is nothing in Rainey's affidavit that is even marginally inconsistent with the fact that he spoke to the police, and Rainey has repeatedly testified that he did do so by way of declaration (in January 2015) and at his deposition (in June 2016). According to the Defendants, because Rainey only testified about communicating with the police on the night of his mother's murder after Plaintiff's release from prison, Plaintiff and Rainey, or Rainey and Johnson, must have colluded to fabricate that evidence. Those arguments should be barred.

---

[4] Amanda Johnson was Brian Rainey's girlfriend and the mother of his child. She is also Plaintiff's niece.

As an initial matter, Rainey testified that in 2012 or 2013, he told prosecutor Anthony Gioia, who was investigating Plaintiff's Writ of Actual Innocence, that Rainey told the police what he saw on the night of the murder—well before Plaintiff was exonerated and released, and well before Plaintiff and Rainey got in touch. Ex. 3 at 91, 93-94; Ex. 4 at 375-78 (explaining that he had not spoken to Rainey after his mother's murder until he was released from prison on the murder charge). Gioia denies as much based on written notes that he has of their conversation, which Gioia has thus far refused to produce. Crediting Rainey, however, the Defendants' chronology fails at the outset: Rainey told someone prior to Plaintiff's release about speaking to the police on the night of his mother's homicide.

But even setting that aside, the evidence of alleged collusion between Plaintiff and Rainey starts and stops with the fact that Plaintiff and Rainey have spoken since Plaintiff's release. Both Plaintiff and Rainey have testified that they re-connected following Plaintiff's exoneration. Ex. 4 at 375-78; Ex. 3 at 179. As Rainey explained "[w]hatever time frame that was when he finally did get released, he came home first, and then I came home after that. And that's when I finally got in contact with him after all these years." Ex. 3 at 179. But there is no evidence whatsoever that any of those conversations had anything to do with this case. To the contrary, Rainey testified that they did not. *Id*. at 181.

Along the same lines, Defendants may wish to insinuate that Rainey's statements were a result of his brief romantic relationship with Amanda Johnson, Plaintiff's niece. Johnson testified that she met Rainey in the summer 2014 or 2015 after Plaintiff had been released. Ex. 5, Johnson Dep. 34, 45. She did not meet Rainey through Plaintiff, and both

she and Rainey were surprised by the coincidence. *Id*. at 34-35. Most importantly, Johnson provided no testimony suggesting in any way that Rainey's account of events was influenced by her relationship with him.

As a result, all the Defendants are left with is the fact that Plaintiff and Rainey re-connected after Plaintiff's release and Rainey was coincidentally connected to Amanda Johnson at some time in summer 2014 or summer 2015. There is simply no foundation to show that Rainey had a motive to provide false information about his own mother's murder to a state prosecutor and under oath in an affidavit and a deposition. Nor is there any evidence that Plaintiff or Amanda Johnson asked him, discussed with him, or convinced him to do so. At the end of the day, Defendants are forced to advance this spurious theory (and the others discussed in this motion) because they framed an innocent man for murder, all of the evidence supports the conclusion that he was framed, and there is no actual evidence that supports any alternative theory. Given the absolute dearth of evidence supporting the Defendants' argument, the Defendants should be barred from making it.

### D.   There is No Evidence Suggesting that Plaintiff Was Behind Denise Wilson's Communication with the FBI

Finally, according to the Defendants, Plaintiff is the reason why Denise Wilson told the FBI in April 1996 that Howard Rice killed Michelle Dyson. Again, there is simply no evidence to support questioning or argument along these lines. Wilson was Rice's ex-girlfriend and she spoke to the FBI as a confidential informant on April 2, 1996. Ex. 6, Wilson 302 at Burgess 8407-17. The interview was conducted as part of an investigation that the FBI and BPD conducted jointly. During the interview, Wilson told

the FBI that "HOWARD killed a girl named MICHELLE DYSON on October 5, 1994 at her residence at 2703 Barclay Street." *Id*. at 8411.

Wilson was also a friend of Plaintiff's; he met her in 1994 when he was on work release. Ex. 4 at 334-35. Plaintiff testified that he recalled Wilson visiting him in prison, but he could not remember when. *Id*. at 337. Defendants have not produced any evidence of any meeting between Plaintiff and Wilson, in the period of time between Plaintiff's conviction (June 13, 1995) and Wilson's FBI interview (April 2, 1996), at which such a plan could have been hatched. Indeed, the FBI recounted that during the interview of Wilson, she stated that "Dyson's boyfriend got blamed for [the murder]" but that "[s]he [Wilson] does not know the boyfriend's name[.]" There is no reason to suspect that the FBI misreported this aspect of its interview, and the fact that Wilson did not even know Plaintiff's name at the time of the interview flatly refutes Defendants' collusion theory.

Nonetheless, based on evidence that Plaintiff and Wilson had met and visited at some point during Plaintiff's lengthy wrongful incarceration, the Defendants would have the jury believe that Plaintiff told Wilson that Rice was responsible for the Dyson murder, and directed Wilson to speak with the FBI about Rice and the Dyson homicide. All available evidence contradicts this theory, and there is too thin an evidentiary reed to permit such an argument or questioning on such a theory to go forward.

Defendants caused Plaintiff's wrongful conviction. They covered up evidence of Plaintiff's innocence for years. When others finally came forward and Plaintiff and his attorneys finally won a long and hard-fought fight to prove his innocence, Plaintiff was exonerated. At the end of the day, there is no evidence that Plaintiff killed Michelle Dyson, and so Defendants would like to defend themselves at trial by arguing that

Plaintiff's exoneration is a sham. They have no evidence that this is the case, and without evidence the law prevents them from advancing such a defense.

WHEREFORE, Plaintiff respectfully requests that the Court enter and order barring Defendants from arguing or questioning witnesses on the following theories:

- That Plaintiff colluded with Charles Dorsey to fabricate Dorsey's confession

- That Plaintiff colluded with Brian Rainey to fabricate (a) Rainey's statements that he saw the offenders on the night of his mother's murder and neither were Plaintiff and (b) that Rainey told the Defendants about what he saw on the night of his mother's murder; and

- That Plaintiff colluded with Denise Wilson to have her report to the FBI that Howard Rice was responsible for the Dyson homicide.


RESPECTFULLY SUBMITTED,

**SABEIN BURGESS**

/s/ Jon Loevy
Jon Loevy

Jon Loevy, admitted *pro hac vice*
jon@loevy.com
Gayle Horn, Bar No. 7182
gayle@loevy.com
Steven Art, admitted *pro hac vice*
steve@loevy.com
Theresa Kleinhaus, admitted *pro hac vice*
tess@loevy.com
Anthony Balkissoon, admitted *pro hac vice*
tony@loevy.com

LOEVY & LOEVY
311 North Aberdeen Street, Third Floor

Chicago, Illinois 60607
(312) 243-5900 (tel.)
(312) 243-5902 (fax)
*Attorneys for Plaintiff Sabein Burgess*

## CERTIFICATE OF SERVICE

I, Jon Loevy, an attorney, hereby certify that on October 20, 2017, I filed the foregoing motion using the Court's CM/ECF system, which effected service on all counsel of record.

RESPECTFULLY SUBMITTED,
/s/ Jon Loevy
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900 (tel.)
(312) 243-5902 (fax)
*One of Plaintiff's Attorneys*