IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND, NORTHERN DIVISION

| | | |
|---|---|---|
| SABEIN BURGESS, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No.: RDB-15-0834 |
| BALTIMORE | * | |
| POLICE DEPARTMENT *et al.*, | | |
| | * | |
| Defendants. | | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF JOSEPH STINE (DKT. NO. 221)**

**Introduction**

It is well-settled that police practice experts can assist jurors in Section 1983 cases, including those involving wrongful convictions. In nonetheless seeking to exclude the testimony of Plaintiff's police practices expert, Joseph Stine, Defendants make no argument about Mr. Stine's qualifications or the admissibility of his opinions besides arguments that he is not relying on competent evidence. This is not, in other words, a genuine *Daubert* motion. Instead, Defendants' gripe with Stine is simply a rehash of their arguments at summary judgment about Plaintiff's evidence. A motion *in limine* is not the proper vehicle to narrow legal issues for trial and summary judgment motions dressed up as motions *in limine* should be rejected. *See Banque Hypothecaire Du Canton De Geneve v. Union Mines, Inc.,* 652 F. Supp. 1400, 1401 (D. Md. 1987) (summary judgment motions dressed up as motions *in limine* are to be discouraged. Accordingly, Defendants' motion should be denied on that basis alone. To the extent that the Court wishes to reconsider arguments made at summary judgment about the competency of Plaintiff's evidence, Plaintiff responds to each of Defendants' contentions below.

**Argument**

**I.     "Police Practices" Is Valid Subject for Expert Testimony**

Courts have long recognized the validity of police practices expert testimony in cases involving wrongful convictions. *Lopez v. City of Chicago,* 464 F.3d 711, 720 (7th Cir. 2006); *Abdullahi v. City of Madison,* 423 F.3d 763, 772 (7th Cir. 2005). *See also* Michael Avery, David Rudovsky, et al., *Police Misconduct: Law and Litigation* 11:15 (West 2012) ("The use of expert testimony regarding proper police practices is now regularly entertained by the courts.").

"In constitutional tort cases, expert testimony regarding sound professional standards governing a defendant's actions can be relevant and helpful." *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013). Such testimony is relevant because it "can give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights." *Id*. at 721–22.

Accordingly, courts in all Circuits have regularly permitted police practices experts to "describ[e] professional standards and identify departures from them." *West v. Waymire*, 114 F.3d 646, 653 (7th Cir. 1997); *e.g.*, *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 460 (8th Cir. 2011) (agreeing with conclusions of police practices expert in finding that jury should have been allowed to hear the case); *Restivo v. Hessemann*, 846 F.3d 547, 579–80 (2d Cir. 2017) (citing *Jimenez* and affirming admissibility of police practices expert to identify professional practices and departures); *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) (similar); *Miranda-Rivera v. Toledo-Davila,*813 F.3d 64, 71 (1st Cir. 2016) (expert allowed to opine that actions were "contrary to generally accepted police practices"); *Young v. County of Los Angeles*, 655 F.3d 1156, 1162 (9th Cir. 2011) (discussing evidence of a police practices expert who stated basic standards); *Estate of Smith v. Marasco*, 318 F.3d 497, 509 (3d Cir. 2003)

(police practices expert who opined that officers' conduct "fell significantly below accepted professional standards"); *Kopf v. Skyrm*, 993 F.2d 374, 378 (4th Cir. 1993) (finding abuse of discretion in *exclusion* of police practices expert called to testify about "accepted police practices"); *Larez v. City of Los Angeles*, 946 F.2d 630, 635 (9th Cir. 1991) (finding that testimony of "an expert on proper police procedures and policies" was relevant and admissible); *Dunster v. Metro. Dade Cty.*, 791 F.2d 1516, 1518 (11th Cir. 1986) (case where both sides presented experts concerning "normal police practices" and standards).

The Defendants do not dispute any of this. In fact, they have disclosed a police practices expert of their own, William Gaut, who provides his own (reciprocal) opinions about the same subjects on which Mr. Stine opines. The jury will hear a classic "battle of the experts" on this point, and there is no need for this Court to bar anything.

Nor is there any merit to Defendants' objections about the specifics of Mr. Stine's police practices testimony. Plaintiff explains as follows.

## II. Mr. Stine can legitimately provide expert police practices testimony on Defendants' failure to disclose information to Plaintiff's defense attorney.

