# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

<table>
<tr><td>SABEIN BURGESS,</td><td>*</td><td></td></tr>
<tr><td>Plaintiff,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>v.</td><td></td><td>Civil Action No.: RDB-15-0834</td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>BALITMORE POLICE DEPARTMENT,<br><em>et al.</em>,</td><td>*</td><td></td></tr>
<tr><td>Defendants.</td><td>*</td><td></td></tr>
</table>

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

Plaintiff Sabein Burgess ("Burgess" or "Plaintiff") has brought federal and state claims against the Baltimore Police Department ("BPD"), individual police officers[1], and a lab technician for conduct resulting in his 19-year incarceration for the murder of Michelle Dyson on October 5, 1994. (ECF Nos. 1 and 141.) Following this Court's Order on March 1, 2016, Plaintiff's remaining claims include Counts I ("42 U.S.C. § 1983 – Due Process"), II ("42 U.S.C. § 1983 – Malicious Prosecution"), III ("42 U.S.C. § 1983 – Failure to Intervene"), VI ("Malicious Prosecution"), VII ("Abuse of Process"), VIII ("Intentional Infliction of Emotional Distress"), and X ("Article 24 of the Maryland Declaration of Rights"). (ECF Nos. 55 and 56).

Currently pending before this Court are three related Motions for Summary Judgment by (1) Defendants Goldstein, Ritz, Purtell, Weese, Lehmann, Patton, and

---

[1] This Court will refer to Defendants Goldstein, Ritz, Purtell, Weese, Lehmann, Patton, and Neverdon as the "Original Officer Defendants" and Defendants Skinner, Boyd, Miles, and Palmere as the "Added Defendants."

Neverdon (ECF No. 179), (2) Defendant Van Gelder (ECF No. 183), and (3) by Defendants Skinner, Boyd, Miles, and Palmere (ECF No. 189). The parties' submissions have been reviewed, and the Court held a motions hearing on October 26, 2017.

For the reasons stated below, the Original Defendants' Motion for Summary Judgment (ECF No. 179) is GRANTED IN PART and DENIED IN PART, Defendant Van Gelder's Motion for Summary Judgment (ECF No. 183) is GRANTED, and Added Defendants' Motion for Summary Judgment (ECF No. 189) is GRANTED IN PART and DENIED IN PART. Specifically, Plaintiff's *Brady*-based claims (under Counts I and X) will proceed against Defendants Weese, Miles, Boyd, Palmere, Goldstein, and Lehmann. Plaintiff's fabrication claims (under Counts I and X) will proceed against Defendants Weese and Goldstein. Plaintiff's post-conviction due process claims (under Counts I and X) will proceed against Defendants Patton, Neverdon, and Goldstein. Plaintiff's malicious prosecution claims (Counts II and VI) will proceed against Defendants Weese and Goldstein. Plaintiff's failure to intervene claim (Count III) will proceed against Defendants Weese, Miles, Boyd, Palmere, Goldstein, and Lehmann. Plaintiff's intentional infliction of emotional distress claim (Count VIII) will proceed against Defendants Weese, Miles, Boyd, Palmere, Goldstein, Lehmann, Patton, and Neverdon. Count VII (abuse of process) is DISMISSED. Summary Judgment shall be ENTERED in favor of Defendants Purtell, Ritz, Van Gelder, and Skinner.

## PROCEDURAL BACKGROUND

Plaintiff initially filed the present action against Defendants Mayor and City Council of Baltimore, the Baltimore Police Department, the Officer Defendants, and Van Gelder, alleging various violations of his federal and state civil rights. Under the auspices of 42 U.S.C. § 1983, he asserts claims of violation of due process (Count I), malicious prosecution (Count II), failure to intervene (Count III), conspiracy to deprive constitutional rights (Count IV), and unconstitutional practice or policy, as prohibited by *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978) (Count V). Plaintiff's state law claims include malicious prosecution (Count VI), abuse of process (Count VII), intentional infliction of emotional distress (Count VIII), civil conspiracy (Count IX), 4 violation of Article 24 of the Maryland Constitution, Md. Const. Declaration of Rights, Art. 24 (Count X), and indemnification (Count XI).

Defendants moved to dismiss all counts, and by Memorandum Opinion and Order dated March 1, 2016, this Court ruled that Counts I, II, III, VI, VII, VIII, and X would proceed against the Officer Defendants and Van Gelder, while Counts IV, V, IX, and XI were dismissed; Count V would proceed against the Baltimore Police Department, while Counts I-IV and VI-XI were dismissed; and all counts against the Mayor and City Council of Baltimore were dismissed with prejudice. (ECF No. 55.)

On March 23, 2016, the Court granted the BPD's Motion to Bifurcate and Stay Discovery related to Plaintiff's *Monell* claim (Count V) pursuant to Fed. R. Civ. P. 42(b) and *Marryshow v. Town of Bladensburg*, 139 F.R.D. 318, 319-20 (D. Md. 1991). (ECF No. 68.)

By subsequent order, this Court granted Plaintiff leave to amend his Complaint to name additional Defendants. (ECF No. 140.) Plaintiff filed his Amended Complaint on January 23, 2017, naming Kelly Miles, John Boyd, John Skinner, and Dean Palmere (together, "Added Defendants") for the first time. (ECF No. 141-1.)

Following the close of discovery, the Original Officer Defendants (ECF No. 179-180), Van Gelder (ECF No. 183), and the Added Officers (ECF No. 189) filed motions for summary judgment. Following a status teleconference, this Court permitted Plaintiff to supplement his Response (ECF No. 195-1) with the declaration of Rakim Muhammad. (ECF No. 204.) The Original Defendants filed a Consolidated Reply (ECF No. 215), and the Added Defendants filed an Abbreviated Reply (ECF No. 307).

On October 26, 2017, the Court held a hearing regarding the Defendants' pending motions for summary judgment. At that hearing, the parties clarified and narrowed their contentions, as discussed below.


## FACTUAL BACKGROUND

In ruling on a Motion for Summary Judgment, this Court considers the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013).

## I.   Individual Defendants

Plaintiff's claims stem from Defendants' conduct throughout the investigation, both pretrial and post-conviction, of the murder of Michelle Dyson on October 5, 1994. The roles of the Defendants in the investigation were as follows:

a. Officers Weese, Miles, Boyd, Palmere, and Skinner responded to the scene. (Defs. Ex. 3 at 73:2 to 75:1, 123:16 to 124:4; 237:4 to 238:16; Defs. Ex. 4 at 26:1 to 27:15)[2].

b. Officer Purtell was conducting an arrest half a block away, and he filed reports of having heard gunshots. (Defs.Ex. 5 at 112:5 to 113:20; Defs.Ex. 6; Defs. Ex. 7).

c. Detective Goldstein was the primary detective assigned to the case. (Defs. Ex. 1 at Vol. 1, 48:13-17).

d. Detective Ritz was the secondary detective on the case. (Defs. Mot. 54, ECF No. 179-1). Detective Ritz also investigated an inmate, Charles Dorsey, who sought to take responsibility for the murder in 1999. (Defs. Ex. 2 at 331:11 to 332:10 and 335:14-20).

e. Sergeant Lehmann, who supervised Detectives Goldstein and Ritz, conducted a telephone interview of Ronald Dyson, the father of the victim. (Defs. Ex. 8 at 153:1-9, 185:1 to 186:8).

f. Mr. Van Gelder was a crime lab technician who tested and reported on gunshot residue ("GSR") samples that were taken from Mr. Burgess's hands. (Defs. Ex. 9 at 164:20 to 165:7, 209:18 to 213:4).

---

[2] The Court will cite filings by the Original Defendants with "Defs." and indicate otherwise for the other Defendants.

g. Detective Patton was not assigned to the subject homicide, but he took a phone message from a potential witness, who happened to work at the location where Detective Patton got his hair cut. (Defs. Ex. 12 at 46:13 to 47:17.) He also took a statement that included information related to the Dyson homicide from a witness in a different case, several years later. (Defs. Ex. 10 at 56:14-15, 95:12-18; Ex. 11 at Burgess 1607 to 1610.)

h. Detective Neverdon was not assigned to the subject homicide, but he later worked on the same case with Detective Patton. (*See* Defs. Ex. 11 at Burgess 1607 to 1610; Ex. 13 at 23:17 to 24:2.)

## II.  Michelle Dyson's Homicide

Turning to the chronology of this case, Mr. Burgess began dating Michelle Dyson a few months before the homicide occurred. (Defs. Ex. 15 at 34:16 to 35:11). Mr. Burgess stayed with Ms. Dyson at her home at 2703 Barclay Street several nights a week (*id.* at 42:2-13), and he had a key to the home (*id.* at 108:6-7).

According to Mr. Burgess, On October 5, 1994, Mr. Burgess was watching two videotapes with Ms. Dyson and with Mr. Burgess's friend, Dwight "Rome" Holmes at 2703 Barclay Street. (Defs. Ex. 15 at 161:19 to 162:17, 166:16-20, and 169:8-9). Mr. Burgess received a page from an acquaintance, Dominique White, which Mr. Burgess understood to be a solicitation to purchase drugs. (*Id.* at 84:13 to 85:21).

Mr. Burgess has explained that he left 2703 Barclay in a white Nissan Pathfinder to drive Mr. Holmes back to his house further south on Barclay Street (*id.* at 94:13 to 95:1; 168:15 to 170:1; Defs. Ex. 17; Defs. Ex 18 at Responses 27 and 28) and to deliver the tapes

to Mr. Burgess's mother (Defs. Ex. 15 at 218:10-18), after which he planned to proceed to Mr. White's home to consummate a drug deal (*id.* at 170:2-12). Mr. Burgess dropped off Mr. Holmes and talked with some friends on the street. (*Id.* at 168:22 to 170:1; 272:14-22.)

Mr. Burgess returned to 2703 Barclay briefly to a videotape that he had left behind (*id.* at 212:18 to 213:22), and saw that Ms. Dyson had put her children to bed (*id.*). Mr. Burgess then travelled to Mr. White's home (*id.* at 415:8-18), where he met with Mr. White, James Bagley, and a third person to complete the drug deal. (*See id.* at 84:1 to 85:12; Defs. Ex. 19 at 32:21 to 33:11). Mr. Burgess then drove to a gas station to buy gas. (Def. Ex. 15 at 187:2-7; 210:11 to 211:7). Mr. Burgess drove to and parked on Whitridge Avenue (just north of 2703 Barclay), so that he could stop in to call the stash house where he kept his drugs. (*Id.* at 71:20 to 72:3; 96:12 to 97:12; 266:22 to 267:13, 416:2-9). As he began to walk to 2703 Barclay, and Mr. Burgess saw the police arresting someone whom he knew as "Jerry." (*Id.* at 98:16 to 100:4). Mr. Burgess also saw two persons sitting on the porches of two rowhomes slightly north of 2703 Barclay and exchanged words in passing. (*Id.* at 105:11 to 108:4).

