| | | |
|---|---|---|
| SABEIN BURGESS, | * | |
| *Plaintiff,* | * | |
| | | Civil Case No. RDB-15-0834 |
| v. | * | |
| BALTIMORE POLICE | * | |
| DEPARTMENT, et al., | | |
| | * | |
| *Defendants.* | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiff Sabein Burgess filed suit against, *inter alia*, Defendant Gerald Goldstein and other individual officers of the Baltimore Police Department ("BPD") alleging various claims under 42 U.S.C. § 1983, Article 24 of the Maryland Declaration of Human Rights, and Maryland common law. (ECF Nos. 1, 141.) Ultimately, as a result of either Orders of this Court or by agreement between the parties as to some Defendants, only four claims against one Defendant, Mr. Goldstein, proceeded to the jury. (*See* ECF Nos. 56, 311, 312, 320, 333, 356.) On November 21, 2017, the jury returned a verdict in Plaintiff's favor on all claims and awarded him $15,000,000. (ECF No. 364.)

Presently pending are two post-trial motions: the Renewed Motion of Defendant Gerald Goldstein Under Federal Rule 50 (ECF No. 376) for Judgment as a Matter of Law and his Motion for New Trial and/or to Alter or Amend Judgment Under Federal Rule 59

(ECF Nos. 374, 411[1]). The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2016). For the reasons set forth below, the Defendant's Renewed Motion Under Rule 50 (ECF No. 376) is DENIED, and the Defendant's Motion Under Rule 59 (ECF No. 411) is also DENIED.

## BACKGROUND

Michelle Dyson was murdered on October 5, 1994. The BPD investigated the crime, and Mr. Burgess, Dyson's boyfriend at the time, was convicted by a jury in the Circuit Court for Baltimore City on June 13, 1995. At trial, Laura Brokaw (f/k/a Laura Shach) prosecuted the case as an Assistant State's Attorney for Baltimore City, and Gordon Tayback represented Mr. Burgess. The trial court sentenced Mr. Burgess to life in prison plus 20 years. While incarcerated, Mr. Burgess was sentenced to five years for rioting. (Def.'s Rule 59 Mot. Ex. M, ECF No. 411-16.) To this day, Mr. Burgess has maintained his innocence as to Michelle Dyson's murder.

In February 2014, the Circuit Court for Baltimore City granted Mr. Burgess' Petition for Writ of Actual Innocence, which the State of Maryland had not opposed, and Mr. Burgess was released after having served almost twenty years in prison. (11/17/2017 Trial Tr. at 305-306.)

Mr. Burgess filed this federal action against, *inter alia*, Defendant Gerald Goldstein and other individual officers of the Baltimore Police Department on March 23, 2015. (ECF No. 1.) Plaintiff alleges various claims under 42 U.S.C. § 1983, Article 24 of the Maryland

---

[1] Due to a technical issue with the electronic filing system, Defendant had to re-file this motion. This Court will refer to the corrected version, ECF No. 411.

Declaration of Human Rights, and Maryland common law. (*Id.*) This case proceeded through discovery and motions practice. As a result of Orders of this Court or by agreement between the parties, only five claims proceeded to trial against two individual Defendants: Gerald Goldstein and Steven Lehman. (*See* ECF Nos. 56, 311, 312, 320, 332, 333.) Plaintiff's claims for trial included (1) violations of the principles of *Brady v. Maryland,* 373 U.S. 83 (1963) in the suppression of evidence favorable to Mr. Burgess, (2) fabrication of evidence, (3) malicious prosecution, (4) failure to intervene, and (5) intentional infliction of emotional distress. (Final Pretrial Order, ECF No. 332.)

At the close of the Plaintiff's case, this Court granted in part the Defendants' Motion for Judgment as a Matter of Law. Specifically, this Court dismissed all claims against Defendant Lehman, the failure to intervene claim against Defendant Goldstein, and any claim based on Defendant Goldstein's alleged fabrication of a gas tank test. (ECF No. 356.) This Court ruled that the following claims would be submitted to the jury:

1. Plaintiff's *Brady*-based claim that Defendant Goldstein withheld (a) evidence that Brain Rainey was an exculpatory witness and (b) other exculpatory information provided by the FBI as recited in Plaintiff's Trial Exhibits 121 and 122;

2. Plaintiff's due process claim that Defendant Goldstein fabricated a police report;

3. Plaintiff's claim that Defendant Goldstein maliciously prosecuted Plaintiff through the suppression and/or fabrication of evidence other than the gas tank test; and

4. Plaintiff's intentional infliction of emotional distress claim.

(*Id.*) During the Conference on Jury Instructions, this Court adjusted the description of the first claim to include a reference to Plaintiff's Trial Exhibit 372. (11/21/2017 Trial Tr. at 11, 179.)

On November 21, 2017, the jury returned a verdict in Plaintiff's favor on all four claims and awarded Mr. Burgess $15,000,000. (ECF No. 364.) Additional relevant facts regarding the trial are discussed below.

## STANDARD OF REVIEW

Under Rule 50 of the Federal Rules of Civil Procedure, judgment as a matter of law should be granted against a party when that party "has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Coryn Grp. II, LLC* v. *O.C. Seacrets, Inc.,* 868 F. Supp. 2d 468, 483 (D. Md. 2012) (citation omitted). Rule 50 permits a litigant to renew its motion for judgment as a matter of law even after judgment has been entered. Fed. R. Civ. P. 50(b). In considering a motion under Rule 50, the court views the evidence in the light most favorable to the non-movant, *Gregg* v. *Ham,* 678 F.3d 333, 341 (4th Cir. 2012), gives that party the benefit of all reasonable inferences from the evidence, *Whalen* v. *Roanoke Cnty. Bd. of Supervisors,* 769 F.2d 221, 224 (4th Cir. 1985), and asks whether there is "substantial evidence in the record to support the jury's findings," *Anderson* v. *Russell,* 247 F.3d 125, 129 (4th Cir. 2001) (citation omitted). However, "the court may not make credibility determinations or weigh the evidence." *Reeves* v. *Sanderson Plumbing,* 530 U.S. 133, 150-51 (2000) (quoting *Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)).

A litigant may also challenge a jury verdict and/or judgment under Rule 59 of the Federal Rules of Civil Procedure, but it is an "extraordinary remedy which should be used sparingly." *See Pacific Ins. Co.* v. *American Nat. Fire Ins. Co.,* 148 F.3d 396, 403 (4th Cir. 1998). First, under Rule 59(a)(1)(A), a court may grant a new trial on all or some issues "for any

reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59. In the Fourth Circuit, a court "must set aside the verdict and grant a new trial[] if . . . (1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Knussman v. Maryland*, 272 F.3d 625, 639 (4th Cir. 2001) (citation omitted). Unlike a motion under Rule 50, when considering a motion for a new trial under Rule 59, "a trial judge may weigh the evidence and consider the credibility of the witnesses." *Poynter by Poynter v. Ratcliff*, 874 F.2d 219, 223 (4th Cir. 1989); *see also McCollum v. McDaniel*, 136 F. Supp. 2d 472, 475 (D. Md. 2001).[2]

Second, under Rule 59(e), a litigant may seek to alter or amend a judgment. Fed. R. Civ. P. 59. While Rule 59(e) does not provide a standard itself, the United States Court of Appeals for the Fourth Circuit has recognized "three grounds for amending an earlier judgment: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Pac. Ins. Co.*, 148 F.3d at 403. To be clearly erroneous, the earlier decision cannot be "just maybe or probably wrong; it must . . . strike [the Court] as wrong with the force of a five-week old, unrefrigerated dead fish." *TFWS, Inc. v. Franchot*, 572 F.3d 186, 194 (4th Cir. 2009) (quoting *Bellsouth Telesensor v. Info. Sys. & Networks Corp.*, Nos. 92-2355, 92-2437, 1995 WL 520978 at *5 n.6 (4th Cir. Sept. 5, 1995)). Whether to alter or amend a judgment under

---

[2] Mr. Burgess cites two Fourth Circuit cases that he contends stand for the rule that a court may not weigh evidence or consider credibility under Rule 59. (*See* Response at 9 n.3.) Both of these cases, however, concern the sufficiency of the evidence under Rule 50. *See Gries v. Zimmer, Inc.*, 940 F.2d 652, 1991 WL 13243 at *3 (4th Cir. 1991); *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1417 (4th Cir. 1991).