Plaintiff has accumulated sufficient evidence that his due process rights were violated under *Brady v. Maryland*, as discussed at length in his response to summary judgment and during the recent summary judgment hearing. Dkt. No. 195-1 at 40-83. In support of their position that Mr. Stine has no factual basis to render opinions on this subject, Defendants cite only one inapposite, out-of-circuit case—*Porter v. White*—in which the prosecutor had received the exculpatory information from the police officers, but failed to disclose it to the plaintiff, so no due process claim could proceed against the police officers. Dkt. No 221-1 at 6 citing 483 F.3d 1294, 1308-10 (11th Cir. 2007). However, *Porter* did not announce anything revelatory about due process claims; it is hornbook law that a due process claim cannot proceed against

police officers if the prosecutor received the exculpatory evidence because the prosecutor is ultimately responsible for disclosure. *See, e.g., Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846 (4th Cir. 1964). But, of course, that rule is totally useless here, where the evidence is that the prosecutor did not receive exculpatory evidence: she testified she always turned exculpatory information over to the defense and would have done so in Plaintiff's case, including a negative identification by Rainey (Ex. 1, Brokaw Dep at 123-24,115-16, 131; she testified that she stated in opening and closing arguments that the children were asleep because that is what she believed (*id*. at 126-27), and there is no police report—in the prosecutor's file or in the homicide file—which indicates that Rainey's statements were ever properly documented by police, let alone turned over to the prosecutor. Dkt. Nos. 51A, 51B, Homicide File; Ex. A, Brokaw Dep. at 121-123. As Plaintiff's expert has explained, Plaintiff's criminal defense attorney, Gordon Tayback, was a skilled advocate and if he had had information that Brian Rainey had made a negative identification he would have used it at trial. Dkt. No. 65, Murphy Report at 12. Furthermore, there is no evidence that the prosecutor received the information contained in the FBI Reports, Handy interview report, or the Wilson 302. Dkt. No. 36, Stine Report at 9, 10; Ex. A, BrokawDep. at 123. Because Plaintiff has accumulated competent evidence that exculpatory information was withheld from both the prosecutor and from him, Mr. Stine may comment on that evidence, as does Defendants' own expert, Mr. Gaut. There is nothing to bar.

> **A.** **Mr. Stine can legitimately opine on the Defendants' failure to disclose Brian Rainey's statements exculpating Plaintiff because it is based on Plaintiff's substantial evidence that the Defendants spoke to Brian Rainey on the night of his mother's murder.**

Defendants next argue that Mr. Stine cannot give any opinions premised on assuming the fact (because he was not present that night, Mr. Stine does not personally know whether it is true

or not, and will not claim to be resolving disputes of fact) that the Defendants spoke to Brian Rainey on the night of his mother's murder because (i) there remain non-Defendant Officers who responded to the scene and have not been identified; and (ii) there is no evidence that Brain Rainey ever went to the Homicide Division at BPD Headquarters.

Defendants are wrong. Mr. Stine's testimony is admissible because it is based on relevant and reliable evidence accumulated by Plaintiff that Defendant Goldstein spoke with Brian Rainey at the crime scene; that uniformed officers Defendants Weese, Miles, Boyd, and Palmere were involved in that conversation; and that Defendants Goldstein and Ritz spoke with Rainey at the homicide unit. That evidence, discussed at length in Plaintiff's opposition to Defendants' motions for summary judgment, is as follows:

- Rainey testified that he spoke to police officers twice on the night of the murder: once on the living room couch at 2703 Barclay and then again at the police station. Dkt No. 193 Ex. 4, Rainey Dep. at 30, 48.[1]
- Rainey further testified that uniformed officers and a detective were at 2703 Barclay at the time he had this conversation, and that each of the officers he spoke with was white and male. *Id.* at 46.
- Rainey's sister, Tawanda Dyson, corroborated Rainey's account in her deposition, explaining that that she spoke at the house to the same uniformed officer who had woken her up and also to a detective. Ex. 3, T. Dyson Dep., at 25 (explaining that the officer who woke her up asked her and her siblings if they had seen anything); *id.* at 125-26 (testifying that she also may have spoken to a detective).
- Tawanda Dyson's testimony was corroborated by the responding officers, who asserted that they would not themselves have spoken to the children, but instead would have waited for a detective—here, Goldstein—to arrive and do so himself. Ex. 23A, Weese 11/10/16 Dep., at 240-41; Ex. 11, Palmere Dep., at 152-53.
- Defendant Weese was the first officer to respond to 2703, making him the "primary responding officer" at the crime scene. Ex. 23A, Weese 11/10/16 Dep., at 60. According to the Computer Assisted Dispatch ("CAD") report, Weese was dispatched at 10:27 p.m. and he arrived a couple of minutes later. Ex. 24, CAD Report, at BPD 2602-03; Ex. 25A, Weese 5/25/17 Dep. at 388-89 (Weese was unit "5C13" on October 5, 1994); Ex. 23A, Weese 11/10/16 Dep. at 110-11 (took him 2-3 minutes to arrive after dispatched).
- Defendant Goldstein arrived at 10:45 p.m. Ex. 26A, Goldstein 11/9/16 Dep. at 8.

---

[1] All citations to exhibit numbers are derived from Plaintiff's List of Exhibits in Support of His Response to Defendants' Motions for Summary Judgment. *See* Dkt. No. 193.