Mr. Burgess has testified that he found the door of 2703 Barclay ajar, and that he smelled a strange odor. (*Id.* at 108:5 to 109:7). Mr. Burgess ran upstairs to check the bedrooms. (*Id.*) Mr. Burgess saw that Ms. Dyson's bedroom was empty, and that Ms. Dyson's four children looked to be asleep. (*Id.* at 108:5 to 110:2). Mr. Burgess then returned to the first floor and noticed the basement door was open. (*Id.* at 108:19-21). Mr. Burgess saw saw "the basement door cracked where all the smoke was coming from, and then as [he] was getting ready to go down there, [he saw] [Dyson's] feet." (Pl. Ex. 1 at 108.)

Burgess ran outside to find the police he had just seen. (*Id.* at 115.) The police,

however, had left, so Burgess instead knocked on his neighbor, Wanda Austin's door. (*Id.*) Burgess told Austin that "something happened to Michelle" and asked Austin to call 911. (*Id.* at 115-17.)

Mr. Burgess ran back to 2703 Barclay and went down into the basement. (Defs. Ex. 15 at 115:6-8). Mr. Burgess cradled Ms. Dyson until police arrived, and tried to keep her from choking on blood that was coming out of her mouth. (*Id.* at 120:8 to121:4). Mr. Burgess heard Ms. Dyson gargling blood when he found her in the basement. (*See id.* at 123:7-17.)

III.    **Initial Law Enforcement Response**

At 10:27 p.m., Defendant Officer Weese was dispatched to the scene. (Defs. Ex. 29 at BPD. 2482.) Upon arrival, Officer Weese found Mr. Burgess in the basement with Ms. Dyson's body and with some blood on his hands. (Defs. Ex. 3 at 73:2 to 75:1; Defs. Ex. 29 at BPD 2482 and 2484; Defs. Ex 30). The Officers handcuffed Mr. Burgess and held him in the dining room. (Defs. Ex. 3 at 74:12-18).

A crime scene technician took GSR samples from Mr. Burgess's hands. (Defs. Ex. 3 at 212:2-15; Defs. Ex. 31). Mr. Burgess claims that the sample was taken from his palms, rather than the webbing of his hands. (Defs. Ex. 15 at 147:17 to 148:18).

Defendant Officer Dean Palmere reported that he spoke to Mr. Burgess at the scene, and documented his discussions in a report. (*See* Defs. Ex. 32). Officer Palmere's report notes that the back kitchen door was found locked and dead bolted. (*Id.*).

Defendant Goldstein reported to the scene at 10:45 p.m. (Defs. Ex. 33 at Burgess 3759). Goldstein testified that when he arrived, there were three or four uniformed officers

present. (Pl. Ex. 26A, Goldstein 11/9/16 Dep. at 10-11.) According to the Defendants' testimony and the police reports, those officers would include: Defendants Weese, Miles, Boyd, Purtell and Palmere. (*See* Pl. Resp. (citing numerous depositions and Pl. Ex. 24, CAD Report at BPD 2602-03).) Following Detective Goldstein's arrival, Officer Weese documented his observations in four pages of police reports. (*See* Defs. Ex. 29). Defendants never found a gun at the scene or in the immediate surroundings. Pl. Ex. 29, Boyd Dep. at 152; Pl. Ex. 30A, Goldstein 11/1/16 Dep. at 80-81.

Three of Dyson's children—Brian Rainey, Tawanda Dyson, and LaShonda Folkes— remember at least one white male uniformed officer coming to get them. (Pl. Ex. 4, Rainey Dep. at 30-31; Pl. Ex. 3, T. Dyson Dep. at 23-24; Pl. Ex. 5, Folkes Dep. at 22.) According to Plaintiff, the police questioned the children at the scene about whether they had seen anything, and specifically, whether "mom's boyfriend" was involved. (Pl. Ex.4, Rainey Dep. at 30; Pl. Ex. 3, T. Dyson Dep. at 25-27.) Rainey told the police that he had seen the offenders come into the house and knew Burgess was not one of them. (Pl. Ex. 4, Rainey Dep. at 30 ("[T]he main thing that stuck out was they're asking was my mom's boyfriend involved, and I told them no."); Pl. Ex. 3, T. Dyson Dep. at 26–27 (recalling Brian telling officers that Burgess was not among the perpetrators).) Mr. Rainey has testified that upon seeing the two men, he became scared and ran up the stairs into his bedroom, after which he heard two gunshots. (Defs. Ex. 39 at 41:8-11, 42:1-6, 42:10-2). One of Mr. Rainey's sisters, Tawanda Dyson, has generally corroborated his story. (See Ex. 41).

Mr. Burgess was taken to Homicide, where he waived his *Miranda* rights and gave a voluntary interview to Detectives Goldstein and Ritz. (Ex. 15 at 220:17 to 221:8 and 223:22

to 226:6; Ex. 35; Ex. 36). Mr. Burgess now admits that he lied to Detectives Goldstein and Ritz about his whereabouts during the murder in order to conceal that he had been engaging in a drug deal. (Defs. Ex. 15 at 229:14 to 230:1). After one hour, Mr. Burgess invoked Miranda, and the interview ended. (Defs. Ex. 36 at Burgess 31).

According to Plaintiff, the children were transported to a police station[3] for an additional interview. (Pl. Ex. 4, Rainey Dep. at 47; Pl. Ex. 3, T. Dyson Dep. at 27-28.) At the police station, Dyson's children were again "questioned as far as what happened." (Pl. Ex. 4, Rainey Dep. at 48; *see also* Pl. Ex. 3, T. Dyson Dep. at 28.) According to Rainey, at first all of the children were questioned together; then he remembers "being separated and them asking me what did I see, and they was asking was Sabein involved or was he the shooter, and I said no." Pl. Ex. 4, Rainey Dep. at 50; *id.* at 52.) The officers also asked Rainey about his mom's relationship with Burgess, and Rainey told them that he had never seen Burgess abuse his mother. (*Id.* at 54.) Rainey testified that more than one officer questioned him and both officers were white and male. (*Id.* at 51.) Finally, Dyson's children were taken by Defendant Skinner to the Department of Social Services. (Pl. Ex. 12, Skinner Dep. at 36, 219.)

Defendants Goldstein and Weese wrote reports describing the events of October 5, 1994, and both reports indicated that all children were sleeping at the time of the murder. (Pl. Ex. 27, Weese Supplemental Report at BPD 2483; Pl. Ex. 45, Goldstein Main Office Report at Burgess 3760.)

## IV.    Pretrial Investigation

Detective Goldstein examined the white Nissan Pathfinder driven by Mr. Burgess

---

[3] Sometimes referred to as the "homicide [unit]" in the Plaintiff's briefing. Defendants contend that this stop never occurred.

and found that the gas needle, which Burgess claims was broken, pointed to "E." (Def. Ex. 26 at Burgess 4833 to 4837). Detective Goldstein claims that he then tapped on the gas tank and concluded the tank was empty. (*Id.* at Burgess 4869 to 4871).

On October 13, 1994, Defendant Sergeant Steven Lehmann interviewed Ms. Dyson's father, Ron Dyson, who relayed that someone known as "Little Man" had something to do with the crime (*see* Defs. Ex. 46). Defendant Lehmann's notes from the call show in part, "Child Bryan ?Q witne[ss] 'Get down base-ment." (Defs. Ex. 46). Detective Goldstein made efforts to identify who "Little Man" was, including referencing a nickname file from the BPD Eastern District (Defs. Ex. 48), and running arrest summary reports on persons known as "Little Man." (Defs. Ex. 49).

On November 2, 1994, Mr. Burgess's GSR test results came back positive for the presence of GSR on both hands. (Defs. Ex. 50). Defendant Daniel Van Gelder conducted the test and completed the report, which he then sent to Detective Goldstein. (Defs. Ex. 9 at 164:20 to 165:7, 209:18 to 213:4, and 219:3-9). The report indicated by checkbox that:

> Gunshot primer residues were found on the hand(s) of the subject. There is a possibility that the residues were transferred from the surface of a firearm or from an object which lay immediately adjacent to a firearm during its discharge. Most probably, however, the subject's hands were immediately adjacent to a discharging firearm or were themselves used to fire a firearm . . .

(Defs. Ex. 50).

In 1994, the FBI had an open case matter identified as case "166-0" relating to ITAR-drug-related murders. (Defs. Ex. 51). Two documents from FBI case file for Case No. 166-0 contain information relating to the murder of Ms. Dyson. (*Id.*) These two FBI documents describe information provided by a confidential informant to the FBI and record providing

that information to the Baltimore Police Department. The documents indicate that Ms. Dyson's death was the result of "drug related problems" (see Defs. Ex. 51) and that she "may have blown a package of drugs and/or a money package." (*Id.*) The document states that "[redacted] another black male and a black female."[4] (*Id.*)

Early in the morning on November 9, 1994, Detective Goldstein submitted an Application for Statement of Charges against Mr. Burgess. (Defs. Ex. 37). The bases were: (1) that Mr. Burgess had given conflicting accounts of where he was during the time that Ms. Dyson had been killed; (2) that there was not enough time for Burgess to have completed all of the tasks that he claimed before discovering Ms. Dyson; (3) that Mr. Burgess had told the police that he did not enter 2703 Barclay before running to Wanda Austin and therefore could not have known, as Wanda Austin reported that Mr. Burgess told her, that Ms. Dyson had been shot; and (4) the presence of GSR on both of his hands. (*Id.*) The Commissioner issued a warrant for Mr. Burgess's arrest. (Defs. Ex. 53). Mr. Burgess was arrested that day. (Ex. 54). Mr. Burgess again waived *Miranda* and gave a second statement to the Detectives. (Defs. Ex. 15 at 245:4-14; Defs. Ex. 55: Ex. 56). Mr. Burgess said that he knew "Little Man," but did not know his real name. (*Id.* at Burgess 51). Detective Goldstein also asked whether Mr. Burgess knew someone named "Kevin," which Mr. Burgess denied. (Id. at Burgess 52).