Rule 59(e) is within the sound discretion of the district court. *See, e.g., Bogart v. Chapell,* 396 F.3d 548, 555 (4th Cir. 2005).

## DISCUSSION

### I.     Rule 50 Motion

Under Rule 50, the Defendant asks this Court to grant judgment notwithstanding the verdict because the jury's findings on each claim were not supported by "substantial evidence in the record." *Anderson,* 247 F.3d at 129.

### A.     *Brady*-based Withholding

Defendant asserts that this Court should grant judgment notwithstanding the verdict "as to Burgess' *Brady*-based claims related to Brian Rainey" and "as to Mr. Burgess's *Brady*-based claims related to communications with the FBI." (Def.'s Rule 50 Mem. 5, 15.) A *Brady*-based withholding claim against a police officer requires that the plaintiff show that "(1) the evidence at issue was favorable to him; (2) the Officers suppressed the evidence in bad faith; and (3) prejudice ensued." *Owens v. Baltimore City State's Attorneys Office,* 767 F.3d 379, 396-97(4th Cir. 2014). A police officer generally "suppresses" evidence by not disclosing it to the prosecutor, *id.* at 396, but suppression does not occur when a criminal defendant is already aware of the exculpatory information. *See Barnes v. Thompson,* 58 F.3d 971, 675-76 (4th Cir. 1995); *Stockton v. Murray,* 41 F.3d 920, 927 (4th Cir. 1994).

In *Owens,* the Fourth Circuit Court of Appeals adopted the "bad faith" requirement as espoused in Judge Wilkinson's concurring opinion in *Jean v. Collins,* 221 F.3d 656, 660 (4th Cir. 2000) (Wilkinson, C.J., concurring). *Owens,* 767 F.3d at 396 n.6. According to Judge Wilkinson, "bad faith" means that the police officer(s) "intentionally withheld the evidence

for the purpose of depriving the plaintiff of the use of that evidence during his criminal trial." *Jean*, 221 F.3d at 663. Relevant considerations include: (a) the officer's actual knowledge of "the significance of the withheld evidence"; (b) the "nature of the withheld material, that would negate any negligent or innocent explanation for the actions on the part of the police"; and (c) the "concealment, doctoring, or destruction" of evidence. *Id.* at 662-663.[3]

Notwithstanding Defendant's separate requests for judgment on specific pieces of withheld evidence, the jury evaluated a single, unified withholding claim.[4] This Court therefore need *not* decide whether the evidence of *every* piece of allegedly withheld evidence was independently sufficient under Rule 50. Rather, the Defendant's withholding of one piece of evidence may support a *Brady* claim as long as there is "substantial evidence" to satisfy the elements of the cause of the action. *Anderson*, 247 F.3d at 129.

### 1.    Rainey's Eyewitness Account

Brian Rainey, Michelle Dyson's son, testified at trial that he had seen his mother arguing with two men in the entryway of his home shortly before his mother was shot. He was interviewed by police on the night of his mother's murder, and when asked if his mother's boyfriend was involved, Rainey testified that he told police officers that Mr. Burgess was not involved. (11/17/17 Trial Tr. at 229-232.)

---

[3] The Defendant devotes considerable briefing to the Eleventh Circuit's intent requirement as discussed in *Porter v. White*, 483 F.3d 1294 (11th Cir. 2007), but the Fourth Circuit's decisions in *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 396-97(4th Cir. 2014) and *Jean v. Collins*, 221 F.3d 656, 660 (4th Cir. 2000) provide more detailed (and binding) guidance on the factors to consider when analyzing bad faith in this context.

[4] (*See* 11/21/2017 Trial Tr. at 178-179 (instructing the jury on a single withholding claim)); *see also Kyles v. Whitley*, 514 U.S. 419, 440 (1995) (*Brady* claim remains unitary even though it is evaluated by viewing the individual pieces of withheld evidence in the aggregate, "not item by item"). Furthermore, Defendant did not request that the verdict form specifically identify each item of evidence withheld.

The Defendant asserts that "there is no evidence" that Mr. Goldstein was ever made aware of Brian Rainey's exculpatory eyewitness account. (Def.'s Rule 50 Mem. 6-8.) This argument is without merit. First, Defendant Goldstein, the lead detective on the Dyson homicide investigation,[5] admitted that he would have seen the children had they been there while he was on the scene. (11/15/17 Trial Tr. at 95-96.) Second, Goldstein testified that he arrived on the scene at 10:45 p.m. (11/13/17 p.m. Trial Tr. at 15.) Third, Officer John Skinner testified that the children left the scene at 11:23 p.m. (11/17/17 Trial Tr. at 174-175.) Fourth, Officer Robert Patton testified that a lead detective would normally "talk to the children that were present in a home on the night of a murder." (*See* 11/8/17 Trial Tr. at 125-126.) These four pieces of evidence support a reasonable inference to be drawn by the jury that – despite his denials – Goldstein interviewed Brian Rainey himself. Alternatively, Goldstein testified that if any other officer on the scene had interviewed Rainey, the officer would have shared that information with him. (11/13/17 p.m. Trial Tr. at 20.) Additionally, Defendant Goldstein does not deny having possession of Detective Lehmann's note indicating "Child Bryan ? a witne[ss]." (Pl.'s Trial Ex. 372) Again, the evidence supports a reasonable inference that, even if Goldstein did not interview Rainey himself, he would have been made aware that Brian Rainey was a witness with exculpatory information.

The Defendant next asserts that there is "no evidence" that the information in the "Child Bryan" note was withheld from the Office of the State's Attorney or from defense counsel Gordon Tayback. (Def.'s Rule 50 Mem. 9-13.) Defendant Goldstein points to his own testimony about his file-sharing practices, the parties' stipulation that "the complete

---

[5] (11/13/17 a.m. Tr. at 7-8 (Goldstein's testimony); 11/16/17 Tr. at 105-108 (Officer Weese's testimony).)

contents of the Prosecutorial File are unknown" (Joint Trial Ex. 503), and to Laura Brokaw's

notes saying, "brother – back room by himself . . . Sabein – told mother to go to basement"

(Def's Ex. 99). The Defendant therefore contends that "no party can establish, in total, what

was ever in the possession of [the prosecution]." (Def.'s Rule 50 Mem. 10.) The Defendant

misses the mark for several reasons. First, Defendant's logic assumes that documents are the

only method of proof available to the Plaintiff. The Plaintiff, however, elicited testimony

from Ms. Brokaw that Brian Rainey's name means nothing to her and that she doesn't

remember the Dyson children having anything to do with the murder trial. (11/16/17 Trial

Tr. at 215-216.) She also testified that Mr. Tayback was a good, diligent attorney who would

have followed up on any exculpatory lead disclosed to him. (*Id.* at 196-198.) Second,

Brokaw's note indicating that a "brother" may have heard "Sabein – [tell] mother to go to

basement" is inculpatory, not exculpatory. Given that the evidence supports a reasonable

inference that Defendant Goldstein knew Brian Rainey's account was exculpatory, the

*inculpatory* nature of the Brokaw note actually supports an inference that Defendant

Goldstein withheld the true content of Rainey's eyewitness account from both Ms. Brokaw

and Mr. Tayback.