- Goldstein testified that when he arrived, there were three or four uniformed officers present. *Id*. at 10-11. According to the Defendants' testimony and the police reports, those officers would include: Defendants Weese, Miles, Boyd, and Palmere. Ex. 23A, Weese 11/10/16 Dep., at 115 (Weese was the first officer in the house); *id*. at 123-24 (Miles and Palmere present in house when Burgess came up the stairs and was handcuffed); Ex. 27, Weese Supplemental Report at BPD 2484 ("Upon officer Weese, along with officer Kelley Miles, entering location officers went to basement door and yelled, "Who's down there?"); Ex. 28, Miles Dep. at 44 (agrees Weese report says that he entered the home with Defendant Weese but has no recollection); Ex. 29, Boyd Dep. at 50-51, 117-18, 126-29 (Boyd was the officer-in-charge on October 5, and is identified as 5C10 on the CAD; was on scene at 2703 Barclay from 22:31 to 23:36); Ex. 11, Palmere Dep. at 338-39 (no reason to doubt he was 5125 on October 5, 1994); Ex. 24, CAD Report at BPD 2602-03 (identifying when 5C13, 5C11, 5C10 and 5125 were dispatched, all before 10:45 p.m.); Ex. 24, CAD Report at BPD 2602-03 (identifying when 5C13, 5C10 and 5125 were dispatched, all before 10:45 p.m.).
- Goldstein was the only detective at the homicide scene. Ex. 30A, Goldstein 11/1/16 Dep. at 95; Ex. 26A, Goldstein 11/9/16 Dep. at 28.
- Rainey and his sister also testified that they were transported to the police station for a further interview on the night of their mother's murder. Ex. 4, Rainey Dep. at 47; Ex. 3, T. Dyson Dep at 27-28. According to Rainey, at the station, he spoke to more than one male, white officer. Ex. 4, Rainey Dep. at 51.
- Defendant Ritz testified that witnesses to a homicide—such as Rainey—would be transported to homicide for an interview. Ex. 19, Ritz Dep. 11/7/2016 at 191-192. There, the witnesses would be interviewed by the homicide detective assigned to the case or another homicide detective on his squad. Ex. 26A, Goldstein 11/9/16 Dep. at 141-143.
- Goldstein was assigned as the primary detective on the Dyson homicide, and Ritz was the secondary; in fact, on the night that the Dyson murder occurred, Goldstein and Defendant Ritz were the only detectives on their squad working. *Id*. at 139-40; Ex. 30A, Goldstein 11/1/16 Dep. at 52; Ex. 26A, Goldstein Dep 11/9/16 at 139-140.

In addition, Defendants' argument that there is supposedly insufficient evidence to reference in any of Mr. Stine's opinions the premise that Rainey spoke with Defendants Goldstein, Ritz, Weese, Miles, Boyd, and Palmere because there remain officers who responded to the scene and still have not been identified misses the mark. Not only has Plaintiff provided a plethora of evidence identifying these Defendants as having spoken to Rainey, but Plaintiff is not required to identify the officers exactly in order to establish this fact. *See Niblack v. Murray*, No. CV 126910MASTJB, 2016 WL 4086775, at *4 (D.N.J. July 29, 2016) (holding "case law does not support Defendants' argument that plaintiff must identify the *exact* perpetrators of

constitutional violations") (emphasis in original). As was recently clarified at the summary judgment hearing, if Defendants want to argue that some heretofore unidentified officer had a role to play, that is an argument they can make to the jury—it is not a basis for summary judgment, and not a basis for excluding expert testimony.

In sum, a motion to bar an expert is hardly the proper forum to re-argue summary judgment. At trial, each Defendant can disclaim to the jury any responsibility for or knowledge of having spoken to Rainey at the crime scene or homicide unit, but that is no basis for barring Mr. Stine from opining on demonstrable evidence that Defendants not only spoke to Rainey about his firsthand observations but also that they withheld that evidence. None of that presents any valid reason to exclude Mr. Stine's testimony.

> **B. Mr. Stine can also legitimately opine on the significance and context of Defendants' failure to disclose the "Lehmann Note" because Plaintiff has accumulated competent evidence of their withholding.**

Along similar lines, Defendants also argue that Mr. Stine cannot give any opinions premised on the fact that the Defendants allegedly withheld the "Lehmann Note"—a note in the police file written by Defendant Lehmann during a phone conversation with the victim's father indicating that Rainey was a witness to his mother's murder—because (i) there is no evidence that Defendants knew of or failed to disclose the "Lehmann Note" and (ii) the notes of the criminal trial prosecutor recite similar statements as those contained in the "Lehmann Note."