Mr. Burgess engaged Gordon Tayback, now deceased, to defend him. (Defs. Ex. 15 at 230:16-21). The pretrial prosecutor in the criminal case was Ilene Nathan. (Defs. Ex. 27). The trial prosecutor in the criminal case was Laura Shach (n/k/a Laura Brokaw). (Defs. Ex. 26 at Burgess 4707; Ex. 60 at 237:14 to 238:2).

---

[4] The parties dispute the identity of the redacted name.

The State's Attorney's Office could not locate its file for the prosecution of Mr. Burgess. (Defs. Ex. 61 at 23:16 to 24:8), but Plaintiff obtained certain files of the prosecutor, Laura Shach, including trial preparation and trial notes. (*See* Defs. Ex. 62.) Ms. Shach confirmed that at least some of the notes were in her handwriting. (Defs. Ex. 60 at 260:19 to 261:2.) The file contains a note referring to "brother," followed by notes reading "told mother to go to basement: - not loud- Go down basement." (Defs. 62 at Burgess 3795.) The parties dispute the meaning and significance of this note.

## V.     Mr. Burgess' Trial

At trial, the State called seven witnesses—including Defendants Weese, Goldstein, and Van Gelder—and introduced documentary evidence, including Mr. Burgess's statements to Detective Goldstein. (*See generally* Defs. Ex. 26). Mr. Burgess called no witnesses. (*See id.* at Burgess 5273).  The jury found Mr. Burgess guilty on all charges. (*See id.* at Burgess 1340-41). The Circuit Court sentenced him to life in prison plus 20 years. (*See id.* at Burgess 1364).

While incarcerated, Mr. Burgess was sentenced to five years for rioting.[5] (Defs. Ex. 15 at 292:8 to 293:3; Defs. Ex. 73 at Individual Defendants 4022).

## VI.    Post-Conviction Investigations

On September 2, 1995, just over two months after Mr. Burgess was convicted, Kenneth "Guppy" Sewell, was killed in a drug-related homicide. (Defs. Ex. 76). On September 5, 1995, Mr. Burgess wrote to Gordon Tayback to tell him that Mr. Sewell had been killed by Howard Rice and that "Howard Rice is one of the people who murdered my girlfriend back in October of 94 . . . ." (Defs. Ex. 74.)  Defendant Detectives Patton and

---

[5] The record is not clear on whether the sentence was consecutive or concurrent, but the parties agreed at the hearing on October 26, 2017 that it must have been concurrent.

Neverdon were assigned to investigate the Sewell homicide. (*See, e.g.,* Defs. Ex. 11.)

A document located in the Sewell file shows includes information from a government witness implicating Howard Rice in the murder of Michelle Dyson. (*See* Defs. Ex. 75 at Burgess 8411). Several copies of the FBI document are included in the file of the Office of the State's Attorney for the Sewell homicide. (Defs. Ex. 79).

As part of the Sewell investigation, Defendants Patton and Neverdon also conducted an interview of an inmate, Raymond Handy. (*See* Ex. 11.) During that interview, Detective Patton inquired whether Mr. Handy had heard about Rice's being involved in a murder of "a girl on Barclay Street." (*See* Ex. 11 at Burgess 1607.) Mr. Handy stated that he had heard that Rice was the killer, but, during the interview, Mr. Handy revealed that Mr. Burgess was the source of the information he was providing to the detectives. (*See id.* at 1608 to 1609.)

Beginning in late 1998 and into 1999, Charles Dorsey, a childhood friend of Mr. Burgess, wrote letters to Mr. Burgess's mother and attorney, claiming that Mr. Dorsey, alone, was responsible for the death of Ms. Dyson. (Defs. Ex. 80.) Mr. Tayback informed the State's Attorney's Office of Dorsey's letters. (Defs. Ex. 82).

On May 25, 1999, Howard Rice was shot to death. (Defs. Ex. 88 at FBI_015 to _016).

On September 17, 1999, Detective Ritz and non-party Detective Frank Miller went to interview Mr. Dorsey. (Defs. Ex. 83). Detective Ritz recorded his general conclusions concerning Mr. Dorsey in a Report. (Defs. Ex. 83).

In November 2001, Mr. Tayback testified at a hearing on a Petition for Post-conviction Relief based on ineffective assistance of counsel stating in part that he decided

not to hire a GSR defense expert because of the volume of GSR on Mr. Burgess's hands. (Defs. Ex. 89 at Burgess 1463 to 1465).

On February 14, 2012, one of the children of Michelle Dyson—Brian Rainey—wrote a letter that indicated that Mr. Rainey believed Mr. Burgess to be innocent. (Defs. Ex. 38).

In May 2012, Mr. Dorsey executed an affidavit prepared by Mr. Burgess's attorneys, now claiming that he and Howard Rice together (and not Mr. Dorsey alone) had shot Ms. Dyson. (Defs. Ex. 90).

## I.   Mr. Burgess' Release

On December 5, 2013, Mr. Burgess filed a Petition for Writ of Actual Innocence in the Circuit Court for Baltimore City. (See Defs. Ex. 91.) The bases were: (a) recent changes in the science of GSR analysis; (b) that Mr. Dorsey had confessed to the crime; and (c) that Mr. Rainey had come forward with an eyewitness account. (*See id.* at Burgess 952 to 967.) At a hearing before the Circuit Court on February 21, 2014, the State elected not to oppose the Petition. (Defs. Ex. 92 at Individual Defendants 1025 to 1026.) The Circuit Court therefore vacated the conviction and granted a new trial. (*Id.*) The State entered a *nolle prosequi* on the charges, and Mr. Burgess was freed. (*Id.* at Individual Defendants 1026.)

On August 7, 2014, Mr. Burgess filed Notices of Claim with the City Solicitor and the Maryland Treasurer. (See Defs. Ex. 93). The Notices recited claims against Defendants Goldstein, Ritz, Lehmann, Weese, Palmere, and Purtell alleging that the officers withheld Mr. Rainey's statement, and further referencing Mr. Dorsey's confession. (*Id.*)

Mr. Burgess commenced this case on March 23, 2015 against the Original Officer Defendants and Mr. Van Gelder. (Doc. No. 1). On January 1, 2017, Mr. Burgess amended

his Complaint by identifying new Defendants Palmere, Skinner, Miles, and Boyd. (Doc. No. 141).

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. An issue is not "genuine" when the court must "determine which of the two conflicting versions of the plaintiff's [factual assertions] is correct." *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984), *superseded by statute on other grounds as stated in Blackwell v. City of Concord,* No. 1:11CV328, 2013 WL 395107, at *3 n. 3 (M.D.N.C. Jan. 31, 2013); *Rohrbough v. Wyeth Lab., Inc.,* 916 F.2d 970, 975 (4th Cir. 1990) (affirming a district court's determination that a witness's affidavit in conflict with his own prior deposition and several other documents was properly disregarded as a sham to defeat a motion of summary judgment).

When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249. Trial courts in the

Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). This Court "must not weigh evidence or make credibility determinations." *Foster v. University of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage). Indeed, it is the function of the fact-finder to resolve factual disputes, including issues of witness credibility. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866-68 (2014).

## DISCUSSION

### I.  Preliminary Issues

#### A. Abandoned Claims and Defenses

At the hearing of October 26, 2017, Plaintiff affirmatively abandoned (a) his abuse of process claim in its entirety and (b) all claims against Defendants Purtell and Skinner. Accordingly, Count VII (abuse of process) and all claims against Defendants Purtell and Skinner are hereby DISMISSED.

Defendants have argued that Plaintiff abandoned a number of other claims, and this Court confirmed at the hearing that the following due process claims under Count I have been abandoned:

i. Any claim that Defendants Patton, Neverdon, or Van Gelder knew of and failed to disclose Brian Rainey's exculpatory statements – thereby violating Plaintiff's pretrial due process rights under *Brady v. Maryland*;

ii. Any claim that Defendants Ritz, Lehmann, Patton, and Neverdon fabricated any evidence;

iii. Any claim that Defendant Weese fabricated gunshot residue ("GSR") evidence;

iv. Any post-conviction due process claims against Defendants Weese, Lehmann, and Van Gelder; and

v. Any post-conviction due process claims that Defendants, namely Defendant Ritz, withheld the (a) Raymond Handy interview or (b) the 1998-99 confession of Charles Dorsey.

Regarding factual assertions underlying various claims, Plaintiff clarified at the hearing that he no longer alleges that any Defendant (i) withheld evidence relating to Jerry Davis before trial or (ii) withheld after conviction the Raymond Hany interview or confession of Charles Dorsey.

Defendants, for their part, have abandoned the assertion that Plaintiff's claims based on conduct occurring in the 1990's are barred by the three-year statute of limitations found in § 5101 of the Courts and Judicial Proceedings Article of the Maryland Code.[6]

### B. Plaintiff Must Sufficiently Identify Defendants

The Added Defendants argue that a "deprivation" under the 14th Amendment requires the identification of specific individuals who have taken "deliberate actions" (Added Defs.' Mot. 19, ECF No. 189-1), and the Original Defendants assert that Plaintiff has failed to sufficiently identify the Defendants with knowledge of Mr. Rainey's exculpatory witness statement. Regarding knowledge of Mr. Rainey's statements, Plaintiff responds that he has sufficiently identified Goldstein, Ritz, Weese, Miles, Boyd, and Palmere, but that such a "showing is not necessary to survive summary judgment. '[C]ase law does not support Defendants' argument that plaintiff must identify the *exact* perpetrators of constitutional violations.'" (Pl.'s Resp. 50, ECF No. 195) (quoting *Niblack v. Murray*, No. CV 126910MASTJB, 2016 WL 4086775, at *4 (D.N.J. July 29, 2016)). This Court rejects Plaintiff's proposed rule from *Niblack*, an unpublished opinion from a district court in another circuit. Rather, this Court's decision in *Roberts v. Prince George's County, Maryland*, 157 F. Supp. 2d 607 (D. Md. 2001), provides the proper guidance.[7]

In *Roberts*, this Court held that "[i]n a § 1983 personal or individual capacity suit, a plaintiff must show that the official charged *personally* caused the deprivation of his federal

---

[6] The parties devoted some briefing but minimal argument to the question of whether Defendants can be held liable for five years of Burgess' sentence given his five-year rioting conviction. At the hearing the parties agreed that the sentence must have been served concurrently. Without objection from the parties, the Court explained that this issue is more properly addressed at the damages stage in the event of a verdict for the Plaintiff.