Defendant's final argument regarding the Rainey evidence is that there is "no

evidence" that any withholding was done in bad faith. (Def.'s Rule 50 Mem. 13.) In

response, Plaintiff notes that bad faith may be established by "the nature of the withheld

material that would negate any negligent or innocent explanation for the actions of the part

of the police." *Jean*, 221 F. 3d at 663. Beyond the clearly exculpatory nature of Rainey's

eyewitness account, Plaintiff argues that ten additional pieces of evidence support an

inference of bad faith.[6] Defendant responds by challenging Plaintiff's characterization of testimony, but he also asks this Court to weigh "contradictory" evidence when considering the evidence identified by the Plaintiff. (Reply 25-32.)

As the jury was instructed (11/21/17 Trial Tr. at 180), "bad faith" simply means that the police officer(s) "intentionally withheld the evidence for the purpose of depriving the plaintiff of the use of that evidence during his criminal trial." *Jean*, 221 F.3d at 663. In this case, there was substantial evidence from which the jury could conclude that Defendant Goldstein withheld the explicitly exculpatory testimony of Brain Rainey, the victim's son. The nature of this evidence negates any innocent explanation for the Defendant's withholding. *Jean*, 221 F. 3d at 663. Furthermore, the Defendant's statement that the Dyson murder "wasn't a whodunnit" (11/13/17 p.m. Trial Tr. at 63-65) and his apparent failure to investigate Detective Patton's information about Howard Rice's confession to killing Ms. Dyson (*see* 11/8/17 Trial Tr. at 146-47) also support a reasonable inference that he was intentionally depriving Mr. Burgess of material exculpatory information in seeking – and later protecting – Mr. Burgess' conviction. The evidence related to Brian Rainey's eyewitness

---

[6] Plaintiff argues that evidence at trial showed that: (1) Goldstein admitted that his initial arrest of Mr. Burgess was made without probable cause, 11/13/17 a.m. Trial Tr. at 24-29; (2) Goldstein told witness Ron Dyson that Mr. Burgess was the primary suspect, and that he had GSR on his hands, even before the GSR test results came back, 11/15/17 Trial Tr. at 250-51; (3) Goldstein made Mr. Burgess wait in handcuffs for hours before questioning and then held him over-night in an exhausted and traumatized state – all because he had already decided Mr. Burgess was going to lie, *id.* at 58; (4) Goldstein misrepresented the methodology by which the October 6 type-written statement was created, *compare* 11/13/17 a.m. Trial Tr. at 116 with 11/17/17 Trial Tr. at 36; (5) Goldstein [allegedly] fabricated a story about having crawled under Mr. Burgess' truck and tapping the gas tank to confirm that it sounded hollow, 11/13/17 a.m. Trial Tr. at 103-05; (6) Goldstein sought consent to search Burgess' car, even after Burgess had invoked his *Miranda* right to counsel, *id.* at 39-41; (7) Despite the absence of a motive or murder weapon, Goldstein said the Dyson murder case "wasn't a whodunnit," 11/13/17 p.m. Tr. at 63-65; (8) The prosecutor had to apologize to the criminal court judge that certain documents should have been turned over far sooner than the eve of trial, 11/16/17 Trial Tr. at 198-205; (9) Goldstein did not follow up on Detective Patton's information about Howard Rice's confession to killing Ms. Dyson, 11/8/17 Trial Tr. at 146-47; and (10) Goldstein's "false explanations" at trial (*see* 11/13/17 a.m. Trial Tr. at 7-8, 49, 56-57, 99; 11/13/17 p.m. Trial Tr. at 9, 15, 22, 33, 39, 75, 77, 85; 11/15/17 Trial Tr. at 26-27, 30, 33-34) evince a "guilty state of mind," *United States v. Hughes*, 716 F.2d 234, 240–41 (4th Cir. 1983).

account, by itself, was sufficient to support the jury's verdict on the *Brady*-based withholding claim.[7]

### 2. FBI Communications

The jury's verdict on the withholding claim was also supported by evidence of FBI communications before Mr. Burgess' criminal trial. (*See* Pl.'s Exhibits G, H, Plaintiff's Trial Exhibits 121 and 122, respectively.) The first memo indicates that, according to the FBI's sources, "[t]hree subjects were involved in the murder of Michelle Dyson," two black males and black female, and "Dyson was killed because of drug related problems. She may have blown a package or drugs and/or a money package." (Pl.'s Trial Ex. 121.) The first memo further provides that "Dyson's babysitter [redacted] knows the details of the motives for the murder and preceding threats," and a name-redacted barber at Hair Dimension, Sinclair Lane Shopping Center, who fathered children with the victim is a "drug underworld player" and "knows a lot about the background of Dyson's killers." (*Id.*) The first FBI memo states that the information above was "furnished to Det. [Redacted] and Det. [Redacted] of the BPD-Homicide Unit (410) 396-2116. Det. [Redacted] is the case detective and he advised that the information appeared to be accurate and resulted in leads on the case." (*Id.*) The second FBI memo states, "[Redacted] was a babysitter for Michelle Dyson. [Redacted] witnessed numerous events and heard numerous conversations between the victim and others, which directly relate to the motive for the victim's murder." (Pl.'s Trial Ex. 122.) The second FBI memo concludes, "On 11/8/94, after 2130 hours, det. [Redacted], the case

---

[7] While the Defendant points this Court to its prior mid-trial statement that the evidence surrounding Brian Rainey's account was "thin" (Def.'s Rule 50 Mem. 6), this Court now reviews the *Brady*-based withholding claim in the light most favorable to Mr. Burgess and after lengthy closing argument and post-trial briefing. This Court is satisfied that the jury's verdict on the withholding claim was supported by substantial evidence.

detective BPD Homicide Unit (410) 396-2116 was provided with the above-stated information." (*Id.*)

The Defendant argues that (a) Mr. Goldstein never received this FBI information; (b) there is "no evidence" that the information contained in these FBI documents was withheld from the prosecutor or from Mr. Tayback; and (c) there is "no evidence" of bad faith. On each point, there is ample evidence for the jury to conclude otherwise. The fact that Goldstein was the lead detective on the Dyson case (11/13/17 a.m. Trial Tr. at 7-8; 11/16/17 Trial Tr. at 105-108) gives rise to a reasonable inference that he was the "case detective" who assessed the information in the memo, which focuses entirely on Michelle Dyson's murder. His status as the lead detective would also mean that even if another officer received this information (*e.g.*, even if Goldstein could not be directly reached at (410) 396-2116), that officer would have shared it with Goldstein. (*See* 11/8/17 Trial Tr. at 146-47.)