Of course, Plaintiff has provided ample evidence that Defendants knew about the note and did not disclose it. That evidence, again discussed at length in Plaintiff's response to Defendants' summary judgment motions, is as follows:

- Judge Timothy Doory, who was an Assistant State's Attorney in the Violent Crimes Unit during the operative period, testified that the "usual practice" was that police notes were *never* disclosed to the prosecutor. Ex. 56, Doory Dep., at 5-6, 51; *see also* Ex. 65, Murphy Report, at 16-17 (explaining that when he was a prosecutor in the Baltimore City State's Attorney's Office he also did not receive notes from detectives); Ex. 26A,

      Goldstein 11/9/16 Dep., at 318 (explaining original notes not disclosed to prosecutor and cannot say in this case whether he photocopied them).

- Judge Doory testified that the expectation was that the detectives would put anything in their notes into a formal report, which would be turned over. Ex. 56, Doory Dep., at 52.
- Lehmann too testified that the detectives were required to transcribe their notes into a formal report. Ex. 41, Lehmann Dep., at 56.
- Neither Lehmann nor Goldstein memorialized the Lehmann Note in a police report, thereby withholding the crucial exculpatory information from the prosecutor and from Plaintiff. Ex. 41, Lehman Dep. at 203; Ex. 26A, Goldstein 11/9/16 Dep. at 236-241.

And, Defendants' argument regarding the criminal trial prosecutor's note can be easily disposed of. First, the note does not prove that the prosecutor knew that Rainey was awake. In fact, Plaintiff has provided substantial evidence to the contrary: when asked about the note at her deposition, the prosecutor testified that she had no idea what the note meant. Ex. A, BrokawDep., at 209-11; *id*. at 211 ("Q. And in reviewing that note, does it refresh your recollection at all about what you were documenting here? A. No, I'm sorry."). And she was emphatic that she had no idea that Rainey was awake and witnessed the crime, as she would not have argued that the children were asleep if she were aware that one of them was not. *Id*. at 126-127. To the contrary, she would have disclosed Rainey's negative identification, and confined her arguments to the record evidence. Ex. A, BrokawDep., at 114-16, 126-27, 129.

Second, this Circuit has rejected Defendants' contention that because the prosecutor's note contains some of the same information as the "Lehmann note," no *Brady* violation occurred. In *Walker v. Kelly*, the Commonwealth of Virginia argued that *Brady* had not been violated because "the autopsy and pre-sentence reports, both of which were provided to Walker, contain the same information found in the withheld reports." 195 Fed. App'x 169, 173-74 (4th Cir. 2006). The Fourth Circuit rejected such a claim, finding that the withheld police reports provided additional impeachment of the witnesses at issue. *Id*. at 174; *see also Gonzalez v. Wong*, 667 F.3d 965, 984 (9th Cir. 2011) (finding failure to turn over psychology reports violated *Brady*

because the reports provided additional impeachment). There is no basis to conclude that Mr. Stine cannot opine on the record evidence that Defendants did not fulfill their *Brady* obligations.

### C. There is also sufficient evidence in the record to support Mr. Stine's ability to provide opinions on the alleged failure to disclose exculpatory evidence related to Howard Rice.

Defendants argue that Mr. Stine cannot give any opinions premised on the fact that the Defendants withheld exculpatory evidence relating to Howard Rice, the real perpetrator, because (i) Plaintiff's criminal defense attorney knew about Rice; (ii) there is no evidence that Rice was "Little Man"; and (iii) there is no evidence that Rainey told the Defendants about the "scary person" and that they concluded that person was Rice. However, Plaintiff has demonstrated material disputes of fact about whether information about Howard Rice's involvement in the murder was withheld, all of which Mr. Stine is competent to opine about.

Defendants' argument has no merit. First, as has been discussed at length in the context of summary judgment, the fact that Plaintiff's criminal defense attorney knew about Rice's existence in no way insulates Defendants from liability for their failure to disclose what they knew about his involvement in Dyson's murder. As in the case with the prosecutor's notes, Defendants cannot hide behind the fact that Plaintiff's attorney received some of the information found in the withheld documents. *See Walker*, 195 Fed. App'x at 174. Moreover, as explained at length in Plaintiff's opposition to the summary judgment motion, while Plaintiff's attorney may have had Rice's name, he did not have actual evidence of Rice's guilt because Defendants withheld it. Defendants told Plaintiff's attorney that they investigated Rice but determined that Rice was not involved. Ex. 58, Tayback Post-Conviction Test. at 60, 71-72. Defendants further withheld any details of that "investigation." Ex. A, BrokawDep. at 123 (has never heard the name Howard Rice or information that he was involved in the Dyson homicide).

Second, Plaintiff has provided competent evidence that Rice was "Little Man":

- As the BPD's Rule 30(b)(6) witness testified, "Little Man" was one of Howard Rice's nicknames. Ex. 33, McLarney Rule 30(b)(6) Dep. at 313-314. The Defendants would have been aware of as much, and of Rice because he was a violent drug dealer suspected of committing numerous murders in and around 27th and Barclay—so much so that the BPD and federal agencies set up a joint task force to "get him off the street." Ex. 16, Gioia Dep. at 88, 288.
- Rice was suspected of three murders that occurred in the month preceding Dyson's homicide—on September 7, September 9 and September 25, 1994—all within a couple miles of 2703 Barclay.
- Michelle Dyson knew Howard Rice. Ex. 2, Brooks Dep, at 83-84.