[7] The parties disagree as to whether the Fourth Circuit in *Lugar v. Edmondson Oil Co.*, 639 F.2d 1058 (4th Cir. 1981), *aff'd in part, rev'd in part on other grounds*, 457 U.S. 922 (1982), adopted joint and several liability in the context of §1983 claims. Even if it did, however, that rule would not absolve the Plaintiff from establishing that *specific* defendants took *specific* actions (that allegedly "concurred in causing the ultimate injury"). *See id.* at 1065 n.14.

rights." 157 F. Supp. 2d at 608 (citing *Vinnedge v. Gibbs,* 550 F.2d 926, 928–29 (4th Cir. 1977);

*see Blackmore v. City of Phoenix,* 126 F.App'x 778, 782 (9th Cir. 2005) (affirming district court's

decision to grant summary judgment because "[§ ] 1983 liability . . . cannot be based on a

group liability theory"); *Goings v. Chickasaw Cty., Iowa*, No. 06-CV-2063-LRR, 2008 WL

686917, at *7 (N.D. Iowa Mar. 10, 2008); *Husbands v. City of N. Y.,* No. 05 Civ. 9252(NRB),

2007 WL 2454106, at *11 (S.D.N.Y. Aug. 17, 2007); *Kepley v. Lantz,* No. 3:05 CV 7474, 2007

WL 2085401, *5-*7 (N.D. Ohio July 18, 2007); *Paul v. City of Rochester,* 452 F.Supp.2d 223,

228 (W.D.N.Y.2006); *Raines v. Chenowith,* No. 1:03CV 1289-JDT-TAB, 2005 WL 1115804, at

*5 (S.D. Ind. Mar. 30, 2005). Plaintiff argued in the hearing that *Roberts* is inapposite because

Mr. Burgess, unlike the defendants in *Roberts*, has produced evidence that each of the

identified officers were present in a location where Mr. Rainey allegedly made his statements.

Such evidence is certainly relevant to this Court's analysis of whether Plaintiff has met his

obligation under *Roberts*, but those alleged facts do not warrant adopting *Niblack's* broad rule

that Plaintiff need not identify the exact perpetrators. For any § 1983 claim against an

individual defendant to survive summary judgment, the record must at least reflect a genuine

dispute as to the specific defendant's involvement in causing the alleged injury. With respect

to any *Brady* violation in this case, the record must show a genuine dispute as to the

individual's *knowledge* of any allegedly withheld exculpatory evidence.

### C. Notice Regarding State Law Claims

Defendants argue that Plaintiff's Notice of Claims under the Local Government Tort

Claims Act ("LGTCA") (Pl. Ex. 115, ECF No. 193), which must be filed within 180 of the

alleged injury, failed to (a) name Defendants Patton, Neverdon, Van Gelder, Miles, or Boyd;

and (b) address the withholding or fabrication of GSR evidence as a cause of Plaintiff's injury. (ECF No. 179-1, at 62.)  Defendants also assert that the Notice as to Plaintiff's intentional infliction of emotional distress (IIED) claim was untimely because it accrued at least 180 days prior to the August 7, 2014 filing date of the Notice. *Id.* at 64.  Without objection at the hearing, this Court held that the alleged omissions may be excused under the "substantial compliance" standard laid out in *Watson v. City of Aberdeen*, No. CIV. JKB-15-0307, 2015 WL 2174885, at *3 (D. Md. May 8, 2015).  Defendant's timeliness argument also fails because, as Plaintiff notes, Burgess' IIED claim accrued upon his release from prison on February 21, 2014, which was within 180 days of the August 7, 2014 Notice. (Pl.'s Resp. 139 (citing *Prince George's County v. Longtin,* 19 A.3d 859, 877-78 (Md. Ct. App. 2011)).

## II. Federal Due Process (Count I)

Plaintiff has alleged that various subsets of the Defendants violated his due process rights in three ways: (a) by withholding exculpatory pretrial evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), (b) by fabricating evidentiary reports, and (c) by suppressing post-conviction exculpatory evidence.

### A. Pretrial *Brady* Violation

Plaintiff alleges that Defendants withheld numerous pieces of exculpatory pre-trial evidence:

> i. That Brian Rainey was an exculpatory eyewitness to the murder as evidenced by (a) statements to officers at the scene, at the police station, and in transit to the Department of Social Services; and (b) Ronald Dyson's statement to Defendant Lehmann that "Child Bryan" might be a "witness";

21

ii. That Howard Rice may have killed Ms. Dyson, including (a) Ronald Dyson's statement implicating someone known as "Little Man," (b) information that that "Kevin" was involved, and (c) other information that Howard Rice murdered Michelle Dyson; and

iii. FBI information indicating that (a) an unnamed source said "[redacted], another black male and a black female" did it; (b) Ms. Dyson's murder was drug-related; and (c) that multiple other witnesses had potentially exculpatory information.

To make out a *Brady* claim against a police officer, a plaintiff must show "that (1) the evidence at issue was favorable to him; (2) the Officers suppressed the evidence in bad faith; and (3) prejudice ensued." *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 396-97 (4th Cir. 2014) (citing *Monroe v. Angelone*, 323 F.3d 286, 299-300 (4thCir. 2003)). Any police officer with *knowledge* of the exculpatory evidence has a duty to disclose that evidence. *See Owens*, 767 F.3d at 397-98 (holding that each of three police officers possessing the same exculpatory statements could be held liable for failing to disclose them to prosecutors); *see also Steidl v. Fermon*, 494 F.3d 623, 630 (7th Cir. 2007) (holding that each of five police officers who were aware of exculpatory information had a duty to disclose it to a "competent authority"); *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988) (finding each of three police supervisors may be held liable under § 1983 when they "know about [their subordinate's suppression of exculpatory evidence] and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see").

A police officer generally "suppresses" evidence by not disclosing the evidence to the prosecutor, *Owens*, 767 F.3d at 396 (citing *Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846-47 (4th Cir. 1964), but suppression does not occur when the criminal defendant is already aware of the exculpatory information. *See Barnes v. Thompson*, 58 F.3d 971, 975-76 (4th Cir. 1995); *see also Stockton v. Murray*, 41 F.3d 920, 927(4th Cir. 1994) ("Aware of the existence of potentially exculpatory information, a defendant cannot sit idly by in the hopes that the prosecution will discover and disclose that information and, when the prosecution does not do so, seize upon the prosecution's conduct as grounds for habeas relief."); *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990).

In *Owens*, the United States Court of Appeals for the Fourth Circuit adopted the "bad faith" requirement as espoused in Judge Wilkinson's concurring opinion in *Jean v. Collins,* 221 F.3d 656, 660 (4th Cir. 2000) (Wilkinson, C.J., concurring). 767 F.3d at 396 n. 6. Judge Wilkinson's opinion therefore provides guidance on how a plaintiff may prove bad faith. According to Judge Wilkinson, "bad faith" means that the police officer(s) "intentionally withheld the evidence for the purpose of depriving the plaintiff of the use of that evidence during his criminal trial." *Jean*, 221 F.3d at 663. Relevant considerations include: (a) the officers' actual knowledge of "the significance of the withheld evidence"; (b) the "nature of the withheld material, that would negate any negligent or innocent explanation for the actions on the part of the police"; and the "concealment, doctoring, or destruction" of evidence. *Id.* at 662-663. Negligence or inadvertent miscommunication between police and prosecutor are insufficient and "conclusory allegations will not suffice." *Id.* at 662.

The prejudice or "materiality" inquiry asks whether "there is 'any reasonable likelihood' [the evidence] could have 'affected the judgment of the jury.'" *Wearry v. Cain*, 136 S.Ct. 1002, 1006 (2016) (quoting *Giglio v. United States*, 405 U.S. 150 (1972)). To demonstrate materiality, plaintiff must "show only that the new evidence is sufficient to 'undermine the confidence' in the verdict." *Wearry*, 136 S.Ct. at 1006 (quoting *Smith v. Cain*, 565 U.S. 73, 76 (2012)); *see also Kyles v. Whitley*, 514 U.S. 419, 441 (1995) (exculpatory evidence is material if it "would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense"). The allegedly withheld evidence must be analyzed together rather than in isolation.[8] *Kyles*, 514 U.S. at 441; *Wearry,* 136 S.Ct. at 1007.  In doing so, the Court must consider together only those pieces of evidence *known* to a *specific* Defendant.

Based on this framework, this Court will first analyze the allegedly withheld evidence to address whether (1) the evidence is exculpatory and (2) was suppressed. This Court will complete the analysis by assessing *each* Defendant's alleged bad faith and, pursuant to *Kyles*, the materiality of the suppressed evidence *known* to that Defendant.

### (1) Brian Rainey's Eyewitness Account

Defendants do not challenge that Brian Rainey's eyewitness account, which he allegedly shared with Defendants on the night of his mother's murder, is exculpatory evidence.  Rather, Defendants argue that whichever officer knew Rainey was a witness fulfilled their *Brady* obligation by disclosing as much to the prosecutor, Laura Shach (n/k/a Laura Brokaw). Defendants argue broadly, "That Mr. Burgess does not know the contents of either—(1) the file of the prosecutor; or (2) the file of his criminal defense attorney—is

---

[8] Plaintiff correctly notes that Defendants' erred in discussing and analyzing the materiality of each piece of evidence in isolation.

dispositive on all of Mr. Burgess's *Brady*-based claims." (Defs. Reply 11.) Defendants also point to Shach's handwritten note, indicating that a "brother" overheard someone tell his mother "go to basement," as evidence that an officer told Shach that Mr. Rainey was a witness. (Defs.' Mot. 49-51, ECF No. 179.)[9]

Regarding Plaintiff's inability to prove the contents of either Shach or Tayback's complete files, Plaintiff appropriately notes that he may use *circumstantial* evidence to prove Defendants failed to disclose exculpatory evidence. (Pl. Resp. 63, ECF No. 195-1 (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003); *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 508, n.17 (1957).) Specific to Mr. Rainey's statements, Plaintiff points out that Shach testified in her deposition that she had no idea what the "brother . . . go to basement" note meant and emphasized that she had no idea Rainey was a witness. (Pl. Resp. 63-64, ECF No. 195-1 (citing Pl. Ex. 44, [Shach] Dep., at 209-11).) Shach further testified that she did not withhold from Plaintiff any documents she received from Defendant Goldstein, the case detective generally responsible for facilitating pretrial disclosures. *Id.* at 63 n.24. The present record therefore reflects a genuine issue of fact to be addressed at trial.