Additionally, Goldstein's own notes closely track information in the FBI memos, such as the identity of Troy Williams as an "old boyfriend" who "works at 'Hair Dimension' Sinclair Lane Shopping Center" and the reference to a "babysitter" for Michelle Dyson. (*See* Pl.'s Trial Ex. 10 at BPD 002674; Pl.'s Trial Exhibits 121 and 122; Resp. 21.) The Defendant's argument that his notes contain *more* information (*i.e.*, last names, addresses, and phone numbers) than the memo ignores that the memo memorializes the *prior* furnishing of *information*, not of the memo itself. The jury could therefore reasonably infer that the prior communication involved additional details not captured in the one-page note.[8]

---

[8] Defendant's awareness of additional details related to the individuals discussed in the FBI memos would also be consistent with the fact that the information "resulted in leads on the case." (Pl.'s Ex. 121.) What's more, any prior

There is also sufficient evidence that Goldstein never shared this information with Ms. Brokaw. Again, a complete Prosecutorial File is but one method of establishing what information was disclosed. At trial, Plaintiff elicited testimony from Ms. Brokaw indicating that she had no FBI-based evidence that Ms. Dyson's murder was drug-related or that there were two or three alternate suspects. (11/16/17 Trial Tr. at 223-226.)[9]

As the Defendant's bad faith argument has already been addressed above, this Court finds that the evidence of Defendant's knowledge and withholding of the exculpatory information in Plaintiff's Exhibits 121 and 122 was independently sufficient to support the jury's verdict. Defendant essentially asks this Court to view the jury's sound reasoning as mere "speculation." Especially when all reasonable inferences must be construed in the Plaintiff's favor, *Whalen*, 769 F.2d at 224, this Court must decline the Defendant's request.[10]

## B. Fabrication

Police officers violate due process when, in bad faith, they fabricate false evidence that is used to obtain a conviction. *See Washington v. Wilmore*, 402 F.3d 274, 282 (4th Cir. 2005). Plaintiff alleged that Defendant Goldstein fabricated a police report saying:

> At the time of this incident there were three children sleeping in a center bedroom. Continuing back from there is . . . a rear bedroom. In this last bedroom another child was asleep. . . The victim's four children who were asleep were turned over to the Department of Social Services.

---

awareness of some of the information in the memos is not inconsistent with the FBI providing both old and new tips to Goldstein.

[9] Brokaw's note "2 guys + Sabein Burgess" (Def.'s Ex. 99 at Burgess 3794) is both inculpatory and inconsistent with the 2 males and 1 female grouping found in Plaintiff's Exhibit 121. If, as the Defendant asserts, this note reflects Goldstein's disclosure, the jury could reasonably conclude the disclosure to Brokaw concealed the exculpatory nature of the underlying FBI information.

[10] As the Rainey and FBI evidence support the jury's verdict, this Court also declines to enter judgment in Defendant's favor simply because Plaintiff inquired into the Defendant's record-keeping and report-generating practices. (See Def.'s Rule 50 Mem. 14, 19.)

(Goldstein Office Report dated October 14, 1994, Def.'s Ex. 99 at BURGESS 3760 and 3761.)

Defendant challenges the fabrication verdict by asserting that (a) there is insufficient evidence that Mr. Goldstein knew Brian Rainey was awake; (b) Mr. Goldstein was entitled to rely upon a fellow officer's statement that the kids were asleep; (c) the statement that the children were "asleep" was literally true; and (d) there is "no evidence" of bad faith. This Court has already found that there was sufficient evidence at trial for the jury to conclude Goldstein knew Rainey was a witness and acted in bad faith when concealing (via withholding or fabrication) this fact from the prosecutor and Mr. Burgess' defense attorney. Goldstein's purported entitlement to rely on a fellow officer's report that the children were asleep is irrelevant when, as discussed above, the jury could reasonably conclude Goldstein knew that Rainey was a witness. Defendant's argument that Goldstein's report is literally true assumes that the report says Rainey was asleep "when the police arrived." The timeframe in the report, however, is "at the time of this incident." (*Id.* at BURGESS 3760.) The "incident" in question could reasonably mean either (a) the arrival of police or (b) the murder itself. The jury was entitled to view it as the latter. This Court therefore finds that the evidence of Defendant's fabrication in the Goldstein Office Report (Def.'s Ex. 99 at BURGESS 3760 and 3761) was sufficient to support the jury's verdict.[11]

## C.    Malicious Prosecution

A malicious prosecution claim requires a showing that a defendant "(1) caused

---

[11] This Court need not address the alternative ground offered by the Plaintiff (i.e., his unpleaded fabrication claim based on the October 6 type-written witness statement), because the record regarding Brian Rainey establishes "substantial evidence" to satisfy the elements of a fabrication claim. *Anderson*, 247 F.3d at 129.

(2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in the plaintiff's favor." *Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 555 (4th Cir. 2017). A police officer may only be found liable where he or she "misled or pressured the prosecution" to pursue charges. *Evans v Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012). When challenging the veracity of a warrant application, Plaintiff must show "that the officer(s) deliberately or with a 'reckless disregard for the truth' made material false statements in the warrant application, or omitted from that application 'material facts with the intent to make, or with reckless disregard of whether they thereby made, the [application] misleading.'" *Humbert*, 866 F.3d at 556.

Defendant concedes that this claim turns upon whether Goldstein omitted material facts from the warrant application. (Def.'s Rule 50 Mem. 24.) This question is intricately tied to the Defendant's knowledge of Mr. Rainey's exculpatory statements. (*Id.*) For the reasons set forth above, there was sufficient evidence at trial for the jury to reasonably conclude that the Defendant knew Mr. Rainey was an exculpatory eyewitness. The omission of this fact from the warrant application reasonably supports the jury's verdict on the malicious prosecution claim.

### D. Intentional Infliction of Emotional Distress

In Maryland, the elements of an intentional infliction of emotional distress ("IIED") tort claim are: "(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; [and] (4) The emotional distress must be severe." *Lasater v. Guttmann,* 194 Md. App. 431, 448 (2010).

Defendant again concedes that this claim is tied to the underlying due process claims and adds that Defendant's conduct did not rise to the level of "extreme and outrageous." (Def.'s Rule 50 Mem. 24.) Having determined that the jury could reasonably return a verdict on the withholding, fabrication, and malicious prosecution claims, this Court also finds that substantial evidence supported the jury's finding that Defendant's conduct was "extreme and outrageous." That is not to say that every due process violation gives rise to an IIED claim, but in this case there was evidence showing that Defendant Goldstein concealed *multiple* pieces of exculpatory evidence and that he later ignored Howard Rice's confession to the very crime for which Mr. Burgess was serving – and enduring – a life sentence.

Accordingly, this Court denies in all respects Defendant's request for judgment as a matter of law under his renewed Rule 50 motion (ECF No. 377).

## II. Rule 59 Motion

Defendant's motion under Rule 59 (ECF Nos. 411, 411-1) incorporates by reference many of the arguments in his Rule 50 motion and raises additional arguments as permitted under Rule 59. Under Rule 59(a), Defendant seeks a new trial by asserting that the verdict was against the clear weight of the evidence, the result of errors of law, and based on false evidence. Under Rule 59(e), Defendant asks this Court to alter or amend the amount of judgment in light of Mr. Burgess' rioting conviction. For the reasons set forth below, Defendant's arguments under Rule 59 are without merit.