Third, Plaintiff has also provided competent evidence that Defendants knew that Rice was the "scary person" to whom Rainey referred:

- Rainey described to the Defendants one of the men who barged into his mother's house as a "scary person" he recognized from the neighborhood. When Mr. Dyson, the victim's father, spoke to Defendant Lehmann on October 13, and possibly at some other point also to Defendants Patton and Ritz, he told them that "Little Man" was a known criminal who liked to dress in disguise; one of Rice's *modus operandi* was to dress in disguise. Ex. 14, Patton Dep. 11/10/16 at 51-52; Ex. 7, R. Dyson Dep. at 93-94.
- Defendant Lehmann passed this information along to Defendant Goldstein. Ex. 41, Lehmann Dep. at 185-186, 189, 227, 229.

### D. There is also sufficient evidence in the record to support Mr. Stine's opinions about Defendants' failure to disclose exculpatory evidence from the FBI.

Defendants argue that Mr. Stine cannot give any opinions premised on the fact that the Defendants withheld exculpatory evidence they had received from the FBI because (i) there is no evidence that certain Defendants (other than Goldstein and Ritz) knew about the FBI documents and (ii) Plaintiff makes "implausible leaps" on the identities of the persons in the documents.

First, Plaintiff reiterates from his summary judgment opposition papers that while he does not dispute that the other Defendants were not involved in withholding evidence communicated from the FBI, the Defendants' suggestion that—as a result—they should be dismissed from Plaintiff's *Brady* claim is misleading. Plaintiff has brought one *Brady* claim: there are various pieces of evidence that support his *Brady* claim, but the Supreme Court has made clear that

*Brady* demands a collective analysis in which all the evidence that was withheld is analyzed together to determine whether a plaintiff's constitutional rights were violated. *Wearry v. Cain*, 136 S.Ct. 1002, 1006-07 (2016). As a result, and particularly given the Fourth Circuit's adoption of joint and several liability in the § 1983 context, *see Lugar v. Edmonson Oil Co.*, 639 F.2d, 1058, 1065 n.14 (4th Cir. 1981), *aff'd in part, rev'd in part*, 457 U.S. 922, all of the Defendants who withheld any piece of *Brady* material are on the hook for Burgess' *Brady* claim to the extent Burgess can prove the same.

Second, Defendants' characterization of Plaintiff's evidence as "implausible" does not demonstrate that there is an insufficient factual basis for which Mr. Stine can opine on whether Defendants withheld the FBI evidence. Defendants are free to challenge Plaintiff's theory at trial; it is no way a basis to exclude Plaintiff's police practices expert. Plaintiff has accumulated competent evidence that the unredacted name in the FBI document is not his:

- Burgess was the person who requested the documents pursuant to a *Touhy* request and attendant subpoena; as the requester, his name would not be redacted. Indeed, the sole basis that the FBI has provided for why it redacted the name of the suspect is privacy concerns. Ex. 93, Deletion Codes at FBI 0002 (explaining P as "The Privacy Act of 1974, 5 U.S.C. § 552a" and P-1 as "information the disclosure of which would be an unwarranted invasion of personal privacy"); Ex. 8, FBI 302 at FBI 252 (citing "P" and "P-1" as the basis for the redaction of the suspect). Those concerns, however, are not at play when the record relates to the person requesting the document. To that end, 5 U.S.C. § 552a(b) exempts from disclosure records "except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains." In short, the Privacy Act and privacy concerns require redaction of individual names—except of the person who has subpoenaed the materials.
- For that reason, Burgess' name appears on another document in the FBI file, which was produced in response to the very same subpoena and *Touhy* request. Ex. 53, Homicides-Howard Rice Chart at FBI 0008.
- Moreover, while Burgess admitted at his deposition—which occurred before the FBI documents were disclosed—that he was selling drugs during this time period, he sold on Milton Avenue—and not at 27th and Greenmount, the intersection mentioned in the FBI documents. Ex. 1, Burgess Dep. 12/1/16 at 70-71, 434 (explaining that he sold on Milton Avenue).
- While Burgess concedes that he would borrow Louis Crosby's Pathfinder whenever he could, he was not the only person who drove a "Pathfinder truck-type vehicle"; indeed,

- there are numerous references within the FBI reports to persons driving a similar vehicle. Ex.60, Group Exhibit of vehicles in the area.
- The FBI report identifies witnesses as a "babysitter" for Dyson's children, a "neighbor" of Dyson's and a former "boyfriend" of Dyson's. Ex. 8, FBI 302 at FBI 252. The fact that the FBI identified people according to their connection to Dyson—e.g., babysitter, neighbor and even a *former* boyfriend—further demonstrates that Burgess' name is not among the redactions, as nothing in the FBI report mentions Dyson's then-current boyfriend. Nor does any type of qualifier precede the redaction; that is, it does not say, as would be expected if Burgess' name were under the redaction, that [redacted], a boyfriend of Dyson, another black male and a black female committed this crime. It simply says "[redacted], another black male and a black female" were responsible for Dyson's homicide. Ex. 8, FBI 302, at FBI 252. As a result, contrary to the Defendants' argument, there is plenty of evidence that the suspect redacted in the FBI 302 is not Burgess.