### (2) Howard Rice

Plaintiff alleges that Defendants withheld various pieces of information that, taken together, pointed to Howard Rice as the "real perpetrator": (a) Ronald Dyson's statement implicating someone known as "Little Man" (an alleged nickname for Howard Rice), (b)

---

[9] Defendants assert once again the affirmative defense that Plaintiff failure to exercise reasonable diligence in pursuing Mr. Rainey's testimony bars this *Brady* claim. As Plaintiff notes, this Court rejected that argument at the motion to dismiss stage. (*See* Pl. Resp. 60; Mem. Op. on Motion to Dismiss 18-20, ECF No. 55.) The current record does not provide any reason to disturb that holding.

information that "Kevin" (an alleged associate of Rice) was involved, and (c) other information that Howard Rice did it. (Pl.'s Resp. 64, ECF No. 195-1.)

Defendants have argued in their Reply and at the hearing that Plaintiff cannot maintain a *Brady* claim for the withholding of information related to Rice because Plaintiff concedes, "Rice was a name Tayback had pretrial." (Defs.' Reply 22-23, ECF No. 215 (quoting Pl.'s Resp. 24, ECF No. 195-1).) Plaintiff also concedes, "Goldstein and Ritz even interrogated Burgess about ['Little Man' and 'Kevin'] on November 9, 1994." (Pl. Ex. 89, Burgess Statement Dated 11/9/94 at ID 26-27.) Plaintiff has not argued that Tayback knew Howard Rice to be anyone other than the real perpetrator. There is no genuine dispute that Plaintiff and his counsel were "aware of the existence of potentially exculpatory information" related to Howard Rice, yet after two decades and extensive discovery, Plaintiff has not identified what additional piece of evidence related to Howard Rice Defendants withheld. *Stockton*, 41 F.3d at 927. As this Court has an "affirmative obligation . . . to prevent factually unsupported claims . . . from proceeding to trial," *Bouchat*, 346 F.3d at 526, the Court GRANTS IN PART the Defendants' Motions for Summary Judgment (ECF Nos. 179, 189, 183) as to Plaintiff's *Brady* claim related to pretrial Howard Rice evidence.

### (3) FBI Reports

Plaintiff alleges that Defendants withheld FBI information as recorded in documents FBI_252 and FBI_253. (Defs. Ex 51.) FBI_252 indicates that an unnamed source reported that "[redacted], another black male and a black female" did it and that Ms. Dyson "was killed because of drug related problems [as s]he may have blown a package of drugs and/or a money package." (*Id.*) FBI_253 indicates that Michelle Dyson's babysitter and another

witness also had potentially exculpatory information. (*Id.*) Both documents indicate that the FBI provided this information to the BPD, and "the case detective" whose name is redacted responded regarding FBI_252 that the "information appeared to be accurate and resulted in leads on the case." (*Id.*) Defendants argue that (a) this information is not exculpatory, (b) there is no evidence that the information in these reports was withheld, and (c) and that Plaintiff was aware of Michelle Dyson's involvement in the drug trade.

Regarding the exculpatory nature of the information, such as the unnamed source's identification of "[redacted], another black male and a black female" as the perpetrators, Plaintiff argues the redacted name cannot be Burgess because (i) Burgess' name would not have been redacted as the requestor of the file, (ii) others in the area drove "Pathfinder truck-type vehicle(s)," and the document indicates a motive contradicting the state's theory that Burgess acted alone with an unknown motive. (Pl.'s Resp. 72-75, ECF No. 195-1.) On this score, Plaintiff has shown make out a genuine dispute as to the exculpatory nature of the information in FBI_252 and FBI_253.

Regarding Defendants' next two contentions, this Court notes again that Plaintiff may prove Defendants withheld information by pointing to *circumstantial* evidence. (*See* Pl. Resp. 63, ECF No. 195-1 (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003); *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 508, n.17 (1957).) Plaintiff also argues that FBI-vetted information that the motive for Dyson's murder related to drugs is "qualitatively different" different than Plaintiff's admitted awareness that Dyson used and/or sold drugs. For example, FBI information explicitly linking the drug trade to the murder may have enabled Tayback to present the drug angle at trial – where the trial judge had rejected evidence of

Dyson's drug use as "irrelevant." (Pl. Ex. 34, Criminal Trial Tr. at Burgess 1000-02.) The record therefore presents a genuine dispute as to the exculpatory nature and suppression of the information in FBI_252 and FBI_253.

### (4) Identifying Defendants

This Court next addresses each Defendant's knowledge of the exculpatory evidence, any bad faith in suppressing said evidence, and the materiality thereof. Defendants primary argument is that, even if Mr. Rainey made the alleged exculpatory statements at the scene and later, Plaintiff has failed to sufficiently identify to whom the statements were made or who was ultimately made aware of those statements. Specifically, Mr. Rainey's description of the recipients of his statement as "white men," at least one of whom wore a uniform, is insufficient. (Defs. Reply 12.) Defendants argue that "[u]nless Mr. Burgess can establish the identity of every officer at the scene—which he cannot—he cannot use process of elimination to prove the identity of any officer inferentially." (Defs. Reply 17, ECF No. 215.) Regarding FBI documents FBI_252 and FBI_253, Defendants argue there no evidence that anyone other than the "case detective," Defendant Goldstein, was informed of this information, so all other Defendants should be entitled to summary judgment on this issue. (Defs. Mot. 44.) Defendants also broadly assert that Plaintiff has failed to show any Defendant acted in bad faith.

Plaintiff responds to the identification challenge by asserting that "Goldstein spoke with the children at the crime scene; that the uniformed officers involved in that conversation were Weese, Miles, Boyd, . . . and Palmere; and that Defendants Goldstein and Ritz spoke with the children at the homicide unit." (Pl. Resp. 43-44, ECF No. 195-1.)

Refuting the possibility that other, unnamed officers on the scene could have been the ones to elicit Mr. Rainey's statements, Plaintiff points to the fact that Goldstein "recalled seeing three or four uniformed officers already present when he arrived." (Pl. Resp. 47 (citing Pl. Ex. 26A, Goldstein 11/9/16 Dep. at 8, 10-11).) Plaintiff further argues that, even if not directly involved in speaking with Mr. Rainey, Defendants Weese, Goldstein, and Lehmann were aware of Rainey's exculpatory statements. (*Id.* at 44.)

### (a) Defendant Weese

Defendant Weese was the first responding officer on the scene following Ms. Dyson's murder. (Pl. Ex. 23A, Weese 11/10/16 Dep. at 60.) Plaintiff alleges that he was among the officers to hear Mr. Rainey's witness statement because, as the first responding officer, he would have interacted with the children to identify them and notify their next of kin. *Id.* at 48 (citing Ex. 83, Weese Incident Report at BPD 2481-83; Ex. 23A, Weese 11/10/16 Dep. at 134, 157-158, 223).) Plaintiff also argues that even if another officer took the statement, "[e]ach of the responding officers testified that they would have communicated whatever information they received from any witness to the primary patrol officer (who would, in turn, convey any information to Goldstein)." Pl. Resp. 53 (citing Pl. Ex. 28, Miles Dep. at 132-134; Pl. Ex. 11, Palmere Dep. at 94-95, 99-100; Pl. Ex. 23A, Weese 11/10/16 Dep. at 330; Pl. Ex. 29, Boyd Dep. at 96-97).) As noted above, Defendant Weese denies any knowledge of Mr. Rainey's statement or the information in the FBI reports, and he claims there is no evidence of bad faith.

The record reflects a genuine dispute as to Defendant Weese's knowledge of Mr. Rainey's statement, but not as to his knowledge of the FBI reports. Regarding bad faith, the

patently exculpatory "nature of [this information] would negate any negligent or innocent explanation" for the Defendant's failure to disclose. (*See* Pl. Resp. 56 (citing *Jean v. Collins*, 221 F.3d at 663).)

Moving to the final step in the analysis, there is also a genuine dispute as to whether "there is any reasonable likelihood [such compellingly exculpatory information] could have affected the judgment of the jury." *Wearry*, 136 S.Ct. at 1006 (internal quotations omitted).

### (b) Defendants Miles, Boyd, and Palmere

Defendants Miles, Boyd, and Palmere are white men who were among the uniformed officers on the scene when Defendant Goldstein arrived. (Pl. Resp. 47, ECF No. 195-1 (citing the CAD Report, Pl. Ex. 24).) Plaintiff argues that, if Goldstein and Weese's denials are to be credited, Mr. Rainey made his witness statements in the presence of these officers on the scene. Plaintiff does not allege these officers were present for Mr. Rainey's additional statements in the police station. Plaintiff also does not appear to allege that Miles, Boyd, or Palmere had any knowledge of the FBI reports.

Defendants Miles, Boyd, and Palmere deny any knowledge of Mr. Rainey's status as an eyewitness and they assert that Plaintiff's use of "logic-games approach" to identify these individuals is insufficient at his stage. These Defendants also challenge the bad faith and materiality elements of Plaintiff's claim.

Put simply, this Court would be ill-equipped to hear this case without the benefit of logic. Especially when this Court must draw all reasonable inferences in favor of the nonmoving party, Mr. Rainey's testimony about the circumstances of his statement and the undisputed presence of Defendants Miles, Boyd, and Palmere on the scene present a

genuine dispute as to the knowledge of Defendants Miles, Boyd, and Palmere of Mr. Rainey's statements at the scene. Like Defendant Weese, the bad faith and materiality arguments by Defendants Miles, Boyd, and Palmere also fail.

### (c) Defendant Goldstein

Defendant Goldstein was the lead detective on the Dyson murder case who began his work by taking control of the crime scene on the night of the murder. Plaintiff alleges that Defendant Goldstein spoke directly with Mr. Rainey at the scene and at the police station. (Pl. Resp. 43-44, ECF No. 195-1.) Plaintiff asserts, in the alternative, that Goldstein was at least aware of Rainey's exculpatory statements. (*Id.* at 44, 50-52.) "All of the uniformed officers on the scene testified that Goldstein, as lead detective, would have been the officer to interview the victim's children." (*Id.* at 47 (citing Ex. 30A, Goldstein 11/1/16 Dep. at 95; Ex. 23A, Weese 11/10/16 Dep. at 240-241; Ex. 11, Palmere Dep. at 152-153; Ex. 80, Stine Rebuttal Report at 3).) Regarding the police station statement, Plaintiff points to the acknowledgement by Defendant Goldstein that the primary detective, himself, would be the one to interview an eyewitness at the station. (Pl. Ex. 26A, Goldstein 11/9/16 Dep. at 141-143.) In terms of the FBI reports, Plaintiff argues that Defendant Goldstein was the "case detective" who responded to receiving the information in both FBI_252 and FBI_253.