### A. Motion for New Trial

Under Rule 59(a), a court "must set aside the verdict and grant a new trial[ ] if . . . (1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is

false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Knussman v. Maryland,* 272 F.3d 625, 639 (4th Cir. 2001) (citation omitted). Defendant raises arguments under each of these three categories.

### 1. Weight of the Evidence

Defendant argues that the jury's verdict on all four claims was against the clear weight of the evidence.

#### a) *Brady*-based Withholding

A single *Brady*-based withholding claim was submitted to the jury (*see* 11/21/17 Trial Tr. at 179-80), and Defendant argues that the any finding of liability for the Rainey testimony or the FBI communications was against the clear weight of the evidence.

In terms of the Rainey evidence, Defendant argues – in addition to the grounds raised in his Rule 50 motion – that (a) Brian Rainey and Tawanda Dyson (who corroborated Rainey's account of having told the police what he saw)[12] were not credible witnesses, (b) Dyson's government interviews discharged Goldstein's *Brady* obligations, and (c) Mr. Goldstein's testimony about his file-sharing practices was not outweighed by circumstantial evidence of any withholding. (Def.'s Rule 59 Mem. 3-12.) Regarding witness credibility, Defendant argues that this Court should disregard Rainey's *entire* testimony due to inconsistencies with other trial evidence and with his own prior statements.[13] These

---

[12] (*See* 11/16/17 Trial Tr. at 151-152.)

[13] Specifically, Defendant points to inconsistencies or implausibilities regarding (a) the number of men who entered the home to kill mother; (b) the exact location of his interview with the police; (c) documents indicating that Rainey heard Mr. Burgess tell his mother to go to the basement; (d) inaccurate statements in declarations prepared by the Mid-Atlantic Innocence Project; (e) having seen medics roll Ms. Dyson's body out of the house; (f) prior dishonest act convictions for

inconsistencies are reasonably excusable given the passage of over 20 years and the need for Mr. Rainey to recall a memory from when he was six years old. (*See* Def.'s Ex. 56 at BPD.2483.) What never changed, however, was Rainey's memory that Mr. Burgess, his mother's boyfriend, was definitively *not* among the intruders who killed his mother. (*See* 11/17/17 Trial Tr. at 229.) Defendant also fails to address the crucial credibility question: why would Rainey testify at trial to exonerate the man he either witnessed killing his mother or, if Rainey saw nothing, whom a jury convicted of having killed his mother? Furthermore, as addressed above, even if Goldstein did not personally interview Rainey, the officer(s) who did would have passed along Rainey's exculpatory account to the lead detective, Mr. Goldstein. (*See* 11/8/17 Trial Tr. at 125-126, 131-132; 11/16/17 Trial Tr. at 105-108.)

Regarding Mr. Dyson's interviews with the government, Defendant claims that because Mr. Dyson relayed to the police that Rainey was "asleep" and to the prosecutor that two additional persons were involved, it was "established" at trial that Brian Rainey's testimony to the contrary was unbelievable. (Def.'s Rule 59 Mem. 10.) First, it is reasonable to credit Rainey's personal observations over Dyson's admittedly third-hand knowledge, which had allegedly been passed from the children to other family members to Mr. Dyson. (11/15/17 Trial Tr. at 271-72, 274.) Second, as addressed above, Defendant hardly "established" at trial that Ms. Brokaw knew Rainey was a witness, let alone an *exculpatory* witness. Ron Dyson's testimony does not warrant a finding by this Court that Mr. Rainey's *entire* testimony at trial was unbelievable.

---

Mr. Rainey and Tawanda Dyson; and (g) the oldest sibling's lack of a memory of an interview on a couch or at a police station. (Def.'s Rule 59 Mem. 3-9.)

In terms of evidence that Goldstein withheld Rainey's exculpatory eyewitness account, Defendant argues that circumstantial evidence merely shows that the prosecutor, not Goldstein, failed to make disclosures. Plaintiff, however, points out that in Goldstein's deposition, which was played at trial, Goldstein admitted, "I can't say for sure that these notes were copied" when he shared his file with the prosecution. (11/13/17 p.m. Trial Tr. at 75-76 (citing Goldstein 11/9/2016 Dep. 304:20-305:7).) Additionally, as addressed above, the Plaintiff elicited testimony from Ms. Brokaw indicating that she was never made aware of Brian Rainey's status as an exculpatory eyewitness. (11/16/17 Trial Tr. at 196-198, 215-216.) That Defendant continues to insist that Rainey was asleep, which the jury evidently did not believe, further supports the view that he would not have given the prosecutor information to the contrary. This Court therefore cannot say that a finding of liability based upon the withholding of Rainey's exculpatory eyewitness account was against the clear weight of evidence. The verdict on the withholding claim will stand based upon the Rainey evidence alone, but this Court will nevertheless address the Defendant's arguments as to the FBI communications.

In terms of the exculpatory FBI information (Pl.'s Trial Ex. 121 and 122), Defendant argues that (a) the phone number in Plaintiff's Exhibits 121 and 122 was not Goldstein's number, (b) his own notes (Pl.'s Trial Ex. 10) show that – rather than having relied on the FBI – he developed the common information on his own, and (c) Mr. Goldstein's testimony about his file-sharing practices was not outweighed by circumstantial evidence of any withholding. (Def.'s Rule 59 Mem. 13-16.) This Court has already disposed of each of these contentions. To reiterate, Goldstein was the lead detective on the Dyson homicide

investigation, so the most natural reading of Plaintiff's Exhibit 121, which focuses entirely on Michelle Dyson's murder, is that Goldstein was the "case detective" who assessed the information in the memo. Even if another officer received this information (*e.g.,* even if Goldstein could not be directly reached at (410) 396-2116), the officer would have shared it with the lead detective, Goldstein. (*See* 11/8/17 Trial Tr. at 146-47.) The commonalities between the memos and Goldstein's own notes (Pl.'s Trial Ex. 10) further support the conclusion that Goldstein was made aware of the FBI information, and any additional details in Goldstein's notes are consistent with the fact that the information "resulted in leads on the case." Moreover, Goldstein admitted, "I can't say for sure that these notes were copied" when he shared his file with the prosecution, (11/13/17 p.m. Trial Tr. at 75-76 (citing Goldstein 11/9/2016 Dep. 304:20-305:7)), and Plaintiff elicited testimony from Ms. Brokaw indicating that she never received the exculpatory information in the memos. (11/16/17 Trial Tr. at 223-226.) Again, the Defendant has not established the withholding verdict was against the clear weight of the evidence.

### b) Fabrication

As this Court has noted, and the parties have consistently acknowledged, the viability of the Plaintiff's fabrication claim rises and falls with Defendant Goldstein's knowledge of Rainey's exculpatory eyewitness account. Having already determined under Rule 50 and Rule 59 that there was sufficient evidence introduced at trial from which the jury could find that Defendant Goldstein knew Rainey was an exculpatory eyewitness, this Court also finds that the jury's verdict on the fabrication claim was not against the clear weight of evidence.

### c) Malicious Prosecution

Defendant's challenge under Rule 59 to the jury verdict on the malicious prosecution claim rests entirely upon his Rule 50 arguments. (Def.'s Rule 59 Mem. 17.) Again, there was sufficient evidence that the Defendant knew Mr. Rainey was an exculpatory eyewitness. The omission of this fact from the warrant application justifies the jury's verdict on the malicious prosecution claim.