As with the other points discussed above, none of this has anything to do with Mr. Stine's competency to provide expert testimony. Defendants' inappropriate attempt to rehash summary judgment should be rejected.

> **III. Mr. Stine can opine on the subject of Defendants' purported fabrication of evidence because Plaintiff has accumulated a sufficient factual foundation to go to trial on this claim as well.**

Defendants argue that Mr. Stine cannot give any opinions premised on the fact that the Defendants fabricated evidence because (i) there is no evidence that Defendants Goldstein and Weese fabricated evidence that the children were sleeping at the time of the homicide; (ii) there is no evidence that Defendant Goldstein fabricated the gas tank evidence; and (iii) there is no evidence that Defendants Goldstein and Van Gelder fabricated the GSR results. As is hopefully by now clear, Plaintiff has demonstrated material disputes of fact about whether this evidence was fabricated. As such, there is no basis to bar Mr. Stine from offering his expert opinion on this subject.

> A. **Plaintiff has provided ample evidence that Defendants Goldstein and Weese fabricated evidence that Dyson's children, including Brian Rainey, were asleep during the murder.**

Plaintiff's evidence that Defendants Goldstein and Weese intentionally authored false reports stating that all of Dyson's children were asleep at the time of the murder is as follows:

- Both Goldstein and Weese authored reports that described all of Dyson's children as having been asleep at the time of the murder. Ex. 45, Goldstein Main Office Report, at Burgess 3760 ("At the time of this incident there were three children sleeping in a center bedroom. Continuing back from there is a bathroom and then a rear bedroom. In this last bedroom another child was asleep."); Ex. 27, Weese Supplement, at BPD 2483 ("All 4 children were upstairs sleeping at the time of the incident").
- Defendants Goldstein and Weese knew that Rainey was not sleeping; instead, he had seen the offenders barge into his mother's house just before the shots were fired and knew that neither offender was Burgess. Ex. 4, Rainey Dep. at 30 ("[T]he main thing that stuck out was they're asking was my mom's boyfriend involved, and I told them no."); Ex. 3, T. Dyson Dep. at 26–27 (recalling Brian telling officers that Burgess was not among the perpetrators).
- Defendants Goldstein and Weese were aware of Rainey's statements because they were either the officer with whom Rainey spoke—for Goldstein at both the house and the police station, and for Weese at the house—or were the respective detective and patrol officer in charge, and therefore were told about Rainey's statements by whichever responding officer-Defendant interviewed Rainey. Ex. 4, Rainey Dep. at 46 ("I know when I did come down the steps they had the yellow tape going on, they had all different types of size, you had the police officers, I'm pretty sure you had the detectives in there, so I know I spoke to one of—whoever concerning, you know, asking me what happened."); Ex. 3, T. Dyson at 125-26 (Tawanda Dyson testifying that it is possible she spoke to a plainclothes detective); Goldstein. Ex. 30A, Goldstein 11/1/16 Dep. at 95 (only detective at home was Goldstein); Ex. 26A, Goldstein 11/9/16 Dep. at 28 (same); Ex. 29, Boyd Dep at 169-170 (had Defendant Office spoken to the children; he would have passed that information along to Goldstein); Ex. 23A, Weese 11/10/16 Dep. at 196, 330-331 (same); Ex. 28, Miles Dep at 132-134 (same), Ex. 11, Palmere Dep. at 94-95 (same).

> B. **Plaintiff has provided ample evidence that Defendant Goldstein fabricated the gas tank evidence.**

Plaintiff's evidence that Defendant Goldstein fabricated the fact that on the night of the Dyson homicide, he tapped on Burgess' gas tank and discovered it was empty is as follows:

- According to Goldstein, because Burgess told him on October 6, 1994, that he got gas before returning to 2703 Barclay and finding Dyson's body, Goldstein examined the car Burgess was driving that night.