Defendant Goldstein denies any knowledge of Mr. Rainey's exculpatory statements and argues, based in part on confidential records from the Department of Social Services, that the timeline of events precludes Rainey and Goldstein's simultaneous presence at any police station. (Defs. Reply 18-20.) Defendant Goldstein also broadly denies any bad faith or that any withheld evidence was material.

Mr. Rainey's testimony about making multiple statements, with at least one detective present, combined merely with Defendant Goldstein's status as the lead detective would be sufficient to deny summary judgment as to Mr. Rainey's statement. On top of that evidence, the uniformed officers on the scene agree that Goldstein would have been the one to interview the children as potential witnesses. The record also reflects a genuine dispute as to Defendant Goldstein's knowledge of the FBI reports. Like Defendants Weese, Miles, Boyd, and Palmere, Defendant Goldstein's bad faith and materiality also fail.

### (d) Defendant Ritz

Defendant Ritz was the secondary detective on the Dyson case. (Defs. Mot. 54.) He was on duty that night, but Plaintiff does not allege that he ever visited the crime scene. Plaintiff alleges that Defendant Ritz was one of two white males who participated in the alleged interview of Mr. Rainey at the police station because Ritz and Goldstein were the two detectives in Goldstein's squad on duty that night (Pl. Resp. 15-16, ECF No. 195-1.) Plaintiff also alleges that Ritz knew of the FBI reports because FBI_252 indicates that the FBI gave the information therein to *two* BPD detectives. Pl. Resp. 71-74.

Defendant Ritz denies any knowledge of Rainey's exculpatory statements and asserts, like Defendant Goldstein, that the timeline of events shows that Rainey was never taken to a police station on the night of the murder. *Id.* at 18-20. Furthermore, "Goldstein and Mr. Burgess both testified that they did not see the children at homicide." (Defs. Repl. 20 (citing Defs. Repl. Ex. 3 at 144:8-17; Defs. Repl. Ex. 12 at 223:10-11.)

This Court has an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat,* 346 F.3d at 526. The combination of

Burgess' own admission that he did not see the children at the police station with the speculative leap from Ritz's role in the case to his participation in an alleged interview at the station warrants summary judgment in Defendant Ritz' favor. Plaintiff's claim that Ritz had actual knowledge of either of the FBI reports is similarly speculative. Specifically, FBI_252 merely states that the information therein was "furnished to Det. [redacted] / Det. [redacted]" yet only "the case detective," Defendant Goldstein, responded about the accuracy of the information. (Defs. Ex. 51.) The method by which the information was "furnished" is unclear. Moreover, the document requires speculation to fill the gaps in connecting Defendant Ritz to one of the redacted names and in assuming that a detective gains actual knowledge of everything "furnished" to him or her. Defendant Ritz's Motion for Summary Judgment (ECF No. 179) is therefore GRANTED as to Plaintiff's *Brady* claim.

### (e) Defendant Lehmann

Sergeant Lehmann supervised Defendants Goldstein and Ritz, and he conducted a telephone interview of Ronald Dyson, the victim's father, on October 13, 1994. (Defs. Mot. 3.) He was not working on the night of the homicide. (*Id.*) Plaintiff alleges that by interviewing Ronald Dyson, Lehmann learned that Brian Rainey witnessed the murder rather than slept through it.[10] (*Id.* at 4.) Plaintiff claims Lehmann documented that conversation in a note allegedly indicating that "Child Bryan" was a "witness" (Pl. Resp. 53 (quoting Pl. Ex. 40, Lehmann Note at BPD 2675)), and explains that Lehmann shared the note with Goldstein (*id.* at 52). Plaintiff also alleges that Lehmann's duties as supervisor, including reviewing the investigation file for completeness, would have caused him to learn of the full

---

[10] As discussed above, he also learned that "Little Man" may have been involved in the crime.

content of Mr. Rainey's eyewitness account. (*Id.* at 53-53.) Plaintiff claims that by failing to turn his note into a formal report and to ensure Goldstein followed up on such a lead, Lehmann effectively withheld the information from the prosecutor. (*Id.* 62-63.)

Unlike all other Defendants, Defendant Lehmann does not appear to have refuted his knowledge of Mr. Rainey's status an eyewitness, but he argues that he never knew of the FBI reports. He also broadly challenges any finding of bad faith or materiality under *Brady*. Defendant Lehmann has failed to demonstrate, however, that there is no genuine dispute on any of those fronts. Indeed, Lehmann is the only Defendant tied to a document regarding Mr. Rainey's status as an eyewitness, a compellingly exculpatory and material fact in this case. Given the nature of this information, a genuine dispute as to bad faith remains.

### (f) Defendants Van Gelder, Patton, and Neverdon

Plaintiff already abandoned any claim that Defendants Van Gelder, Patton, and Neverdon knew of and failed to disclose Brian Rainey's exculpatory statements. There is no dispute in the record that these Defendants lacked knowledge of any other pretrial exculpatory information.

### (5) Qualified Immunity

Defendants also assert qualified immunity against Plaintiff's *Brady*-based claims. "To establish a qualified-immunity defense, a public official must demonstrate that (1) a plaintiff has not alleged or shown facts that make out a violation of a constitutional right, or that (2) the right at issue was not clearly established at the time of its alleged violation." *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 395–96 (4th Cir. 2014) (internal quotations omitted).

As addressed above, this Court finds genuine disputes of material fact as to Defendants' constitutional misconduct under *Brady*. Additionally, Plaintiff persuasively quotes the holding in *Owens* that "our precedent unmistakably provides that by 1988, a police officer violates clearly established constitutional law when he suppresses material exculpatory evidence in bad faith." (Pl. Resp. 84, ECF No. 195-1 (quoting *Owens*, 767 F.3d at 401).) Defendants therefore do not have a viable claim of qualified immunity against the *Brady* claims discussed above.

### B. Allegations of Fabricated Evidence

A § 1983 fabrication claim requires the Plaintiff to show that an officer: (1) fabricated evidence; and (2) that the fabrication resulted in the deprivation of liberty. *Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005). Plaintiff asserts that Defendants Weese and Goldstein fabricated police reports; Defendants Goldstein and Van Gelder fabricated GSR evidence; and that Defendant Goldstein fabricated the results of his gas tank analysis.

### (1) Police Reports

Plaintiff alleges that Defendant Goldstein fabricated at least part of his "Main Office Report" (Pl. Ex. 45) and that Defendant Weese fabricated at least part of the "Weese Supplemental Report" (Pl. Ex. 27). (Pl.'s Resp 85-88, ECF No. 195-1.) Specifically, Plaintiff claims, as discussed above, that Goldstein and Weese knew Rainey had witnessed his mother's murderers enter the house, so their reports stating that all the children were "asleep" were patently false, or "fabricated." (*See* Pl. Ex. 45, Goldstein Main Office Report, at Burgess 3760 ("At the time of this incident there were three children sleeping in a center bedroom. Continuing back from there is a bathroom and then a rear bedroom. In this last

bedroom another child was asleep."); Pl. Ex. 27, Weese Supplement, at BPD 2483 ("All 4 children were upstairs sleeping at the time of the incident.").) Regarding the causal connection between the fabrication and Plaintiff's injury, Plaintiff explains, "[t]he proper inquiry . . . is whether [the plaintiff's] conviction was a reasonably foreseeable result of [the defendant's] initial act of fabrication . . . ." *Washington*, 407 F.3d at 283. In this case, he argues that the suppression of the *only* eyewitness account, which is patently exculpatory, foreseeably resulted in his false conviction.

Defendants Goldstein and Weese insist they had no knowledge of Rainey's eyewitness account, so they cannot be said to have fabricated a report indicating that he was "asleep." They also argue that the police reports did not contribute to the filing of charges or the jury's finding of guilt. (ECF No. 179 at 51-53.)

The Defendants' arguments are without merit. First, the parties acknowledged at the hearing that the fabrication claim regarding the children being "asleep" is intricately tied to whether Defendants Goldstein and Weese had any knowledge of Rainey's eyewitness account. As this Court addressed above, the record presents a genuine dispute as to Goldstein and Weese's knowledge. Regarding causation under *Washington*, viewing the evidence in the light most favorable to the Plaintiff, the fabrication of police reports to conceal the only eyewitness account, when that account is as exculpatory as Mr. Rainey's alleged statement, foreseeably results in a wrongful conviction. Defendants' Motion for Summary Judgment is therefore DENIED IN PART as to this fabrication claim.

**(2) Gunshot Residue Evidence**

With respect to the GSR evidence created and used in Burgess' prosecution, Plaintiff alleges (1) that Defendant Van Gelder "fabricated" the results of the test by downplaying the possibility of GSR transfer – contrary to valid science of the day and (2) that Defendants Goldstein and Van Gelder "fabricated" GSR evidence by electing to conduct a GSR test known to be "worthless" under the circumstances. (Pl.'s Resp. 117, 119-136, ECF No. 195-1.)  Plaintiff cites various cases in other circuits to support his theory that a forensic report with "no valid scientific basis" is necessarily fabricated in violation of a defendant's due process rights. (Pl.'s Resp. 126, ECF No. 195-1 (citing *Stinson v. Gauger*, Nos. 13-3343, 13-3346 & 13-3347 (7th Cir. Aug. 18, 2017) (*en banc*); *Mills v. Barnard*, 869 F.3d 473, 485 (6th Cir. 2017); *Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008); *Gregory v. City of Louisville*, 444 F.3d 725, 744 (6th Cir. 2006)).)

Defendants' argument is simple: "when evidence is not even false, it certainly cannot be fabricated." (ECF No. 215 at 32.) Plaintiff himself admitted in his December 2013 Petition for Writ of Actual Innocence ("Petition") that Van Gelder's conclusions were valid in 1994 and 1995. In his Petition, Plaintiff asserts:

> At the time, the prevailing opinion in the Baltimore Police Department was that GSR evidence could not be readily transferred. However, since Burgess' conviction and subsequent post-trial filings, there have been significant developments in the area of GSR analysis, both locally and nationally, that necessitate a rejection of such a conclusion today. . . The development that led to this revised interpretation occurred after the May 1997 deadline for filing a motion for a new trial under Rule 4-331, and, thus, Burgess would not have been able to proffer an expert to refute the State's expert in time.