### d) Intentional Infliction of Emotional Distress

Defendant's final "weight of the evidence" challenge is also meritless. Defendant again rests entirely upon his Rule 50 arguments and concedes that this claim is tied to the underlying due process claims. (Def.'s Rule 50 Mem. 17; Def.'s Rule 59 Mem. 24.) In this case, the evidence showed that Defendant Goldstein concealed *multiple* pieces of exculpatory evidence and that he later ignored Howard Rice's confession to the very crime for which Mr. Burgess was serving – and enduring – a life sentence. The jury's verdict on the IEED claim was therefore not against the clear weight of the evidence.

### 2. False Evidence

Defendant's second line of attack under Rule 59(a) is that the jury's verdict is based upon false evidence. Defendant specifically contends that portions of Plaintiff's counsel's closing argument constituted "false evidence." (Def.'s Rule 59 Mem. 30-33.) First, Defendant asserts that, even though this Court only permitted a *Brady* claim based upon Rainey's eyewitness account and the FBI memos to go to trial, Plaintiff's counsel argued in closing that Defendant withheld "six difference pieces of exculpatory information." (11/21/17 Trial Tr. at 31.) Second, Defendant notes that Plaintiff's counsel argued an

unpleaded claim that Defendant fabricated the content of Mr. Burgess' written interview statements. Third, Defendant claims that Plaintiff's counsel "misrepresented" the content of the State's Attorney's file. Defendant contends, "The simple fact is that we do not know whether the jury improperly based its verdict on any of the new theories warrants a new trial." (Def.'s Reply 43 (citing *Jones v. Wells Fargo Bank, N.A.*, 858 F.3d 927, 932-34 (5th Cir. 2017) (reversing trial court's denial of motion for judgment as a matter of law, where jury verdict was based upon unpleaded legal theory); *Christopher v. Florida*, 449 F.3d 1360, 1365-67 (11th Cir. 2006) (finding that a grossly excessive award indicated the jury's reliance on improper closing argument).)

As the jury was instructed, however, arguments are not evidence (11/21/17 Trial Tr. at 171), and the Defendant's lengthy briefs cite no authority for this Court to consider the closing arguments under a Rule 59(a) "false evidence" challenge. Furthermore, "jurors are presumed to follow the law," *Nguyen v. Arce*, 34 F. App'x. 879, 883-84 (4th Cir. 2002), and they were instructed that the due process claims were limited to fabrication of a police report saying the children were "asleep" and to withholding Brian Rainey's testimony, the FBI memos, and information in Plaintiff's Exhibit 371. (11/21/17 Trial Tr. at 178-79.) Even if some of the evidence discussed by Plaintiff's counsel does not support a due process claim, Plaintiff's counsel simply "wasted his time and his breath on that particular evidence." (Pl.'s Resp. 55.) Unlike in *Wells Fargo*, 858 F.3d 927 or *Christopher*, 449 F.3d 1360, there has been no indication – in the form of jury questions or otherwise – that the jury's verdict was based

upon anything other than theories identified in the jury instructions. This Court declines the Defendant's request for a new trial based upon allegedly improper closing arguments.[14]

### 3. Miscarriage of Justice

Defendant also seeks a new trial based upon two forms of alleged errors of law.[15] First, he alleges this Court erred in admitting Plaintiff's Exhibits 121 and 122. Second, he contends that this Court erred in its Jury Instructions. In order for "errors of law" to warrant a new trial under Rule 59(a), the error must "result in a miscarriage of justice." *See Sergeant v. Anne Arundel Cty., Md.*, 681 F. Supp. 2d 631, 633-35 (D. Md. 2010) (quoting *Knussman*, 272 F.3d at 639); *see also* Fed. R. Civ. P. 61 (Errors in admitting or excluding evidence are not grounds for a new trial "[u]nless justice requires[.]").

### a) Plaintiff's Exhibits 121 and 122

Defendant challenges the admissibility of Plaintiff's Exhibits 121 and 122, two FBI memos, under numerous rules of evidence. These exhibits were the subject of a motion *in limine* from the Defendant (ECF No. 211), which this Court denied at the motions hearing on November 6, 2017. (11/6/17 Hr'g Tr. at 131-156; *see also* ECF No. 346 at 4.) At the hearing, the Court established that the vast majority of the information contained in the documents was offered to prove notice to the BPD rather than for the truth of the matters asserted therein. This Court therefore discussed a limiting instruction to that effect.

---

[14] To the extent Defendant's objections to Plaintiff's closing argument are more properly considered as a "miscarriage of justice" challenge, this Court further rejects Defendant's request for a new trial as there was ample evidence to support the due process claims under the narrowly tailored jury instructions. *See infra*; *United States v. Caro*, 597 F.3d 608, 631 (4th Cir. 2010), *cert. denied*, 132 S. Ct. 996 (2011) (finding that juries are presumed to follow their instructions).
[15] While a "clear error of law" is one ground for altering or amending a judgment under Rule 59(e), the Defendant asks this Court to consider the alleged errors of law in granting a "new trial," a request that is governed by Rule 59(a). Even under the "clear error" standard for Rule 59(e), none of the alleged errors come close to "strik[ing] this Court] as wrong with the force of a five-week old, unrefrigerated dead fish." *TFWS*, 572 F.3d at 194.

(11/6/17 Hr'g Tr. at 154.) Those portions of the documents regarding the *transmission* of the information to the BPD (*e.g.,* "This information was furnished to Det. [redacted]/Det. [redacted] pf the BPD-Homicide Unit (410) 396-2116," Pl.'s Trial Ex. 121.) was offered for the truth of the matter asserted. Though not briefed by the parties, all parties discussed the applicability of Rule 807 of the Federal Rules of Evidence, the "Residual Exception" to the rule against hearsay. Defendant specifically objected under Rule 807(b) that the declarant's name was redacted. (11/6/17 Hr'g Tr. at 149.) After evaluating Defendant's briefs and oral arguments, this Court admitted the hearsay portions under Rule 807. (11/6/17 Hr'g Tr. at 156.)

Defendant once again argues that the FBI memos were inadmissible, but this Court has already considered and rejected Defendant's arguments before trial. *See Sergent v. Anne Arundel Cty., Md.,* 681 F. Supp. 2d 631, 634 (D. Md. 2010) (rejecting Rule 59(a) evidentiary challenge when issue was briefed, argued, and decided before trial). This Court's prior ruling shall stand. (*Id.*) Rule 807 excepts from the rule against hearsay a statement if:

> (1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Evid. 807. Rule 807(b) requires that the proponent provide reasonable notice, "before the trial or hearing . . . of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it." *Id.*