- The problem for Goldstein was that the gas gauge on the car was broken, and was always on empty, so Goldstein's initial examination of Burgess' car proved nothing. Ex. 1, Burgess Dep. 12/1/16 at 208-210.
- Goldstein would have known as much because when he turned on the car, the light indicating that fuel was low did not turn on. Ex. 34, Criminal Trial Tr., Goldstein Testimony at Burgess 1064.
- As a result, according to Goldstein, after looking at the gas needle on the dashboard, Goldstein climbed under the car and tapped on the gas tank. From this, he determined that the tank was "empty." Ex. 26, Goldstein Dep. 11/9/16 at 124-132-133; Ex. 34, Criminal Trial Tr., Goldstein Testimony at Burgess 1065-66.
- Goldstein communicated that finding to Brokaw and then repeated it at Burgess' criminal trial. Ex. 52, Brokaw Notes at Burgess 3777; Ex. 34, Criminal Trial Tr., Goldstein Testimony, at Burgess 1065-66.
- Goldstein's evidence, however, was false. As Burgess has explained, he bought gas before returning to 2703 Barclay and so his tank was not empty and would not have sounded empty had Goldstein tapped on it. Ex. 1, Burgess Dep. 12/1/16 at 90.
- Although evidence technicians ordinarily process and search a suspect's automobile, Defendant Goldstein decided to do this particular examination of Burgess' car himself. Ex. 26, Goldstein Dep. 11/9/16 at 104-105.
- Defendant Goldstein never memorialized his examination anywhere. Ex. 36, Stine Report at 17 At most, Defendant Goldstein put information about his tank tapping in a note that says only "Gas Tank Empty." Ex. 90, Goldstein Note at BPD 2651. This ambiguous note, however, could simply refer to the observation and photograph of the needle on the dashboard of the Pathfinder—actions Plaintiff does not dispute occurred.
- Defendant Goldstein testified that he would transcribe any pertinent information from his notes into a report, and similarly, and more globally, also memorialize any pertinent information in a report. Ex. 26, Goldstein Dep. 11/9/16 at 147.
- Goldstein's "finding" that the tank was "hollow" and "empty" is nowhere memorialized—neither in the note nor in his Main Office Report, which was supposed to include all pertinent facts. Ex. 26, Goldstein Dep. 11/9/16 at 99-100; Ex. 45, Goldstein Main Office Report at Burgess 3759-67. This deviation from Goldstein's practice supports Plaintiff's claim that the test and its results were fabricated.

### C. Plaintiff has adduced ample evidence that Defendants Van Gelder and Goldstein fabricated the GSR results.

As argued at length in response to the Defendants' summary judgment motion, there is plenty of evidence that Goldstein and Van Gelder fabricated the GSR evidence.

First, Defendants point out yet again that Defendant Van Gelder cannot be held liable for his trial testimony alone. As everyone undoubtedly understands by this point, that proposition (supported by Supreme Court case law) is undisputed. But that said, Van Gelder's trial testimony

is still admissible evidence to support Plaintiff's fabrication claim. *Buckley v. Fitzsimmons,* 20 F.3d 789, 796-97 (7th Cir. 1994) ("constitutional wrongs completed out of court are actionable even if they lead to immunized acts" because absolute immunity "does not whitewash wrongs" already completed). Indeed, "adopting [defendant's] reasoning would lead to the untenable result that officials who fabricate evidence or manufacture probable cause could later shield themselves from liability simply by presenting false testimony regarding that evidence." *Spurlock v. Satterfield,* 167 F.3d 995, 1003-04 (6th Cir. 1999).

As Plaintiff has repeatedly pointed out, Defendant Van Gelder's misconduct extends beyond his trial testimony. *Mastroianni v. Bowers,* 160 F.3d 671, 677 (11th Cir. 1998) (absolute testimonial immunity does not "relate backwards" to "protect [a defendant] for any activities he allegedly engaged in prior to taking the witness stand"). Prior to testifying, Van Gelder encouraged the prosecution of Mr. Burgess by lying, *inter alia,* on a form that he created about the GSR results, and in a conversation with the prosecutor. This conduct, outside of his trial testimony, subjects him to liability for fabrication.

Second, Defendants' argument that if Van Gelder had "no idea" where on Plaintiff's hands the samples were taken from, then he could not have fabricated his evidence is wrong. Van Gelder gave the prosecutor a scientific-sounding conclusion that Burgess was "most probably" guilty of murder, and that led to Burgess' wrongful conviction. It is no defense to say that Van Gelder just willy-nilly jotted down that conclusion and caused that prosecution without bothering to gather the relevant facts. It violates the Constitution to create false evidence "deliberately or with a reckless disregard for the truth," which would be the case if Van Gelder "had obvious reasons to doubt the accuracy of the information he reported." *Miller v. Prince George's County*, 475 F.3d 621, 627 (4th Cir. 2007).