(Pl. Ex. 76 at Burgess 952-953.)[11] In an effort to make out a fabrication claim, Plaintiff now argues that Van Gelder's conclusion was "patently false" and that "there was *no valid scientific basis* for his false conclusions—not then and not now." (Pl.'s Resp. 126, ECF No. 195-1.) Defendants have further argued that Van Gelder's analysis, which acknowledged but minimized the possibility of GSR transference, was affirmatively supported by scientific views of the day, as evidenced in a 1991 FBI Law Enforcement Bulletin (VG Ex. 16 at 156:8-21). Defendants also note that Van Gelder completed the BPD's standard form[12] in a manner that even the Plaintiff's own experts, Mr. Niemeyer and Mr. Kilty, have trouble criticizing. (*E.g.,* Niemeyer Deposition, VG Ex. 11 at 118:13 ("You'd have to select that choice"); Kilty Deposition, VG Ex. 16 at 88:12-13 ("I don't think Mr. Van Gelder engaged in misconduct").)

Plaintiff seeks stretch a disagreement among experts – among his own views even – into a fabrication claim under § 1983. The Court has serious concerns about plaintiffs using § 1983 as a vehicle for attacking the conclusions of forensic examiners who utilize procedures later improved upon by the advancement of science or whose analysis is negligent at worse. Courts sitting at summary judgment may have trouble denying inferences that a forensic conclusion is knowingly misleading or false when presented with record evidence of inaccuracies or mere negligence. To be clear, forensic examiners who improperly manipulate, suppress, or destroy physical evidence in an effort to alter the results of their

---

[11] Defendants also assert (a) judicial estoppel (VG Mot. at 18, ECF No. 183-1), which the Court declined to impose at the motion to dismiss stage (*see* Mem. Op. Mot. Dismiss 15, ECF No. 55), and (b) qualified immunity (Defs.' Reply at 34 n. 24), but the Court need not analyze the various elements of those defenses given the finding *infra.*

[12] Checking the box next to the statement, "There is a ***possibility*** that these residues were transferred from the surface of a firearm or from an object which lay immediately adjacent to a firearm during its discharge. Most probably, however, the subject's hands were immediately adjacent to a discharging firearm or were themselves used to fire the firearm . . ." (VG Ex. 3 (emphasis added)).

tests should be liable for fabricating evidence, but courts must be careful not to open the floodgates of litigation against forensic examiners whose analysis is less than perfect - and more properly challenged via cross-examination at trial.

Despite these concerns, the Court need not decide the exact contours of a § 1983 fabrication claim in the Fourth Circuit against a forensic examiner for a false scientific conclusion because Plaintiff asks this Court to find a genuine dispute between "two conflicting versions of the plaintiff's" own assertions. *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984). What's more, there is no record evidence that Van Gelder doctored or destroyed the sample or that he tampered with his equipment to obtain a specific result. The dispute over whether Van Gelder's conclusions were false – let alone fabricated – is therefore not "genuine." *Barwick*, 736 F.2d at 960.

For the same reason, Plaintiff's claim that Defendants Goldstein and Van Gelder fabricated evidence by conducting a GSR test in the first place must also fail. Plaintiff cannot proceed to trial after maintaining that only *after* Burgess' conviction did GSR science advance to a point where a GSR test would have been generally understood to be worthless, due to the ease of transfer, in case such as this. Plaintiff's GSR fabrication claim is creatively alleged but untenable on the record.

Accordingly, Defendant Van Gelder's Motion for Summary Judgment (ECF No. 183) is GRANTED, and Defendant Goldstein's Motion for Summary Judgment (ECF No. 179) is GRANTED IN PART as to the GSR fabrication claim.

### (3) Gas Tank Test

Plaintiff asserts, "Defendant Goldstein fabricated the fact that on the night of the Dyson homicide, he tapped on Burgess' gas tank and discovered it was empty." (Pl.'s Resp. 88, ECF No. 195-1.) Based on Plaintiff's comments at the hearing, this Court understands this claim to be an assertion that either Goldstein never conducted the test in the first place or that Goldstein fabricated his finding of "empty" after performing the test. According to Plaintiff, the gas tank test caused Burgess' deprivation of liberty because Goldstein testified at length at trial that the test "support[ed] the State's claim that Burgess' alibi was false and showed his consciousness of guilt." (*Id.* at 90 (citing Pl. Ex. 34, Criminal Trial Tr. at Burgess 1314).) Specifically, it refuted Burgess' statement that he was getting gas before returning to Ms. Dyson's home. (ECF No. 195-1 at 88-90.) The prosecutor then reinforced this argument in closing. (Pl. Ex. 34, Criminal Trial Tr. at Burgess 995, 1065-66.)

Defendants argue this claim was waived as Plaintiff raised it for the first time in his Response (ECF No. 215 at 30 (citing cases)) and that Goldstein's external tapping of the tank was negligent at worst – certainly not an intentional fabrication (*id.* at 31).

Plaintiff did not waive this claim given that the Amended Complaint alleges that Defendant Goldstein "fabricated false reports." (Am. Compl. ¶ 94, ECF No. 141-1.) That discovery has enabled Plaintiff to specifically identify the gas tank test as one of those reports will not prevent Plaintiff from maintaining such a claim.

On the merits, the record presents a genuine dispute of material fact as to whether Goldstein fabricated the gas tank test. Burgess maintains that he bought gas on the night of Ms. Dyson's murder and that his gas needle – but not fuel level warning light – was broken.

(Pl. Ex. 1, Burgess Dep. 12/1/16 at 209-210.)  Plaintiff also points to the fact that Goldstein acknowledged at deposition that the car had enough gas for Burgess to drive out of the police station. (Pl. Ex. 26A, Goldstein 11/9/16 Dep. at 133-134.)  Furthermore, despite his apparent lack of familiarity with fuel gauge systems,[13] Goldstein conducted the gas tank test personally, which departed from the usual practice of having an experienced evidence technician conduct such an exam. (Pl. Ex. 26, Goldstein Dep. 11/9/16 at 104-105.)  Viewing this evidence in the light most favorable to the nonmoving party, the record shows a genuine dispute as to whether the tank was in fact "empty."  Accordingly, Defendant Goldstein's Motion for Summary Judgment (ECF No. 179) is DENIED IN PART as to this claim.

### C.  Post-conviction Due Process

Both parties agree that the United States Supreme Court's decision in *District Attorney's Office for the Third Judicial District v. Osborne*, 557 U.S. 52 (2009) governs Plaintiff's post-conviction due process claim.  "The post-conviction due process inquiry asks whether the alleged conduct 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranged as fundamental,' or 'transgresses any recognized principle of fundamental fairness in operation.'" *Id.* at 69 (quoting *Medina v. California*, 505 U.S. 437, 446, 448 (1992)).

Plaintiff alleges that Defendants Patton, Neverdon, and Goldstein[14] violated *Osborne* by withholding the following post-conviction evidence – all pointing to Howard Rice's role in the murder:

---

[13] Pl. Ex. 26, Goldstein Dep. 11/9/16 at 131-133 (explaining that he did not know in 1994 and to date still does not know what a gas or low fuel light is).

[14] Goldstein was responsible for disclosing exculpatory information from the Dyson homicide file up until his departure from the BPD in 1997. (Pl. Ex. 30A, Goldstein Dep 11/1/2016 at 50-51, 56.)

      i.    An FBI 302 report ("FBI 302") explicitly implicating Howard Rice in the murder of Michelle Dyson (Pl. Ex. 67 at BPD 3377)[15];

     ii.    The "Howard Rice Homicide Chart" tracking "a series of similar murders in a small geographical area and timeframe" and indicating that Rice was a suspect in Michelle Dyson's murder despite (Pl. Resp. 31 (citing Pl. Ex. 53, Rice Homicide Chart at FBI 0008)); and

      i.    A note in the Dyson homicide file saying, "Vehicles used by Rice; Reach out to Bobby Patton relative to a statement he took from an individual after suspect was convicted" (Pl. Ex. 69, ECF No. 193-75).[16]

(*See* Pl. Resp. 97-99, ECF No. 195-1.)

Defendants assert that, as a matter of law, (1) a post-conviction due process claim was not properly pled; (2) there is no post-conviction due process right to exculpatory evidence; (3) and the Officer Defendants are protected by qualified immunity because any withholdings would not have transgressed a "clearly established" right. Addressing the factual allegations, Defendants generally argue that (4) the Plaintiff knew of the exculpatory information because Mr. Burgess' attorney spoke with the subject of the FBI 302 about the Dyson homicide (see Defs. Ex. 78 at Burgess 10171-72), or in the alternative, that (5) the Defendants satisfied due process by disclosing the FBI 302 to *other* prosecutors. (Defs. Mot. 32-38, ECF No. 179.)

---

[15] This 302 has been the subject of protective redactions in this case, so the Court provides a general description and citation rather than direct quotations.

[16] Plaintiff alleged for the first time in his Response that Defendants withheld information obtained by Patton from a confidential source. The information was allegedly recorded in an unidentified DEA file that was ultimately reviewed by Assistant State's Attorney Tony Goia (*see* Pl. Resp. 31 n.7, 98), though Goia is now uncertain as to the contents of those files (*see* Defs. Repl. Ex. 22 at 74:3-21, 82:1 to 84:11). The Court agrees with the Defendants that the Court cannot consider this evidence at this stage because it appears to "present[] insurmountable hurdles in terms of the competency . . . [and] layers of hearsay accompanying the purported document." Defs. Reply 38.

Plaintiff responds that (1) this Court already held that Burgess pleaded a post-conviction due process claim (*see* Mem. Op. 17-18, ECF No. 55); (2) that "[s]uppression of conclusive evidence that an innocent man is imprisoned for a crime committed by another person is the quintessential violation of due process" (Pl. Resp. 100, ECF No. 195-1 (citing cases)); and (3) Defendants cannot assert qualified immunity after admitting during their depositions that they had a duty to turn over exculpatory evidence discovered after a criminal trial (*id.* at 106 (citing Pl. Ex. 26, Goldstein Dep. 11/9/16, at 62; Pl. Ex. 14, Patton 11/10/16 Dep. at 150)). Regarding the factual contentions, Plaintiff argues that (4) even though Plaintiff or his attorney were aware of Howard Rice's potential involvement, they never had access to the highly exculpatory FBI 302; and (5) disclosure to a prosecutor on *another* case does not satisfy due process (Pl. Resp. 98 (citing *Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846 (4th Cir. 1964); *Kyles v. Whitley*, 514 U.S. at 437)).