Defendant's challenge emphasizes the notice requirement, but the admission of Plaintiffs Exhibits 121 and 122 complied with the "spirit" and purpose of 807(b)'s notice requirement, which numerous courts have applied flexibly. *c.f. United States v. Mandel*, 591 F.2d 1347, 1369 (4th Cir. 1979), *overruled en banc on other grounds*, 602 F.2d 653 (4th Cir. 1979) (acknowledging that compliance with the "sprit" of the notice requirement may justify admissibility, but declining to find the spirit fulfilled when rumor-based hearsay was admitted against a criminal defendant); *see also United States v. Simmons*, 773 F.2d 1455, 1458–59 (4th Cir. 1985) (holding ATF trace forms admissible under predecessor Rule 807); *United States v. Burdulis*, 753 F.3d 255, 264 (1st Cir. 2014); *Hicks v. Charles Pfizer & Co. Inc.*, 466 F. Supp. 2d 799, 809–10 (E.D. Tex. 2005) (holding that Rule 807(b) is satisfied "where conformity is impossible and the purpose of the rule has been satisfied" and collecting cases). Defendant directs this Court to *United States v. Taylor*, 2011 WL 13195944, at *3 (E.D. Va. Mar. 3, 2011), *aff'd*, 457 F. App'x. 282 (4th Cir. 2011), in which the District Court for the Eastern District of Virginia distinguished *Simmons*, 773 F.2d 1455, and excluded government forms where the government "never provided defense counsel the names and addresses of the individuals that prepared the [form in question]," but that *criminal* case dealt with the government's failure to produce the names and addresses of its *own* agents. In this civil case, the federal government, which is not party to this case, redacted the names in these documents before producing them to Plaintiff during discovery. Even though Plaintiff was unable to provide a name and address for the specific FBI agent declarant, the Defendant's submission of a motion *in limine* demonstrates that Defendant had adequate advance knowledge of Plaintiff's intent to use the documents at trial. Both parties had an equal – and

fair – opportunity to assess and investigate the statements contained in these documents. Additionally, unlike the rumor-based hearsay in *Mandel*, 591 F.2d at 1369, the statements here were made by an FBI agent in the normal course of business.

What distinguishes this case from *Mandel* also establishes the "most important element," circumstantial guarantees of trustworthiness. *United States v. Dunford*, 148 F.3d 385, 392-94 (4th Cir. 1998). Namely, these official, stamped FBI records written by an FBI agent were produced pursuant to a subpoena, and they record near contemporaneous communications among law enforcement agencies. There is not a shred of evidence that anyone in the FBI had any incentive to lie when writing these memos. The Defendant's final argument under Rule 807 is that the declarant's own testimony would have been the "best evidence," but Defendant completely ignores that Rule 807 limits this analysis to "other evidence that the proponent can obtain through *reasonable efforts*." Fed. R. Evid. 807 (emphasis added). Securing the declarant's testimony in this case was placed beyond the Plaintiff's reasonable efforts by the FBI's decision to conceal the declarant's name.[16] For the second time in this litigation, this Court finds that Plaintiff's Exhibits 121 and 122 were admissible under Rule 807.

Even if Rule 807 were not the appropriate hearsay exception, there has been no "miscarriage of justice" when the documents could have been admissible as business and public records under Rules 803(6) and 803(8), respectively. *See Spanierman Gallery, Profit*

---

[16] Because over 20 years have passed since Mr. Burgess' criminal trial, a time during which Mr. Burgess' criminal defense attorney has died, Mr. Burgess has had to go to great lengths to procure documents and testimony in support of his constitutional claims. When the choice is between evidence which is technically imperfect and no evidence at all, only "clear folly" would dictate a strict view depriving the jury of relevant evidence. *Sherin v. Crane-Houdaille, Inc.*, 47 F. Supp. 3d 280, 291 (D. Md. 2014). To hold otherwise would risk rewarding government agents for successfully concealing their constitutional violations while evidence dissipates.

*Sharing Plan v. Merritt*, 2003 WL 22909160, at *5 (S.D.N.Y. Dec. 9, 2003) (collecting cases regarding admissibility of FBI reports under both rules); *see also Hare v. Opryland Hosp., LLC*, DKC 09-599, 2010 WL 3719915, at *15 (D. Md. Sept. 17, 2010) (finding that police reports may be admissible under both rules).[17] As required by both Rule 803(6) and 803(8), the circumstantial guarantees of trustworthiness for these official FBI memos were more than sufficient. In terms of authentication, Plaintiff was prepared to call an FBI Record Custodian had this Court not already admitted the memos under Rule 807. (*See* ECF No. 310 at 20.)[18] There is also no miscarriage of justice when the due process claims were independently supported by the evidence of Brian Rainey's exculpatory eyewitness account.

### b) Jury Instructions

Defendant's next argument in seeking a new trial is that this Court's jury instructions were erroneous in three ways. First, he claims this Court erred by instructing the jury to consider Plaintiff's Exhibit 372 in relation to the due process claims. (Def.'s Rule 59 Mot. Mem. 24-26.) Second, he contends this Court erred by rejecting a proposed instruction on the permissible use of GSR evidence. (*Id.* 26-28.) Third, he argues that this Court should have provided a limiting instruction on evidence of uncharged or dismissed claims. (*Id.* 29-

---

[17] Defendant's citation to *Doe v. Bd. of Educ. of Prince George's Cty.*, 982 F. Supp. 2d 641, 657 n.2 (D. Md. 2013), *aff'd*, 605 F. App'x 159 (4th Cir. 2015) (citing Fourth Circuit cases holding that witness statements to police are not business or public records) in his prior motion *in limine* (ECF No. 211-1 at 5) is unavailing. Unlike in *Doe*, the statements at issue here are not witness statements to the police, but rather the FBI's *own* statements of having furnished information to the BPD.

[18] Defendant's argument under Federal Rule of Evidence 602 that the FBI agent declarant did not have personal knowledge also fails. The use of the passive voice ("was furnished") does not defeat the reasonable inference that the FBI declarant called the BPD himself or herself to share the information laid out in the remainder of the memo. (*See* Def.'s Mem. Mot. Exclude at 7, ECF no. 211-1 (acknowledging that personal knowledge may be "inferable from circumstances") (quoting Advisory Committee Notes to 1972 Proposed Rule).) Defendant's argument under Rule 403 similarly lacks merit. The documents give rise to numerous reasonable and highly relevant inferences, which the parties were free to argue and support with other evidence, regarding Goldstein's knowledge. That evidence is adverse does not make it unfairly prejudicial.

30.) In order for "errors of law" in the form of errant jury instructions to warrant a new trial, the errors must "result in a miscarriage of justice." *Sergeant,* 681 F. Supp. 2d at 633-35; Fed. R. Civ. P. 61 (Any errors by the court are not grounds for a new trial "[u]nless justice requires[.]"). None of these instructions, however, constituted an error of law, and even if they did, no prejudice or "miscarriage of justice" resulted.

The instruction that the jury may consider Plaintiff's Exhibit 372, the "Lehmann note" containing exculpatory information such as "Child Bryan ? a witne[ss]," was proper. While the note also contained other information that *may* support the already dismissed claim that Howard Rice information was withheld (*see* ECF No. 311 at 26), this Court would have invaded the province of the jury by inserting a line-by-line analysis of the exhibit. *See Noel v. Artson,* 641 F.3d 580, 587 (4th Cir. 2011) (finding it "sensible" to avoid making counsel's arguments for them with analysis of specific exhibits). Additionally, this Court immediately followed the mention of Plaintiff's Exhibit 372 with an overview of the elements of a due process withholding and/or fabrication claim. (11/21/17 Trial Tr. at 179.) Defendant does not identify any legal error in how the elements were described for the jury. This Court presumed that the jury would follow its instructions, *United States v. Caro,* 597 F.3d 608, 631 (4th Cir. 2010), *cert. denied,* 132 S. Ct. 996 (2011) (citing *United States v. Alerre,* 430 F.3d 681, 692 (4th Cir.2005); *Richardson v. Marsh,* 481 U.S. 200, 206 (1987)), to identify which parts of Plaintiff's Exhibit 372 supported a due process claim. The instruction itself was therefore not erroneous.