Additionally, Plaintiff has provided substantial evidence that Defendant Van Gelder did know certain facts of the scene:

- Goldstein undoubtedly knew, and Goldstein had a conversation with Van Gelder about the GSR analysis before Goldstein received the finalized report. Ex. 111, Burgess suppression testimony, at 93–94; Ex. 34, Criminal Trial Tr., Goldstein Testimony, at Burgess 1057-58, 1075-76; Ex. 26, Goldstein Dep. 11/9/16 at 207–208; Ex. 100, Van Gelder Dep. at 164–165.
- Van Gelder admitted that, before arriving at his conclusions, he saw and considered a report from the on-scene evidence technician, which included photographs of the crime scene and stated that Burgess had blood on his hands. Dkt. No.183-1 at 2 ¶ 3; Ex. 100, Van Gelder Dep. at 318; Ex. 112, Crime lab technician's report; Ex. 113, Gunshot Primer Residue Case Information sheet, (showing that shooting took place indoors);Ex. 100, Van Gelder Dep. at 82–83 (Van Gelder admitting in general before finalizing his conclusion and testifying in court, he might learn whether the shooting was at close range)

Third, Plaintiff's evidence that Defendant Van Gelder and Goldstein fabricated the GSR results is as follows:

- Van Gelder told Goldstein, the prosecutor, and then later, the jury, that because there was "a lot" of GSR on Burgess, it was not the result of innocent transfer. Ex. 52, Brokaw Notes, at Burgess 3778; Ex. 34, Criminal Trial Tr., Van Gelder Testimony, at Burgess 1197-98.
- Van Gelder told the lead detective and the prosecutor that objective science—GSR—showed that Burgess was "most probably" guilty of murder. Van Gelder knew that he could not honestly opine on whether Burgess had fired the gun, or been next to the gun when it was fired, or been nowhere near the gun when it was fired, based on the GSR evidence, because every scientist in the field had known that, long before 1994-95. Ex. 47, Kilty Dep. at 88-89; Ex. 88, Kilty article at 54 (explaining the history of GSR tests and that none of them have ever been able to put the "smoking gun" in the suspect's hands, because the science merely identifies particles containing antimony, barium, and lead—but does not address how those particles arrived on the suspect's hands); Ex. 100, Van Gelder Dep. at 300–301 (it was well understood in October 1994 that transfer could happen through incidental contact with persons or objects, especially at the crime scene).
- The understanding that if a suspect was admittedly in an environment full of GSR, the science cannot tell whether he was a shooter, an accomplice, or an innocent transferee, was widely shared not just among scientists like Van Gelder, but also among police professionals generally. Ex. 82, Gaut report, at 35 (Defendants' police practices expert admitting "[i]t is known that GSR may be transferred from one surface to another."). Ex. 108, Gaut Dep. at 185, 204–05 (elaborating that it was known that GSR can transfer from one person to another and that knowledge was shared by all police).
- Goldstein asserted that the positive GSR results gave him probable cause to arrest Plaintiff. Ex. 26, Goldstein 11/9/16 Dep. at 197; Ex. 64, Application for Statement of Charges at BPD 2502. Based on his training, Defendant Goldstein would have known

that any GSR testing would have been meaningless given the circumstances of the case: a close-range shooting in a small, confined basement where Burgess admitted to contact with the victim after her murder, including cradling her head in his hands. Ex. 108, Gaut Dep. at 185; Ex. 82, Gaut Report at 35; *see also* Ex. 120, Stine Dep. at 232; Ex. 36, Stine Report at 19–20, 27; Ex. 80, Stine Rebuttal Report, at 2–3.

### IV. Mr. Stine May Also Legitimately Opine on the Consequences of Mr. Burgess' Conviction

Without explanation, Defendants claim that "Mr. Stine engages in rank speculation as to the consequences to Mr. Burgess of any of the acts or omissions on the part of Defendants that Plaintiff alleges." Dkt. No. 221-1 at 11. Plaintiff has no idea what this means. At any rate, Mr. Stine may opine on the consequences of Defendants' misdeeds and any further argument on this subject is waived. *Schwartz v. Wellin*, No. 2:13-CV-3595-DCN, 2014 WL 12637912, at *3 (D.S.C. Aug. 14, 2014) ("It is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel, and . . . perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (internal quotation marks and citations omitted).

### Conclusion

Defendants have restyled their summary judgment papers as a motion *in limine* to exclude the opinions of Mr. Stine. These arguments are improper at this stage, and Plaintiff has cited sufficient evidence on which Mr. Stine may rely for his opinions. Accordingly, the motion should be denied.

WHEREFORE, Plaintiff respectfully requests that the Court deny Defendants' Motion *in limine* to exclude the testimony of Joseph Stine.

RESPECTFULLY SUBMITTED,

/s/ Gayle Horn

Jon Loevy
Gayle Horn
Steve Art
Theresa Kleinhaus
Tony Balkissoon
LOEVY & LOEVY
311 North Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900 (tel.)
(312) 243-5902 (fax)

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

    I, Gayle Horn, an attorney, hereby certify that on October 27, 2017, I filed the foregoing motion using the Court's CM/ECF system, which effected service on all counsel of record.

                                          RESPECTFULLY SUBMITTED,
                                          /s/ Gayle Horn
                                          LOEVY & LOEVY
                                          311 N. Aberdeen St., 3rd Floor
                                          Chicago, Illinois 60607
                                          (312) 243-5900 (tel.)
                                          (312) 243-5902 (fax)
                                          *One of Plaintiff's Attorneys*