Regarding Defendant's legal arguments, Plaintiff is correct to note that this Court has already resolved that he pleaded a post-conviction due process claim. (Mem. Op. 17-18, ECF No. 55.) In terms of the right at stake here, *Osbourne* does not require the Court to expound a new, technically outlined, right every time it applies the post-conviction standard to a given case. This Court has already considered and acknowledged that "continuing efforts to conceal any possibility of an alternative perpetrator," presents a viable post-conviction due process claim – one that Plaintiff must ultimately prove at trial. (Mem. Op. 17, ECF No. 55.) Burgess' own continued efforts to prove his innocence before, during, and after trial underscore that finding. In terms of qualified immunity, even though the parties do not cite and this Court has not found precedent "on all fours," courts should not grant qualified

immunity if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Hope v. Pelzer*, 536 U.S. 730, 752, 122 S. Ct. 2508, 2522, 153 L. Ed. 2d 666 (2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Defendants do not claim to be unreasonable officers, so their own admission at deposition that they should properly track and disclose post-conviction exculpatory information is fatal to their claim of qualified immunity.

Turning to the Defendants' factual contentions, the Wilson 302 and Rice Homicide Chart present explicit, specific exculpatory information. The record will require a jury to resolve whether the withheld information exceeds Burgess' own knowledge at the time and whether such information could have resulted in Burgess' earlier release from prison. Furthermore, the ultimate disclosure of the FBI 302 to the prosecutor on the Sewell case will not bar Plaintiff's present post-conviction due process action. *Barbee*, 331 F.2d at 846; *Kyles v. Whitley*, 514 U.S. at 437. Defendants' own accounts conflict as to whether and how the information was disclosed,[17] presenting another genuine dispute requiring a trial.

## III.     Malicious Prosecution (Counts II & VI)

Plaintiff pursues malicious prosecution claims against Defendants Weese, Goldstein, and Van Gelder. To maintain his federal and state malicious prosecution claims, Plaintiff must show that the Defendants "(1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in the plaintiff's favor." *Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 555 (4th Cir.

---

[17] Patton and Neverdon deny ever seeing the 302 in question, but it appeared in the case file for the Sewell investigation on which both defendants worked. (Pl. Resp. 32 (citing Pl. Ex. 36, Stine Report at 10; ECF No. 164 at 2).) Goldstein argues that he had no post-conviction disclosure obligation as the exculpatory information was never placed in the Dyson file, but Patton says he would have disclosed evidence such as the Raymond Handy interview to Goldstein. (Pl. Ex. 14, Patton 11/10/16 Dep. at 150.)

2017), *as amended* (Aug. 22, 2017). A police officer may only be found to be liable where he or she "'misled or pressured the prosecution'" to pursue charges. *Evans v Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012). When challenging the veracity of a warrant application, Plaintiff must show "that the officer(s) deliberately or with a 'reckless disregard for the truth' made material false statements in the warrant application, or omitted from that application 'material facts with the intent to make, or with reckless disregard of whether they thereby made, the [application] misleading.'" *Humbert v. Mayor & City Council of Baltimore*, 866 F.3d 546, 556 (4th Cir. 2017) (internal citations omitted).

Defendants argue that (1) Defendant Goldstein's application for Mr. Burgess' arrest warrant contains no false statements and omits no material information, and (2) there is no evidence Defendants pressured the prosecutor in any way. Plaintiff responds to the first point by arguing that the warrant application relied in part on the gas tank test, which Goldstein allegedly knew to be fabricated, and omitted much of the exculpatory evidence discussed above, especially Mr. Rainey's testimony.

This Court has already observed genuine disputes of material fact that foreclose summary judgment against Defendants Goldstein and Weese. The malicious prosecution claim against Defendant Goldstein is intricately tied to his knowledge of Mr. Rainey's exculpatory statements and to any knowledge that he fabricated the gas tank test or any other police report. The claim against Defendant Weese is similarly tied to whether he fabricated the Weese Supplemental Report.

On the other hand, this Court has already granted Defendant Van Gelder's Motion for Summary Judgment as to Plaintiff's fabrication claim, so summary judgment in Van

Gelder's favor is necessarily granted with respect to Plaintiff's malicious prosecution claims as well.

## IV.    Failure to Intervene (Count III)

The Fourth Circuit has held that a police officer may be held liable under § 1983 for failing to intervene where "he (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Randall v. Prince George's County*, 302 F.3d 188, 203-04 (4th Cir. 2002). Plaintiff alleges that all individual Defendants, except Van Gelder, Patton, and Neverdon, failed to intervene to prevent Burgess' constitutional injuries.

Defendants contend that no officer committed any constitutional violations, but if one did, that there is no evidence any other Defendant knew about it. Plaintiff responds that he has shown at least a genuine dispute as to the existence of various constitutional violations and that, despite Defendants' argument that each individual worked in silos insulated against knowledge of each other's misconduct, the roles and responsibilities of Weese (first responding officer), Goldstein (lead detective), Lehmann (supervisor who interviewed Ronald Dyson and reviewed the Dyson file's completeness), and Ritz (second detective) necessarily would have given them knowledge of and opportunity to prevent constitutional violations by other officers.

The Court has already resolved that the record will require a jury to determine whether any Defendant violated Plaintiff's constitutional due process rights. In terms of the Defendants' knowledge of each other's potential violations, Plaintiff has produced facts that, when viewed in the light most favorable to the Plaintiff, give rise to reasonable inferences

that some of the Defendants would have known of another's constitutional violation. As explained above, there is a genuine dispute as to Weese, Goldstein, and Lehmann's awareness of Mr. Rainey's eyewitness account even if they did not speak directly to him. That dispute also precludes summary judgment on this claim as to Weese, Goldstein, and Lehmann[18].

As to Defendant Ritz, the Court addressed above the lack of a genuine dispute as to Ritz's direct or second-hand knowledge of exculpatory information (namely, Mr. Rainey's statements and the FBI reports) allegedly withheld in violation of due process. That finding similarly warrants summary judgment in Ritz's favor on this count as well.

Regarding Defendants Miles, Boyd, and Palmere, the same evidence showing that these Defendants overheard Mr. Rainey's exculpatory statements, *see* Section II.a.vii. *supra*, also supports an inference that they were aware of the other officers having obtained and withheld knowledge of Rainey's statement. These individual defendants are therefore not entitled to summary judgment on this count.

## V.    Intentional Infliction of Emotional Distress (Count VIII)

In Maryland, the elements of an intentional infliction of emotional distress ("IIED") claim are: "(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; [and] (4) The emotional distress must be severe." *Lasater*

---

[18] Plaintiff also asserts – for the first time in his Response – that the same evidence makes Lehman liable as a supervisor. (Pl. Resp. 112-114.) Defendants argue this theory has been brought too late and is barred by qualified immunity in the absence of a clear law prohibiting Lehman's conduct. The *Brady* obligations in this case were clearly established at the time of Lehman's conduct, so qualified immunity does not apply, but the Court sees no reason to allow this late claim to proceed to trial. *See e.g., Williams v. Maryland,* No. DKC 09-0879, 2011 U.S. Dist. LEXIS 85619, at *13-14 (D. Md. Aug. 3, 2011) (and cases cited therein). The requisite knowledge that would give rise to Lehman's alleged supervisory liability would be sufficient to make Lehman *directly* liable under *Brady*. With the *Brady* and failure to intervene claims already proceeding, supervisory liability would needlessly triplicate the claims against Lehmann.

*v. Guttmann*, 194 Md. App. 431, 448 (2010). Defendants argue that their actions were not "extreme and outrageous."[19]  Plaintiff argues in response that "[a]n average member in the community would consider it outrageous for police officers to falsely frame, arrest and imprison an innocent citizen" (Pl. Resp. 141, ECF No. 195-1 (citing *Henry v. Ramos*, 1997 WL 610781, at *2 (N.D. Ill. Sept., 28, 1997).).  Mr. Burgess has constantly maintained that he is "an innocent citizen." (*See* Pl. Resp. 95-97.)

The record shows that Plaintiff is entitled to proceed to trial against the eight remaining Defendants – namely Defendants Weese, Goldstein, Miles, Boyd, Palmere, Lehmann, Patton, and Neverdon – for various constitutional violations resulting in his allegedly wrongful imprisonment. When this Court must draw all reasonable inferences in favor of the Plaintiff, the record indicates that a reasonable jury could find that the alleged constitutional violations constitute "extreme and outrageous" conduct.

## VI. State Due Process (Count X)

The parties agree that Article 24 of the Maryland Declaration of Rights has been read as *in pari materia* with the due process rights under the Fifth and Fourteenth Amendments of the United State Consitution. Accordingly, this count will follow the course of Count I in all respects.

---

[19] The Court has already rejected Defendants' LGTCA timeliness argument, and Defendants have abandoned their assertion of the three-year statute of limitations under state law.

# CONCLUSION

For the reasons stated above, the Original Defendants' Motion for Summary Judgment (ECF No. 179) is GRANTED IN PART and DENIED IN PART, Defendant Van Gelder's Motion for Summary Judgment (ECF No. 183) is GRANTED, and Added Defendants' Motion for Summary Judgment (ECF No. 189) is GRANTED IN PART and DENIED IN PART. Specifically, Plaintiff's *Brady*-based claims (under Counts I and X) will proceed against Defendants Weese, Miles, Boyd, Palmere, Goldstein, and Lehmann. Plaintiff's fabrication claims (under Counts I and X) will proceed against Defendants Weese and Goldstein. Plaintiff's post-conviction due process claims (under Counts I and X) will proceed against Defendants Patton, Neverdon, and Goldstein. Plaintiff's malicious prosecution claims (Counts II and VI) will proceed against Defendants Weese and Goldstein. Plaintiff's failure to intervene claim (Count III) will proceed against Defendants Weese, Miles, Boyd, Palmere, Goldstein, and Lehmann. Plaintiff's intentional infliction of emotional distress claim (Count VIII) will proceed against Defendants Weese, Miles, Boyd, Palmere, Goldstein, Lehmann, Patton, and Neverdon.

Plaintiff's abuse of process claim (Count VII) is DISMISSED.

Summary Judgment shall be ENTERED in favor of Defendants Purtell, Ritz, Van Gelder, and Skinner.

A separate Order follows.


Dated: October 31, 2017                             _____/s/_____

                                                  Richard D. Bennett
                                                  United States District Judge