The Defendant's insistence at trial that "Little Man" was not Howard Rice (11/9/17 Trial Tr. at 78, 246-247; 11/21/17 Trial Tr. at 88) undermines his argument that Plaintiff's

counsel's "Little Man" arguments contravened this Court's Order, which assumed that "Little Man" was a nickname for Howard Rice. (ECF No. 311 at 26.) This Court therefore does not view counsel's arguments as an improper violation of a court order. If the "Little Man" reference in Plaintiff's Exhibit 372 was insufficient to support a due process claim, counsel simply wasted his breath. Moreover, there has been no prejudice or "miscarriage of justice" when this Court accurately enumerated the elements of the withholding and fabrication claims, *see Sturges v. Matthews,* 53 F.3d 659, 661-63 (4th Cir. 1995) (finding no prejudice from extraneous instruction when underlying elements were properly provided), and when the jury's verdict was independently supported by other evidence.

This Court's rejection of the requested limiting instruction regarding GSR evidence was also proper. The Defendant submitted the following instruction:

> The gunshot residue evidence in this case has been presented by the Plaintiff in support of his claim for damages based on his alleged innocence. It has not been offered and cannot be considered in deciding liability against the Defendants.

*See* ECF No. 351 at 48. At the instruction conference, this Court rejected the instruction because it would confuse the jury. (11/20/17 Trial Tr. at 370.) The Defendant's brief has not changed this Court's view, especially when the instruction on the due process claims excluded GSR evidence as potential ground for liability. (*See* 11/21/17 Trial Tr. at 178-79.) Defendant's claim of prejudice on this count is also meritless. He complains of having made strategic decisions based upon an alleged "agreement" the instruction would be provided. At the motions hearing, however, this Court indicated that it would "consider" a requested instruction on GSR evidentiary value. (11/6/17 Hr'g Tr. at 184-185.) Defendant had no

guarantee the instruction would be given, so his strategic decisions assumed the risk that this Court would decline to provide the instruction. The denial did not result in a "miscarriage of justice" as the jury is presumed to have followed this Court's guidance on the viable due process claims. *Caro,* 597 F.3d at 631.[19]

For the same reason, Defendant's claim of error regarding a rejected instruction on uncharged or dismissed claims is meritless. This Court effectively provided the jury with the requested guidance (*see* Def.'s Rule 59 Mot. Mem. 29) by specifically identifying three forms of allegedly withheld evidence and one allegedly fabricated police report. (11/21/17 Trial T. at 178-79.) The requested instruction was therefore "substantially covered by the court's charge to the jury." *Noel v. Artson,* 641 F.3d at 586 (citing *United States v. Lighty,* 616 F.3d 321, 366 (4th Cir. 2010)). This Court struck a "sensible" balance as identifying additional, extraneous pieces of evidence would only confuse the jury. *See Noel,* 641 F.3d at 587. Again, the Defendant has not overcome the presumption that the jury followed the narrowly tailored due process instructions. Furthermore, there has been no "miscarriage of justice" when the withholding and fabrication claims were independently supported by the evidence of Brian Rainey's exculpatory eyewitness account and the evidence of the FBI memos.

**B.      Motion to Alter or Amend the Amount of Judgment**

Under Rule 59(e), Defendant seeks to alter or amend the amount of judgment based upon the Plaintiff's five-year "concurrent" sentence for rioting while he was serving almost

---

[19] This finding is also supported Defendant's failure to meet any of the appellate review requirements for rejected jury instructions, namely that the requested instruction "(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired" that party's ability to make its case. *Noel v. Artson,* 641 F.3d 580, 586 (4th Cir. 2011), citing *United States v. Lighty,* 616 F.3d 321, 366 (4th Cir. 2010).

twenty years of his lifetime plus twenty sentence. (Def.'s Rule 59 Mot. Mem. 34-35.) Specifically, he requests that this Court reduce the judgment from $15 million to $11,153,846.14. (*Id.* 35.) He cites a case from the United States Court of Appeals for the First Circuit, *Olsen v. Correrio*, 189 F.3d 52, 66-70 (1st Cir. 1999), for the proposition that a concurrent sentence during wrongful imprisonment breaks the causal link for the time concurrently served. Plaintiff argues, despite his earlier concession to the contrary (*see* ECF No. 311 at 19 n.6), that the sentence was consecutive. Mr. Burgess also argues that he "never would have been present in the yard at all had he not been [wrongfully convicted]." (Pl.'s Resp. 62.)

Notwithstanding Plaintiff's counsel's prior comments, the Circuit Court Commitment Record establishes that the rioting conviction would be served "consecutive to the last sentence to expire of all outstanding and unserved Maryland sentences." (Pl.'s Ex. Q, ECF No. 385-18.)[20] The parties have not presented a clear record of how the state court handled the consecutive sentence upon Mr. Burgess' release, but the status of the consecutive sentence has no bearing on this Court's consideration of the damages related to the

---

[20] Even if the sentence were concurrent, a tort-based causation analysis precludes a reduced judgment in this case. *See Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (finding that causation in constitutional tort cases, like in common law tort cases, "require[s] a demonstration of both but-for and proximate causation.") The First Circuit case, *Olsen*, 189 F.3d 52, does not apply because the purportedly "concurrent" sentence barring incarceration damages in that case was actually a *subsequent* sentence of "time served" after a nolo plea to the *same crime.* The First Circuit therefore found that the earlier, invalid conviction was no longer a but-for cause of the time served in prison. *Id.* at 66-67. This case, however, involves a rioting conviction during the service of an invalid sentence, and none of the nearly twenty years' imprisonment would have been served absent Defendant's misconduct. Defendant essentially argues that the rioting conviction was a *superseding* cause of five years' imprisonment, but any link in a causal chain must *itself* operate as a but-for cause of the plaintiff's injury. *See Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F.Supp.2d 334, 354 (D. Md. 2011) (discussing Maryland tort law principles regarding superseding causes); *Sindler v. Litman*, 166 Md. App. 90, 116, (2005) (finding that an intervening force constitutes a superseding cause only if "it alone, without [Defendant's misconduct] contributing thereto in the slightest degree, produces the injury."). Given that Burgess was serving a life sentence up until the time he was released, Defendant cannot establish that Plaintiff's rioting conviction operated as a but-for, let alone superseding, cause of any time Mr. Burgess spent in prison.

Plaintiff's nearly twenty-year wrongful imprisonment for Michelle Dyson's murder.[21] The possibility of parole on the rioting sentence also weighs against any offset in this case. The Defendant's request for a reduced judgment is denied.

## CONCLUSION

For the reasons set forth above, the Defendant's Renewed Motion Under Rule 50 (ECF No. 376) is DENIED, and the Defendant's Motion Under Rule 59 (ECF No. 411) is also DENIED. Because Plaintiff's only remaining claim, the bifurcated *Monell* claim against the Baltimore Police Department, remains STAYED (ECF No. 408), the entire case will now be STAYED pending resolution of any and all appellate proceedings related to the verdict on November 21, 2017.

Dated: March 9, 2018

_Richard D. Bennett_
United States District Judge

---

[21] Even if the state court retroactively declared or declares "time served," the Defendant's misconduct remains a but-for and proximate cause of Plaintiff's injury. *See supra*, n.20. Put simply, a free man has no prison in which to riot.